UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**TO BE FILED
UNDER SEAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Arbitration of          :  Docket No. _____

SECURITY INSURANCE COMPANY OF HARTFORD  :
Itself and as Successor in Interest to
THE FIRE AND CASUALTY INSURANCE COMPANY  :
OF CONNECTICUT and THE CONNECTICUT
INDEMNITY COMPANY,                      :

                               :
                       Petitioner,   :  **PETITION FOR ORDER
                                   :  COMPELLING
        -against-                :  ARBITRATION**

COMMERCIAL RISK REINSURANCE COMPANY     :
LIMITED (BERMUDA) and COMMERCIAL RISK RE-
INSURANCE COMPANY (VERMONT),           :

                               :
                       Respondents.   :
                               : .

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Petitioner, Security Insurance Company of Hartford, itself and as successor in interest to

the Fire and Casualty Company of Connecticut and the Connecticut Indemnity Company,

("SICH" or "Petitioner"), by its attorneys Stroock & Stroock & Lavan LLP, respectfully

petitions this Court for an order compelling Respondents Commercial Risk Reinsurance

Company Limited (Bermuda) ("Commercial Risk Bermuda") and Commercial Risk Re-

insurance Company (Vermont) ("Commercial Risk Vermont") (together, "Commercial Risk" or

"Respondents") to arbitrate in accordance with the terms of their written agreements with

Petitioner, as follows:

**INTRODUCTION**

       1.      This dispute relates to five Quota Share Reinsurance Contracts (the "Treaties"),

pertaining to three insurance programs, the HPP Workers Compensation Program ("HPP"), the

NHE Workers Compensation Program ("NHE") and the ORS Workers Compensation Program ("ORS"), incepting on various dates between March 1, 2000 and September 2001. Pursuant to the Treaties, Respondents agreed to reinsure workers compensation policies underwritten by program managers HPP, NHE and ORS and issued by Petitioner. The terms of the Treaties are identical in all material respects other than program name, quota share percentage, inception date and limits of liability.

2.    Disputes arose under the Treaties when Respondents refused to pay losses thereunder in response to Petitioner's demand and Petitioner commenced arbitration by filing three demands – one for each program. Petitioner seeks in excess of $6.4 million with respect to these programs.

3.    After the parties agreed to consolidate the three disputes into one arbitration to be conducted in New York – which they denominated the "Non-DIG Arbitration" to distinguish it from another simultaneously pending arbitration between the parties relating to the DIG Workers compensation program (the "DIG Arbitration") – the parties selected arbitrators in accordance with the terms of the Treaties.

4.    Each party selected one arbitrator and with significant input from the parties, those party selected arbitrators chose a third, "neutral" Umpire. At that time, the parties had already selected and accepted arbitrators for the DIG Arbitration. The arbitrators selected by the parties for the Non-DIG Arbitration were identical to those chosen for the DIG Arbitration.

5.    At the Non-DIG organizational meeting at which the arbitrators disclosed their contacts with the parties and their counsel for the purpose of clearing conflicts, the parties accepted the three selected arbitrators for the Non-DIG Arbitration.

6.      After Respondents received an adverse decision in the DIG Arbitration awarding Petitioner over $22 million (as to which they have since sought vacatur), the arbitrator appointed by Respondents withdrew from the Non-DIG Arbitration without any explanation. As there were no motions pending before the panel, and no evidence had been submitted in the Non-DIG Arbitration, the remaining panel members and Petitioner requested that Respondents appoint a substitute arbitrator. Petitioners and the remaining panel members requested that the appointment be made quickly so that the arbitration hearing, which had already been postponed nearly four months to accommodate the schedule of Respondents' party appointed arbitrator, could proceed as scheduled on June 25, 2007.

7.      Although Respondents appointed a substitute arbitrator in response to the request of the remaining panel members and Petitioner, in apparent response to the fact that they received an adverse decision from the panel in the DIG Arbitration, they have insisted that the Non-DIG Arbitration proceed ab initio with a new panel – that is, that Petitioner appoint an arbitrator (or re-appoint the previously selected arbitrator) and that Umpire selection commence anew. The Umpire, however, was duly selected in accordance with the Treaties, which do not provide for replacement of the Umpire upon substitution of a party appointed arbitrator.

8.      Respondents' newly appointed arbitrator candidate has refused to disclose information relating to conflicts so as to demonstrate that he is a suitable and disinterested arbitrator as required to be appointed under the Treaties, and has refused to indicate whether he is available for the June 25-29, 2007 hearing dates. For their part, Respondents have indicated that they will not proceed with arbitration on the scheduled and agreed-upon June 25-29, 2007 hearing dates.

3

## THE PARTIES

9.      SICH is an insurance company organized under the laws of the State of Delaware, with its principal place of business in Charlotte, North Carolina.

10.     Upon information and belief, Respondent Commercial Risk Bermuda is a reinsurance corporation, organized under the laws of Bermuda with its principal place of business in Pembroke, Bermuda.  Commercial Risk Bermuda maintains offices in New York, New York.

11.     Upon information and belief, Respondent Commercial Risk Reinsurance Vermont is a corporation duly organized under the laws of the State of Vermont, with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

12.     Pursuant to 9 U.S.C. § 202, this proceeding involves a contractual relationship that falls under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-208, because the Arbitration is not entirely between citizens of the United States.

13.     The Treaties are agreements between Petitioner and Respondents, pursuant to which Respondents, as subscribing reinsurers, accepted a quota share of the interests and liabilities of Petitioner.

14.     The Treaties evidence transactions in commerce within the meaning of the Federal Arbitration Act, 9 U.S.C. §§ 1-16.

15.     This Court has jurisdiction to hear this matter pursuant to 9 U.S.C. §§ 1, 2, 4, 203 and 28 U.S.C. § 1331.

16.     This Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1332(2) as this is a dispute between a citizen of North Carolina and citizens of New York and Bermuda.

4

17.     The amount in controversy exceeds $75,000, exclusive of interest and costs.

18.     The Non-DIG Arbitration is venued in New York, New York.

19.     Respondents Commercial Risk Bermuda and Commercial Risk Vermont reside in this judicial district.

20.     This judicial district is where a substantial part of the events or omissions giving rise to the claim occurred.

21.     Venue in this Court is proper pursuant to 9 U.S.C. § 204 and § 1391.

## FACTUAL BACKGROUND

22.     SICH, Commercial Risk Bermuda and Commercial Risk Vermont entered into a Quota Share Reinsurance Contract incepting May 1, 2000, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont assumed a 90% and 10% quota share respectively of losses arising out of the HPP Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (the "2000 HPP Treaty"). A copy of the 2000 HPP Treaty is annexed as Exhibit 1 to the Declaration of Michele L. Jacobson ("Jacobson Dec."), which is annexed to this Petition as Exhibit A.

23.     SICH, Commercial Risk Bermuda and Commercial Risk Vermont entered into a Quota Share Reinsurance Contract incepting incepting May 1, 2001, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont assumed a 90% and 10% quota share respectively of losses arising out of the HPP Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (the "2001 HPP Treaty" and together with the "2000 HPP Treaty", the "HPP Treaties"). A copy of the 2001 HPP Treaty is annexed as Exhibit 2 to the Jacobson Dec.

24.     SICH, Commercial Risk Bermuda and Commercial Risk Vermont entered into a Quota Share Reinsurance Contract incepting March 15, 2000, pursuant to which Commercial

5

Risk Bermuda and Commercial Risk Vermont assumed an 80% and 20% quota share respectively of the losses arising out of the NHE Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (the "2000 NHE Treaty"). A copy of the 2000 NHE Treaty is annexed as Exhibit 3 to the Jacobson Dec.

25.     SICH, Commercial Risk Bermuda and Commercial Risk Vermont entered into a Quota Share Reinsurance Contract incepting March 15, 2001, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont assumed an 80% and 20% quota share respectively of the losses arising out of the NHE Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (the "2001 NHE Treaty" and together with the 2000 NHE Treaty, the "NHE Treaties"). A copy of the 2001 NHE Treaty is annexed as Exhibit 4 to the Jacobson Dec.

26.     SICH, Commercial Risk Bermuda and Commercial Risk Vermont entered into a Quota Share Reinsurance Contract incepting September 1, 2001, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to assume an 80% and 20% quota share respectively of the losses arising out of the ORS Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (the "ORS Treaty"). A copy of the ORS Treaty is annexed as Exhibit 5 to the Jacobson Dec.

27.     The Treaties are identical in all material respects other than program name, quota share percentage, limits and inception date. The Arbitration Clause in the Treaties (Article 32) provides:

> As a condition precedent to any right of action hereunder, any dispute or difference between the Company [SICH] and any Reinsurer [Commercial Risk] relating to the interpretation or performance of this Contract, including its formation or validity, or any transaction under this Contract, whether arising before or after termination, shall be submitted to arbitration.

\* \* \*

> Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator. If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration, the requesting party may appoint a second arbitrator.

\* \* \*

> All arbitrators shall be active or retired officers of insurance or reinsurance companies, or Lloyd's London Underwriters, and disinterested in the outcome of the arbitration.

\* \* \*

> The decision in writing of a majority of the arbitrators shall be final and binding upon both parties.

See Jacobson Dec., Exhibits 1-2 at 18-19, Exhibits 3-4 at 16-17, Exhibit 5 at 22-23.

28.    In August 2005, SICH served Commercial Risk Bermuda and Commercial Risk Vermont with separate Demands for Arbitration under the HPP Treaties, the NHE Treaties and the ORS Treaty (the "Arbitration Demands") as a result of Commercial Risk's failure to pay amounts due to SICH under the Treaties. Copies of the Arbitration Demands are annexed as Exhibit 6 to the Jacobson Dec.

29.    In accordance with the terms of the Treaties, in its Arbitration Demands, SICH identified Martin Haber, the former Chief Legal Officer of the Continental Corporation (now CNA), as its party appointed arbitrator for each of the disputes, and requested that Commercial Risk appoint an arbitrator.

30.    In the course of transmitting the Arbitration Demands, SICH advised Commercial Risk that it would consent to consolidation of the three disputes if Commercial Risk so consented. See Jacobson Dec., Exhibit 7.

7

31.    By letter dated September 15, 2005, counsel for Commercial Risk appointed Theodor Dielmann, a former officer of Hannover Reinsurance Company, as its party appointed arbitrator for each of the disputes.  See Jacobson Dec., Exhibit 8.

32.    By mid-November, 2005, counsel for SICH and Commercial Risk had agreed to consolidate the three disputes into one arbitration.  See Jacobson Dec., Exhibits 9 and 10.

33.    In accordance with the procedure agreed upon by the parties and both Messrs. Haber and Dielmann, and as commonly done in the reinsurance industry, the parties exchanged lists of acceptable Umpire candidates, which were narrowed to one mutually acceptable Umpire candidate per party.  See Jacobson Dec., Exhibits 9 and 10.

34.    As part of the Umpire selection process, counsel for SICH and Commercial Risk jointly sent out questionnaires to all of the proposed Umpire candidates in order to ascertain whether any of them had conflicts that would render them "interested," or scheduling issues which would prevent the prompt scheduling of a hearing.  See Jacobson Dec., Exhibit 11.

35.    The Umpire was to be chosen from the list of the party who successfully predicted whether the last digit of the Dow Jones index on a selected day was odd or even.

36.    Based on this agreed-upon process, on or about March 1, 2006, the parties selected Mr. David Thirkill to be the Umpire in this dispute.

37.    On or about March 1, 2006, Mr. Thirkill accepted the appointment as Umpire in the Non-DIG matter and began attempting to schedule an organizational meeting for later that month.  See Jacobson Dec., Exhibit 12.

38.    The Non-DIG organizational meeting was thereafter scheduled for March 28, 2006.

39.     At the March 28, 2006 organizational meeting for the Non-DIG Arbitration, the party appointed arbitrators, Mr. Haber and Mr. Dielmann, and the jointly selected Umpire, Mr. Thirkill, disclosed their contacts with the parties, counsel and potential witnesses by referencing their disclosures in the simultaneously pending DIG Arbitration.  See Jacobson Dec., Exhibit 13 at 3-4 and Exhibit 14 at 4-17.

40.     Through the same process used by the parties in connection with this Arbitration, the identical Panel of three arbitrators had been selected previously to preside over the DIG Arbitration between the parties under two Quota Share Reinsurance Contracts relating to the DIG Workers Compensation Program.

41.     Several months earlier, at the DIG Arbitration organizational meeting, the DIG Arbitration was scheduled for a Hearing during the week of December 11, 2006.

42.     After the panel members completed their disclosures during the Non-DIG organizational meeting, the parties formally accepted the Panel on the record for the Non-DIG Arbitration.  See Jacobson Dec., Exhibit 13 at 4.

43.     During the Non-DIG organizational meeting, the parties also executed a Hold Harmless Agreement, in which they stipulated that the arbitrators had been appointed, that they found the arbitrators to be without conflicts and that they accepted the Panel.  A copy of the executed Hold Harmless Agreement is annexed as Exhibit 15 to the Jacobson Dec.

44.     After consultation with the parties, the Panel scheduled the Non-DIG Arbitration Hearing for the week of March 5, 2007.

45.     As of March 2006, the Panel in the Non-DIG Arbitration, as well as the DIG Arbitration, consisted of Messrs. Haber, Dielmann, and Thirkill.

9

46.     Immediately following the organizational meeting for the Non-DIG Arbitration, the Panel heard oral argument on SICH's motion for pre-hearing security in both the DIG and Non-DIG Arbitrations.

47.     The Panel issued a single oral decision resolving both motions and awarding pre-hearing security in the amount of the claim (less security already held by SICH), without interest, in favor of SICH.  The Panel followed up its oral ruling with separate written security awards in each of the DIG and Non-DIG Arbitrations.

48.     In November 2006, SICH was advised that, due to the illness of Commercial Risk's party appointed arbitrator, the DIG Arbitration Hearing would have to be postponed from the December 2006 date.

49.     The parties and the Panel thereafter agreed to conduct the DIG Arbitration Hearing during the March 2007 week originally scheduled for the Non-DIG Arbitration Hearing and re-schedule the Non-DIG Arbitration Hearing to the week of June 25, 2007.  See Jacobson Dec., Exhibit 16.

50.     The DIG Arbitration Hearing proceeded as re-scheduled on March 5, 2007.  On March 11, 2007, a majority of the Panel issued an Award in the amount of $20,754,990 plus interest in the amount of $1,300,000, in favor of SICH (the "DIG Award").  A copy of the DIG Award is annexed hereto as Exhibit 17 to the Jacobson Dec.

51.     On March 20, 2007, Commercial Risk's party arbitrator, Theodor Dielmann, advised the parties and the other Panel members by email of his withdrawal as arbitrator from the Non-DIG and DIG Arbitrations "[a]fter in-depth deliberation."  A copy of Mr. Dielmann's March 20, 2007 email is annexed as Exhibit 18 to the Jacobson Dec.

10

52.     Mr. Dielmann's withdrawal email contained no explanation for his withdrawal. See Jacobson Dec., Exhibit 18.

53.     Thereafter, on March 20, 2007, on behalf of the remaining panel members, the Umpire, Mr. Thirkill, noted Mr. Dielmann's withdrawal as party-appointed arbitrator for Commercial Risk and requested that "Commercial Risk appoint a replacement as soon as possible." Mr. Thirkill also requested, on behalf of the remaining panel members, that Commercial Risk "appoint a replacement as soon as possible." Mr. Thirkill pointed out that since the Non-DIG Hearing was not scheduled to start for over three months, there would be no need for a postponement unless the parties agreed otherwise. See Jacobson Dec., Exhibit 19.

54.     In response to Mr. Thirkill's email, SICH's counsel advised that it "[did] not agree to a postponement of the hearing dates."

55.     In response to Mr. Thirkill's e-mail, Commercial Risk's counsel responded "Thanks for this, which we have noted." See Jacobson Dec., Exhibit 20.

56.     In light of Mr. Dielmann's reference to "in depth deliberation," on March 20, 2007, SICH's counsel requested that Commercial Risk's counsel disclose any information or conversations it or its client had with Mr. Dielmann regarding his withdrawal. SICH also reaffirmed its commitment to the June 25-29 Non-DIG Arbitration Hearing dates. See Jacobson Dec., Exhibit 21.

57.     Commercial Risk refused to respond to SICH's request for information about Mr. Dielmann's withdrawal. Commercial Risk noted SICH's commitment to, but did not confirm that it would proceed on, the scheduled and agreed-upon hearing dates. See Jacobson Dec., Exhibit 22.

58.    By letter dated March 27, 2007, SICH's counsel inquired regarding the status of Commercial Risk's appointment of a replacement arbitrator, and advised Commercial Risk that it would seek court appointment of a replacement arbitrator if, within ten days, Commercial Risk did not appoint a replacement arbitrator who satisfied all applicable requirements and was available for a hearing during the week of June 25, 2007. See Jacobson Dec., Exhibit 23.

59.    On April 1, 2007, Umpire David Thirkill also inquired regarding the status of Commercial Risk's efforts to appoint a replacement. Mr. Thirkill noted that he and Mr. Haber believed that the replacement should be made as soon as possible. He requested that Commercial Risk advise of the replacement by April 4, 2007. See Jacobson Dec., Exhibit 24.

60.    By letter dated April 5, 2007, Commercial Risk advised SICH that it had appointed Peter Gentile as arbitrator for the Non-DIG Arbitration. A copy of the April 5, 2007 letter from Commercial Risk's counsel to SICH's counsel, which was copied to Mr. Haber and Mr. Thirkill, is annexed as Exhibit 26 to the Jacobson Dec.

61.    Despite the fact that SICH had selected its party arbitrator, Martin Haber, in its Arbitration Demands and the parties had jointly selected Umpire David Thirkill, and both Messrs. Haber and Thirkill had been accepted by the parties, Commercial Risk requested that SICH confirm its re-appointment of Mr. Haber as arbitrator and advised that, upon such confirmation, Mr. Gentile would contact Mr. Haber to undertake the selection of a new Umpire.

62.    On that same date, Commercial Risk filed a petition in the United States District Court for the Southern District of New York in connection with the DIG Arbitration, seeking to vacate the Panel's award. Commercial Risk Reinsurance Co. Ltd. v. Security Ins. Co. of Hartford, No. 07-Civ-2772 (S.D.N.Y. filed April 5, 2007)(Marrero, J.).

12

63.    Commercial Risk simultaneously filed an Order to Show Cause for a Preliminary Injunction to prevent SICH from drawing down on the pre-hearing security posted by Commercial Risk in order to satisfy a portion of the DIG Award.

64.    After considering papers submitted by Commercial Risk and SICH, and hearing oral argument on Commercial Risk's Motion for a Preliminary Injunction to restrain SICH from drawing down on pre-hearing security to partially satisfy the DIG Award, on April 9, 2007, the Court ruled from the bench that Commercial Risk had not satisfied any of the requirements for injunctive relief and denied Commercial Risk's motion.

65.    The Court held that:

> In view of what is at stake -- which is essentially a money dispute -- the money dispute is literally resolvable by the party that may win on the merits ultimately paying back what may have been improperly drawn down, if in fact the plaintiffs were to prevail on the merits. I don't see where that irreparable harm comes in. Plaintiffs indicate that their view of the irreparable harm enters in the issue of what they characterize as the improper or abuse of the process. Again, I'm not persuaded that that is the case here. Under the applicable doctrine, the arbitrators have a fairly extensive latitude to interpret the scope of arbitration and make appropriate rulings concerning on that scope. Those determinations ordinarily are entitled to substantial deference by the Court except as has been indicated in the cases of clear abuse of legal acts or illegal acts or other forms of impropriety.
>
> I don't believe that there is sufficient evidence that the standard has been met here. On those grounds, the issue of whether or not the arbitrators improperly excluded evidence, in my view, has not been compellingly demonstrated to the point warranting the extraordinary remedy not only of denial of the confirmation of [the] arbitration award but also of granting of preliminary injunctive relief.
>
> I also do not believe that the plaintiffs are likely to succeed on the merits given the language of the contract that is at issue here, the parties' agreements, and I also am not persuaded that there are sufficient issues going to the merits as to make the plaintiff's claims later on for litigation and the balance of equities tilting decidedly in the plaintiff's favor because the Court believes that in

13

> the reading of the contract that there is sufficient support in the
> underlying agreements for the posting of the letter of credit and for
> the draw down of the letter of credit absent a confirmation award.

See Jacobson Dec., Exhibit 27 at 25-26.

66.    On April 11, 2007, the Court issued a written Order denying the Preliminary

Injunction Motion. See Commercial Risk Reinsurance Co. Ltd. v. Security Ins. Co. of Hartford,

No. 07-Civ-2772 (S.D.N.Y. April 11, 2007)(slip op.)(Marrero, J.), a copy of which is annexed as

Exhibit 28 to the Jacobson Dec.

67.    In order to determine whether Mr. Gentile was qualified to serve as an arbitrator

under the terms of the Treaties, on April 9, 2007, SICH's counsel requested that Mr. Gentile

complete an arbitrator questionnaire in the form that had been used previously by the parties in

connection with Umpire selection. See Jacobson Dec., Exhibit 29.

68.    Commercial Risk's counsel responded on behalf of Mr. Gentile and advised that

he would not fill out the questionnaire and provide the requested information until a new panel

was constituted.  Commercial Risk's counsel also intimated that it was reneging on its previous

agreement to the June 25-29, 2007 Non-Dig Arbitration Hearing date. See Jacobson Dec.,

Exhibit 30.

69.    Thereafter, SICH's counsel requested a response directly from Mr. Gentile and, in

light of Commercial Risk's indication that it was unlikely to proceed on the scheduled hearing

dates, queried Mr. Gentile's availability for a hearing on the June 25-29, 2007 dates. See

Jacobson Dec., Exhibit 30.

70.    On April 12, 2007, Mr. Gentile responded to SICH's counsel by email.  He

advised that he would "disclose any potential conflicts at the appropriate time." He further stated

that Commercial Risk had directed him to contact Mr. Haber to "agree on a process for selecting

the third arbitrator" and that when the third Arbitrator was selected the Panel would meet with

14

counsel to "select a mutually convenient date for the Arbitration Hearing." A copy of the April 12, 2007 email from Mr. Gentile is annexed as Exhibit 31 to the Jacobson Dec.

71.    Thereafter, Commercial Risk demanded in writing that SICH appoint an arbitrator within thirty (30) days, despite the fact that, as Commercial Risk was well aware, SICH had appointed Mr. Haber in its Arbitration Demands. See Jacobson Dec., Exhibit 32.

72.    The parties duly selected Messrs. Haber and Thirkill as Arbitrators in accordance with the provisions of the Treaties.

73.    The parties duly accepted Messrs. Haber and Thirkill as Arbitrators in the Non-DIG Arbitration.

74.    At no time has Mr. Haber withdrawn as Arbitrator in this matter.

75.    At no time has Mr. Thirkill withdrawn as Arbitrator in this matter.

76.    The rulings on SICH's motion for pre-hearing security in the DIG and Non-DIG Arbitrations were by a two to one majority of the Panel.

77.    The DIG Award was issued by a two to one majority of the Panel.

78.    Commercial Risk is dissatisfied with the rulings issued thus far by the Arbitration Panels in the DIG and Non-DIG Arbitrations.

79.    Commercial Risk seeks to replace Mr. Thirkill as Umpire in the Non-DIG Arbitration in an attempt to depose an Umpire who appears to have ruled against it.

80.    The Treaties do not provide for Umpire replacement upon withdrawal and replacement of a party appointed arbitrator.

81.    There are no motions pending in the Non-DIG Arbitration.

82.    The Non-DIG Arbitrators have not received any evidence in connection with the Non-DIG Arbitration.

83.     The Arbitration Hearing in the Non-DIG matter was postponed for nearly four months from its originally scheduled hearing date to accommodate the schedule of Commercial Risk's initially appointed arbitrator, Mr. Dielmann.

84.     Commercial Risk seeks to further delay payment of its long delinquent obligations to SICH under the Treaties by attempting to orchestrate the recommencement of this Arbitration ab initio.

85.     There would be no prejudice to Commercial Risk by virtue of its proceeding with the Non-DIG Arbitration with Mr. Thirkill as the Umpire.

86.     There would be significant prejudice to SICH if the Non-DIG Arbitration had to commence anew.

### COUNT I
**(Pursuant to 9 U.S.C. §§ 4 and 206 Compelling Arbitration With Existing Umpire)**

87.     SICH repeats and realleges each of the allegations set forth in paragraphs 1-86 as if fully set forth herein.

88.     David Thirkill, the Umpire in the Non-DIG Arbitration, was duly selected by the parties in accordance with the provisions of the Treaties.

89.     Respondents have refused to proceed with the Non-DIG Arbitration with David Thirkill as the Umpire, as they previously agreed, and as required under the Treaties.

90.     Pursuant to the Convention on the Enforcement and Recognition of Foreign Arbitral Awards, 9 U.S.C. § 206, this Court may compel Respondents to proceed with the Non-DIG Arbitration with David Thirkill as the Umpire in accordance with the parties' agreement.

91.     Pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, this Court may compel Respondents to proceed with the Non-DIG Arbitration with David Thirkill as the Umpire in accordance with the parties' agreement.

92.    By virtue of Respondents' refusal to proceed with the Non-DIG Arbitration with David Thirkill as the Umpire, SICH is entitled to an order compelling Respondents to proceed with the Non-DIG Arbitration with David Thirkill as the Umpire.

## COUNT II
### (Pursuant to 9 U.S.C. §§ 4 and 206 Compelling Arbitration on Agreed-Upon Dates)

93.    SICH repeats and realleges each of the allegations set forth in paragraphs 1-92 as if fully set forth herein.

94.    The parties agreed to proceed with the Non-DIG Arbitration on the re-scheduled date of June 25-29, 2007.

95.    Respondents have refused to proceed with the Non-DIG Arbitration on June 25-29, 2007, as they previously agreed.

96.    Pursuant to the Convention on the Enforcement and Recognition of Foreign Arbitral Awards, 9 U.S.C. § 206, this Court may compel Respondents to proceed with the Non-DIG Arbitration on June 25-29, 2007 in accordance with the parties' agreement.

97.    Pursuant to the Federal Arbitration Act, 9 U.S.C. § 4, this Court may compel Respondents to proceed with the Non-DIG Arbitration on June 25-29, 2007 in accordance with the parties' agreement.

98.    By virtue of Respondents' refusal to proceed with the Non-DIG Arbitration on June 25-29, 2007, SICH is entitled to an order compelling Respondents to proceed with the Non-DIG Arbitration on June 25-29, 2007.

## COUNT III
### (Pursuant to 9 U.S.C. §§ 5 and 206 Appointing A Replacement Arbitrator)

99.    SICH repeats and realleges each of the allegations set forth in paragraphs 1-99 as if fully set forth herein.

100.    Respondents have refused to allow their appointed replacement arbitrator to disclose contacts with the parties and counsel so as to clear any conflict he may have and demonstrate that he is, <u>inter alia</u>, disinterested in the outcome of the arbitration, as required under Article 32 the Treaties.

101.    As a result of this directed non-disclosure, Respondents have failed and refused to appoint an arbitrator who is disinterested as required by the Treaties.

102.    Pursuant to the Convention on the Enforcement and Recognition of Foreign Arbitral Awards, 9 U.S.C. § 206, this Court may appoint an arbitrator in accordance with the provisions of the Treaties.

103.    Pursuant to the Federal Arbitration Act, 9 U.S.C. § 5, this Court may appoint an arbitrator in accordance with the provisions of the Treaties.

104.    By virtue of Respondents' failure to appoint an arbitrator who is disinterested in the outcome of the arbitration as required under Article 32 of the Treaties, SICH is entitled to an order appointing a replacement Arbitrator to act as Respondents' party appointed arbitrator from a list to be supplied by Petitioner.

**WHEREFORE**, SICH demands judgment granting the Petition and awarding the following relief:

(1)     on the First Count, an Order compelling Respondents to arbitrate the Non-DIG dispute with David Thirkill as the Umpire;

(2)     on the Second Count, an Order compelling Respondents to proceed with the Non-DIG Arbitration Hearing on June 25, 2007 in accordance with the parties' agreement;

(3)     on the Third Count, an Order appointing a replacement Arbitrator to act as Respondents' party appointed arbitrator from the list to be supplied by Petitioner.

(4)     such other and further relief as this Court deems necessary or appropriate.

Dated: New York, New York
     April 24, 2007

STROOCK & STROOCK & LAVAN LLP

By:     _____

Michele L. Jacobson (MJ 4297)
*Attorneys for Petitioner*
180 Maiden Lane
New York, New York 10038
(212) 806-5400

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TO BE FILED
UNDER SEAL

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

In the Matter of the Arbitration of

SECURITY INSURANCE COMPANY OF HARTFORD
Itself and as Successor in Interest to
THE FIRE AND CASUALTY INSURANCE COMPANY
OF CONNECTICUT and THE CONNECTICUT
INDEMNITY COMPANY,

                      Petitioner,

            -against-

COMMERCIAL RISK REINSURANCE COMPANY
LIMITED (BERMUDA) and COMMERCIAL RISK RE-
INSURANCE COMPANY (VERMONT),

                  Respondents.

Docket No. _____

**DECLARATION OF
MICHELE L. JACOBSON IN
SUPPORT OF PETITION
FOR ORDER COMPELLING
ARBITRATION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MICHELE L. JACOBSON,** hereby declares under penalty of perjury that the following

is true and correct:

      1.     I am a member of the firm of Stroock & Stroock & Lavan LLP, attorneys for

Petitioner Security Insurance Company of Hartford, Itself and as Successor in Interest to the Fire

and Casualty Insurance Company of Connecticut ("SICH"). I submit this Declaration in support

of Petitioner's motion to compel Respondents Commercial Risk Reinsurance Company Limited

(Bermuda) ("Commercial Risk Bermuda") and Commercial Risk Re-Insurance Company

(Vermont) ("Commercial Risk Vermont", together, "Commercial Risk") to arbitrate the disputes

arising under five Quota Share Reinsurance Contracts (the "Treaties") pertaining to three

insurance programs, which were consolidated by agreement of the parties, with the Umpire who

was duly selected by Commercial Risk and SICH in accordance with the terms of those Treaties, and on June 25-29, 2007 – the dates agreed upon by the parties and the Panel.

2.    In particular, I submit this Declaration to provide the Court with the documents and facts upon which this motion is based. As counsel for SICH, I have personal knowledge of the facts set forth herein.

3.    Annexed hereto as Exhibit 1 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting May 1, 2000 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take a 90% and 10% quota share respectively of losses arising out of the HPP Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A.

4.    Annexed hereto as Exhibit 2 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting May 1, 2001 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont, pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take a 90% and 10% quota share respectively of losses arising out of the HPP Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (together with Exhibit 1 hereto, the "HPP Treaties").

5.    Annexed hereto as Exhibit 3 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting March 15, 2000 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take an 80% and 20% quota share respectively of the losses arising out of the NHE Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A.

2

6.     Annexed hereto as Exhibit 4 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting March 15, 2001 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take an 80% and 20% quota share respectively of the losses arising out of the NHE Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (together with Exhibit 3 hereto, the "NHE Treaties").

7.     Annexed hereto as Exhibit 5 is a true, complete, and correct copy of the Quota Share Reinsurance Contract incepting September 1, 2001 between SICH, Commercial Risk Bermuda and Commercial Risk Vermont pursuant to which Commercial Risk Bermuda and Commercial Risk Vermont agreed to take a 80% and 20% quota share respectively of the losses arising out of the ORS Workers Compensation Program, in accordance with the schedule of liabilities attached thereto as Exhibit A (the "ORS Treaty").

8.     The Treaties are identical in all material respects other than program name, quota share percentage, limits and inception date.  The Arbitration Clause in the Treaties (Article 32) provides:

> As a condition precedent to any right of action hereunder, any dispute or difference between the Company [SICH] and any Reinsurer [Commercial Risk] relating to the interpretation or performance of this Contract, including its formation or validity, or any transaction under this Contract, whether arising before or after termination, shall be submitted to arbitration.
>
> * * *
>
> Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator.  If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration, the requesting party may appoint a second arbitrator.
>
> * * *

3

All arbitrators shall be active or retired officers of insurance or reinsurance companies, or Lloyd's London Underwriters, and disinterested in the outcome of the arbitration.

\* \* \*

The decision in writing of a majority of the arbitrators shall be final and binding upon both parties.

See Exhibits 1-2 at 18-19, Exhibits 3-4 at 16-17, Exhibit 5 at 22-23.

9.      In August 2005, SICH served Commercial Risk Bermuda and Commercial Risk Vermont with separate Demands for Arbitration under the HPP Treaties, the NHE Treaties and the ORS Treaty (the "Arbitration Demands") as a result of Commercial Risk's failure to pay amounts due to SICH under the Treaties. Copies of the Arbitration Demands are annexed hereto collectively as Exhibit 6.

10.      In accordance with the terms of the Treaties, in the Arbitration Demands, SICH identified Martin Haber, the former Chief Legal Officer of the Continental Corporation (now CNA), as its party appointed arbitrator for each of the disputes, and requested that Commercial Risk appoint an arbitrator. In the cover letters transmitting the Arbitration Demands, SICH advised Commercial Risk that it would consent to consolidation of the three disputes if Commercial Risk so consented. A copy of one those cover letters (for NHE) is annexed hereto as Exhibit 7.

11.      By letter dated September 15, 2005, counsel for Commercial Risk appointed Theodor Dielmann, a former officer of Hannover Reinsurance Company, as its party appointed arbitrator for each of the disputes. A copy of the September 15, 2005 letter is annexed hereto as Exhibit 8. In mid-November, 2005, counsel for SICH and Commercial Risk agreed to consolidate the three disputes into one arbitration. A copy of the November 18, 2005 letter from SICH's counsel to Commercial Risk's counsel reflecting, inter alia, SICH's agreement to

4

consolidation is annexed hereto as Exhibit 9. A copy of the November 21, 2005 correspondence from Commercial Risk's counsel to SICH's counsel reflecting Commercial Risk's agreement to, inter alia, consolidation is annexed hereto as Exhibit 10.

12.    In accordance with the procedure agreed upon by the parties and both Messrs. Haber and Dielmann, and as commonly done in the reinsurance industry, the parties exchanged lists of acceptable Umpire candidates, which were narrowed to one mutually acceptable Umpire candidate per party. See Exhibit 9 ("the parties will exchange lists of umpire candidates in an expeditious fashion in the Consolidated Arbitration") and Exhibit 10 ("We confirm the procedural points raised [in your letter of November 18, 2005]"). The Umpire was to be chosen from the list of the party who successfully predicted whether the last digit of the Dow Jones index on a selected day was odd or even. As part of this process, counsel for SICH and Commercial Risk jointly sent out questionnaires to all of the proposed Umpire candidates in order to ascertain whether any of them had conflicts or scheduling issues. Copies of these letters and the questionnaire are annexed as Exhibit 11.

13.    Based on this agreed-upon process, on or about March 1, 2006, Mr. David Thirkill was selected to be the Umpire in this dispute.[1] A copy of Mr. Thirkill's email correspondence dated March 1, 2006 accepting the appointment and attempting to schedule an organizational meeting for later in the month is annexed hereto as Exhibit 12.

14.    At the March 28, 2006 organizational meeting for the Arbitration, the party appointed arbitrators, Mr. Haber and Mr. Dielmann, and the jointly selected Umpire, Mr. Thirkill, disclosed their contacts with the parties, counsel and potential witnesses by referencing

---

[1]    The Treaties also provide that "[t]he parties hereby waive all objections to the method of selection of the arbitrators, it being the intention of both sides that all the arbitrators be chosen from those submitted by the parties." Exhibits 1-2 at 19, Exhibits 3-4 at 16, Exhibit 5 at 23.

their disclosures in a simultaneously pending arbitration between the parties in which the same Arbitrators had been selected.  See Transcript of March 28, 2006 Organizational Meeting, annexed hereto as Exhibit 13 at 3-4 and Excerpt of Transcript of the February 22, 2006 Organizational Meeting for the "DIG Arbitration", annexed hereto as Exhibit 14 at 4-17.[2]  To distinguish between the two simultaneously pending arbitration proceedings, the parties denominated this Arbitration as the "Non-DIG Arbitration" and the other Arbitration as the "DIG Arbitration."  Several months earlier, the DIG Arbitration had been scheduled for a Hearing during the week of December 11, 2006.

15.     After the panel members completed their disclosures, the parties formally accepted the panel on the record in the Non-DIG Arbitration.  See Exhibit 13 at 4.  The parties also executed a Hold Harmless Agreement, in which they stipulated that the arbitrators had been appointed, that they found the arbitrators to be without conflicts and that they accepted the Panel. A copy of the executed Hold Harmless Agreement is annexed hereto as Exhibit 15.  After consultation with the parties, the Panel scheduled the Non-DIG Arbitration Hearing for the week of March 5, 2007.  Thus, as of March 2006, the Panel in this Arbitration, as well as the DIG Arbitration, consisted of Messrs. Haber, Dielmann, and Thirkill.

16.     Immediately following the Organizational Meeting for the Non-DIG Arbitration, the Panel heard oral argument on SICH's motion for pre-hearing security in both the DIG and Non-DIG Arbitrations.  The Panel issued a single oral decision resolving both motions and awarding pre-hearing security in the amount of the claim (less security already held by SICH),

---

[2]     Through the same process used by the parties in connection with this Arbitration, the identical Panel had been selected previously to preside over the DIG Arbitration between the parties under two Quota Share Reinsurance Contracts relating to the DIG Workers Compensation Program.

without interest, in favor of SICH. The Panel followed up its oral ruling with separate pre-hearing security awards in each of the Arbitrations.

17.    In November 2006, SICH was advised that, due to the illness of Commercial Risk's party arbitrator, the DIG Arbitration Hearing would have to be postponed from the December 2006 date. The parties and the Panel thereafter agreed to conduct the DIG Arbitration Hearing during the March 2007 week originally scheduled for the Non-DIG Arbitration Hearing and re-schedule the Non-DIG Arbitration Hearing to the week of June 25, 2007. Email correspondence regarding the agreed scheduling change, which include a December 5, 2006 email to the panel, a December 29, 2006 email from the Umpire to the parties, and a January 29, 2007 email from the Umpire to the parties, are annexed hereto collectively as Exhibit 16.

18.    The DIG Arbitration Hearing proceeded as re-scheduled on March 5, 2007. On March 11, 2007, a majority of the Panel issued an Award in the amount of $20,754,990 plus interest in the amount of $1,300,000, in favor of SICH (the "DIG Award"). A copy of the DIG Award is annexed hereto as Exhibit 17.

19.    On March 20, 2007, Commercial Risk's party arbitrator, Theodor Dielmann, sent an email to the parties and the other Panel members advising that "[a]fter in-depth deliberation, I wish to withdraw as arbitrator from both the Non-DIG and DIG arbitrations (the Panel of the latter having remained constituted until all parts of the Order have been fully performed)." A copy of Mr. Dielmann's email is annexed hereto as Exhibit 18.

20.    Later that day, on behalf of the remaining panel members, the Panel's Umpire, Mr. Thirkill, acknowledged Mr. Dielmann's withdrawal as party-appointed arbitrator for Commercial Risk and requested that "Commercial Risk appoint a replacement as soon as possible." Mr. Thirkill also noted that since the Non-DIG Hearing was not scheduled to start for

7

over three months, there would be no need for a postponement unless the parties agreed otherwise. A copy of Mr. Thirkill's email is annexed hereto as Exhibit 19.

21.    Both parties responded to Mr. Thirkill's email on March 20, 2007. SICH's counsel advised that it "[did] not agree to a postponement of the hearing dates, and . . . [had] informed [Commercial Risk's counsel] Mr. Higgins that [it] fully expect[ed] that those hearing dates [would] hold firm." A copy of the March 20, 2007 email from SICH's counsel in response is included as part of Exhibit 19. Commercial Risk's counsel responded, "Thanks for this, which we have noted." A copy of the March 20, 2007 email from Commercial Risk's counsel in response is annexed hereto as Exhibit 20.

22.    Particularly in light of Mr. Dielmann's reference to "in depth deliberation" (see Exhibit 18), by letter of the same date, SICH's counsel requested that Commercial Risk's counsel disclose "the details of any information that either [it] or [its] client have, or any conversations that either [it] or [its] client have had with Mr. Dielmann concerning his actions." A copy of the March 20, 2007 letter from SICH's counsel to Commercial Risk's counsel is annexed hereto as Exhibit 21.

23.    Shortly thereafter, Commercial Risk's counsel advised SICH's counsel by letter as follows: "We will not be responding in any way to the request for information [about communications with Mr. Dielmann regarding his withdrawal]. We note your expectation and commitment to the non-DIG hearing dates." A copy of the letter dated March 20, 2007 from Commercial Risk's counsel to SICH's counsel is annexed hereto as Exhibit 22.

24.    By letter dated March 27, 2007, SICH's counsel inquired regarding the status of Commercial Risk's appointment of a replacement arbitrator, stating:

> To date, Commercial Risk Reinsurance Company Limited
> (Bermuda) and Commercial Risk Re-Insurance Company

> (Vermont) (collectively "Commercial Risk") have not appointed a
> replacement arbitrator who is available to serve on a panel during
> the week of June 25, 2007, nor have you advised us of Commercial
> Risk's intent to do so.
>
> Please be advised that if we do not receive within ten (10) days,
> notice of appointment of a replacement arbitrator who satisfies all
> applicable requirements and is available for a hearing during the
> week of June 25, 2007, we will seek court appointment of a
> replacement arbitrator.

A copy of the March 27, 2007 letter from SICH's counsel to Commercial Risk's counsel is

annexed hereto as Exhibit 23.

    25.    On April 1, 2007, Umpire David Thirkill wrote to Commercial Risk's counsel,

noting:

> although there is still some time to go until the hearing, Mr. Haber
> and I are of the opinion that the replacement for Mr. Dielmann
> should be made as soon as possible. You should, by now, have
> had the opportunity of discussing the matter with Commercial
> Risk. Would you kindly advise us by Wednesday of this week
> [April 4, 2007] as to the replacement.

A copy of Mr. Thirkill's April 1, 2007 email to Commercial Risk's counsel, which was copied to

SICH's counsel and Mr. Haber, is annexed hereto as Exhibit 24.

    26.    On April 4, 2007, Commercial Risk's counsel advised SICH's counsel by email

that "[it would] have a letter in [their] hands tomorrow on an arbitrator for non-DIG." A copy of

the April 4, 2007 email from Commercial Risk's counsel to SICH's counsel is annexed hereto as

Exhibit 25.

    27.    By letter dated April 5, 2007, Commercial Risk advised SICH that it had

appointed Peter Gentile as arbitrator for the Non-DIG Arbitration. Despite the fact that there was

a constituted Panel, including SICH's party appointed arbitrator Martin Haber and a jointly

selected Umpire, David Thirkill – both of whom had been accepted by the parties – Commercial

Risk requested that SICH confirm its selection of Mr. Haber as its party appointed arbitrator and

9

advised that, upon such confirmation, Mr. Gentile would contact Mr. Haber to undertake selection of a new Umpire. A copy of the April 5, 2007 letter from Commercial Risk's counsel to SICH's counsel, which was copied to Mr. Haber and Mr. Thirkill, is annexed hereto as Exhibit 26.

28.    On that same date, Commercial Risk filed a Petition in this Court in connection with the DIG Arbitration, seeking to vacate the Panel's award. Commercial Risk also filed an Order to Show Cause for a Preliminary Injunction to prevent SICH from drawing down on the pre-hearing security posted by Commercial Risk in order to satisfy a portion of the DIG Award. This Court scheduled oral argument on the Preliminary Injunction Motion for April 9, 2007.

29.    After considering papers submitted by Commercial Risk and SICH, and hearing oral argument on Commercial Risk's Motion for a Preliminary Injunction to restrain SICH from drawing down on pre-hearing security to partially satisfy the DIG Award, on April 9, 2007, this Court ruled from the bench that Commercial Risk had not satisfied any of the requirements for injunctive relief and denied Commercial Risk's motion. The Court held that:

> In view of what is at stake -- which is essentially a money dispute -- the money dispute is literally resolvable by the party that may win on the merits ultimately paying back what may have been improperly drawn down, if in fact the plaintiffs were to prevail on the merits. I don't see where that irreparable harm comes in. Plaintiffs indicate that their view of the irreparable harm enters in the issue of what they characterize as the improper or abuse of the process. Again, I'm not persuaded that that is the case here. Under the applicable doctrine, the arbitrators have a fairly extensive latitude to interpret the scope of arbitration and make appropriate rulings concerning on that scope. Those determinations ordinarily are entitled to substantial deference by the Court except as has been indicated in the cases of clear abuse of legal acts or illegal acts or other forms of impropriety.
>
> I don't believe that there is sufficient evidence that the standard has been met here. On those grounds, the issue of whether or not the arbitrators improperly excluded evidence, in my view, has not been compellingly demonstrated to the point warranting the

10

extraordinary remedy not only of denial of the confirmation of [the] arbitration award but also of granting of preliminary injunctive relief.

I also do not believe that the plaintiffs are likely to succeed on the merits given the language of the contract that is at issue here, the parties' agreements, and I also am not persuaded that there are sufficient issues going to the merits as to make the plaintiff's claims later on for litigation and the balance of equities tilting decidedly in the plaintiff's favor because the Court believes that in the reading of the contract that there is sufficient support in the underlying agreements for the posting of the letter of credit and for the draw down of the letter of credit absent a confirmation award.

See Exhibit 27 (Transcript of Argument and Oral Ruling on Motion for a Preliminary Injunction in DIG matter) at 25-26. On April 11, 2007, the Court issued a written Order on the Preliminary Injunction Motion, a copy of which is annexed hereto as Exhibit 28.

30.    By email dated April 9, 2007, SICH's counsel wrote to Commercial Risk's proposed replacement arbitrator, Mr. Gentile, and requested that he complete an attached questionnaire designed to elicit information which would determine whether he was qualified to be an arbitrator under the terms of the Treaties. This questionnaire was in the same format as had been previously used by the parties in connection with Umpire selection. A copy of the April 9, 2007 email from SICH to Mr. Gentile, which was copied to Commercial Risk's counsel, Mr. Haber and Mr. Thirkill, is annexed hereto as Exhibit 29.

31.    On April 10, 2007, Commercial Risk's counsel wrote to SICH's counsel advising that Mr. Gentile would not fill out the questionnaire and provide the requested information at that time, because "[such disclosure] should await the complete constitution of the new panel." Acknowledging that SICH had previously appointed an arbitrator in accordance with the Treaties' terms in its Arbitration Demand, while ignoring that an Umpire had been duly selected in accordance with the terms of the Treaties, Commercial Risk noted that it had "asked Mr. Gentile to contact Mr. Haber about third arbitrator selection under the treaty." Commercial

11

Risk's counsel also intimated that it was reneging on its previous agreement to the June 25-29, 2007 Hearing date, stating, "[t]he hearing dates you indicate would appear to be most unlikely." A copy of the April 10, 2007 email from Commercial Risk's counsel to SICH's counsel is annexed hereto as Exhibit 30.

32.    The following day, SICH's counsel reiterated its request to Mr. Gentile that he complete the questionnaire and, in light of the statement by Commercial Risk's counsel that the "hearing dates would appear to be most unlikely," queried his availability for a hearing on the June 25-29, 2007 dates. A copy of the April 11, 2007 email from SICH's counsel to Mr. Gentile, which was copied to Commercial Risk's counsel, Mr. Haber and Mr. Thirkill, is annexed hereto as part of Exhibit 30.

33.    On April 12, 2007, Mr. Gentile responded to SICH's counsel by email, advising that he would "disclose any potential conflicts at the appropriate time." Mr. Gentile also stated that Commercial Risk had directed him to contact Mr. Haber to "agree on a process for selecting the third arbitrator" and that "[w]hen a third Arbitrator is selected, this Panel will meet with counsel to select a mutually convenient date for the Arbitration Hearing." A copy of the April 12, 2007 email from Mr. Gentile is annexed hereto as Exhibit 31.

34.    Within an hour of Mr. Gentile's response, Commercial Risk's counsel wrote to SICH's counsel demanding that SICH appoint an arbitrator within thirty (30) days, despite the fact that, as Commercial Risk was well aware, SICH had appointed Mr. Haber in its Arbitration Demand and neither Mr. Haber nor SICH had taken any action that would suggest that he had withdrawn. A copy of the April 12, 2007 email from Commercial Risk's counsel to SICH's counsel is annexed hereto as Exhibit 32.

35.    Given that SICH has already designated Mr. Haber as its Arbitrator in accordance with the provisions of the Treaties, and the parties selected Mr. Thirkill in accordance with the provisions of the Treaties, there is no legal or factual basis for Commercial Risk's refusal to proceed with the Non-DIG Arbitration, with the existing, duly selected and agreed-upon Umpire on the June 25-29, 2007 dates previously agreed to by the parties and the Panel.

36.    Commercial Risk should not be permitted to further delay payment of its long delinquent obligations to SICH by orchestrating the recommencement of this Arbitration ab initio. Since the Panel ordered Commercial Risk to post security in March 2006, it has neither heard nor considered any motions. At the time of Mr. Dielmann's withdrawal, there were no matters sub judice before the Panel and, to date, the Panel has not been presented with any evidence. There would be no prejudice to Commercial Risk by virtue of its proceeding with the Non-DIG Arbitration with Mr. Gentile as its substitute party appointed arbitrator.[3]

37.    In contrast, SICH would be prejudiced by the further delay caused by Commercial Risk's strategy to insist on re-appointment of existing Arbitrators. Indeed, this Arbitration was already postponed for nearly four months from its originally scheduled hearing date to accommodate the schedule of Commercial Risk's initially appointed arbitrator, Mr. Dielmann.

38.    Commercial Risk should not be given the opportunity to re-start the Arbitration process anew. For all the foregoing reasons, and the reasons set forth in the Petition, the Affidavit of Eugene Wollan and the accompanying Memorandum of Law, SICH respectfully

---

[3]    As SICH has not been provided with disclosures by Mr. Gentile at this time (despite its request therefor), it is not able to accept him presently without qualification. However, in the event, and assuming for the purposes of this application, that Mr. Gentile is conflict free and can proceed in an unbiased fashion, SICH would proceed with a Panel consisting of Mr. Haber, Mr. Gentile and Mr. Thirkill.

requests that this Court issue an Order compelling Commercial Risk to arbitrate this matter with Mr. Thirkill as the Umpire at a Hearing to commence on June 25, 2007.

Dated: New York, New York
      April 24, 2007

                                   MICHELE L. JACOBSON

14