# EXHIBIT 13

---

**Page 1**

```
------------------------------x
In the Matter of the Arbitration
              -of-
SECURITY INSURANCE COMPANY OF HARTFORD Itself
and as Successor in Interest to THE FIRE AND
CASUALTY INSURANCE COMPANY OF CONNECTICUT and
THE CONNECTICUT INDEMNITY COMPANY,

                 Claimant,

              -against-

COMMERCIAL RISK REINSURANCE COMPANY LIMITED
(BERMUDA) and COMMERCIAL RISK RE-INSURANCE
COMPANY (VERMONT),

       (Non-DIG Arbitration) Respondents.
------------------------------x
```

March 28, 2006
10:05 a.m.
Stroock & Stroock & Lavan LLP
180 Maiden Lane
New York, New York

ORGANIZATIONAL MEETING BEFORE:

DAVID A. THIRKILL, Umpire

MARTIN D. HABER, ESQ., Arbitrator

THEODOR DIELMANN, Arbitrator

Reported by:
ANDREW WALKER, RPR (1991)

---

**Page 2**

APPEARANCES:

STROOCK & STROOCK & LAVAN LLP
    Attorneys for Claimant
    180 Maiden Lane
    New York, New York 10038-4982

BY: MICHELLE L. JACOBSON, ESQ.
    ANDREW LEWNER, ESQ.

D'AMATO & LYNCH
    Attorneys for Respondents
    70 Pine Street
    New York, New York 10270

BY: JOHN P. HIGGINS, ESQ.

ALSO PRESENT:

JAMES F. MEEHAN, ESQ.
Vice President and General Counsel
Royal & SunAlliance USA

ANDRE LEFEBVRE
Financial Risk Officer
Royal & SunAlliance USA

JOELLE de LACROIX
CRP

---

**Page 3**

THE UMPIRE: Let's go on the record.

Good morning, ladies and gentlemen. This is the organizational meeting of a dispute between Security of Hartford Insurance Company and Commercial Risk Reinsurance Company Limited, and I think we've all agreed to caption this as, in parentheses, "Non-DIG" to distinguish it from another dispute between the parties which have, in effect, the same cast of characters if different underlying contracts.

I think everybody has got a copy of an agenda that was circulated and, if so, we could move straight to that agenda and item 1, "Disclosures."

The panel, if it's okay with you, would like to use the same disclosures as was disclosed at the previous hearing on the DIG matter. The obvious only update is that whereas before you had not secured an umpire, in this matter

---

**Page 4**

Proceedings - 3/28/06

obviously now you have, and it's me. I have no additional disclosures to that.

If none of the other panelists do --

MR. HABER: I have no further disclosures.

MR. DIELMANN: No, none either.

THE UMPIRE: Would that be acceptable to the parties?

MS. JACOBSON: Yes, that's acceptable.

MR. HIGGINS: Yes.

THE UMPIRE: So I thus assume there's no questions of the panel in relation to those disclosures. And would, therefore, ask you to formally accept the panel as it is.

MS. JACOBSON: We accept the panel on behalf of the claimant.

MR. HIGGINS: We do on behalf of respondent.

THE UMPIRE: May I take this opportunity, I understand that there's been some family situation with Mr. --

5

```
1              Proceedings - 3/28/06
2      Bob Lewin, and the panel would like to
3      pass on condolences to him in that
4      regard.
5          MS. JACOBSON: I will pass those
6      along, thank you.
7          THE UMPIRE: I think we had a hold
8      harmless at the last hearing.
9      Presumably somebody's prepared one on a
10     similar basis.
11         MS. JACOBSON: We have.
12         MR. LEWNER: Yes.
13         THE UMPIRE: Go off the record for
14     a second.
15         (Pause in the proceedings)
16         THE UMPIRE: Back on the record.
17         Just for the record, during the
18     break the parties signed -- the parties
19     and the panel signed both the hold
20     harmless and a confidentiality
21     agreement.
22         Before we go on to brief
23     statements, what we'd like to do is to
24     go through this organizational meeting
25     and then adjourn that and then stay on
```

6

```
1              Proceedings - 3/28/06
2      the record for some questions in
3      relation to the security issue, and then
4      we'll go off that record and the panel
5      will meet, and, if necessary, discuss
6      security related to both matters since
7      from a principle viewpoint we believe
8      that the issues are the same.
9          That's what we'd like to do if
10     that's okay with you.
11         MS. JACOBSON: That's fine.
12         MR. HIGGINS: That's fine with us.
13         THE UMPIRE: Thank you.
14         So if we move on, obviously -- and
15     thank you, the panel would like to thank
16     the parties for the position statements
17     received, I think they were very clear,
18     as were the exhibits. If you'd like to
19     add anything to it, you should go ahead.
20         MS. JACOBSON: Okay.
21         At the outset -- I would like to
22     thank the panel for hearing this matter.
23         At the outset, I want to make
24     clear that although we've been referring
25     to this arbitration as the non-DIG
```

7

```
1              Proceedings - 3/28/06
2      arbitration, in reality it's really
3      three separate programs, NHE, ORS and
4      HPP, that are all governed by separate
5      reinsurance contracts. Commercial Risk
6      has failed to make payments under three
7      separate reinsurance agreements which
8      covered business written by three
9      program managers with three separate
10     sets of facts. What's notable, really,
11     about Commercial Risk's position
12     statement is what it doesn't say.
13     Although paying lip service to the
14     notion that it's going to satisfy its
15     obligations under the reinsurance
16     agreements, it hasn't done that.
17         Despite the fact that Commercial
18     Risk has been in and audited, it does
19     not share the audit with the panel or
20     with the claimant. What's plain is that
21     Commercial Risk really doesn't have a
22     position, they only intend to use this
23     arbitration proceeding as a means to go
24     fish.
25         We will show that Commercial Risk,
```

8

```
1              Proceedings - 3/28/06
2      contrary to their position statement,
3      was very involved in these three
4      programs, and that their underwriter
5      participated in joint audits with
6      Security of Hartford. Commercial Risk
7      was in large measure the risk bearer and
8      took that role very seriously. If
9      anyone is an ostrich--and I've taken
10     that from their position
11     statement--that's Commercial Risk now
12     and not Commercial Risk at the time.
13     These reinsurance agreements were all
14     terminated or expired by June 30th of
15     '02 and if, in fact, there were
16     problems, why does it take so long for
17     them to complain?
18         We've asked for prehearing
19     collateral. I don't know if the panel
20     would like me to address that now, but
21     as set forth in our papers we are
22     seeking security in connection with this
23     proceeding.
24         THE UMPIRE: Unless my
25     co-panelists have another decision, if
```

Page 9

Proceedings - 3/28/06

you're talking in a principle sense, keep going; if you want to get into details, why don't you leave that to the post-organizational meeting discussion I referred to earlier.

MS. JACOBSON: Okay. Well, in essence, our contention is that under the reinsurance contracts, each reinsurance contract, there is a provision for security that is unconditional, it's not conditioned on there not being any disputes. So irrespective of whether or not we are in an arbitration proceeding, Commercial Risk is required to post that as a contractual matter. We are seeking that security now, we're calling it prehearing security but, in essence, it's a contractual right which is unconditional, and if the panel would like, I can set aside the numbers discussion for later on.

THE UMPIRE: Please.

MS. JACOBSON: Thank you.

Page 10

Proceedings - 3/28/06

THE UMPIRE: Thank you.

MR. HIGGINS: We also would like to thank the panel for attention.

We agree there are three separate contracts, three separate contractual agreements, but we take serious issue with an implication that we're fishing here. We did take a limited audit, and that limited audit disclosed several irregularities, to put it mildly, in the underwriting. And those, although there isn't a formal report of this arbitration, we did share the conclusions in broad terms. As a matter of fact, a lot of it has to do with referrals and that sort of thing, and a statement was made by RSA that those referral documents and all the issues relating to the referral question would be delivered to us last year, and we're still waiting for them. So to suggest that we're fishing is, I think, not correct, and shouldn't be given any weight by the panel.

Page 11

Proceedings - 3/28/06

In terms of the contractual right to security, I think we can get into the details of it later. The only statement we made in support of it at this stage by Security is--I think there are too many "securitys" here, but by Security--is the contractual obligation. They, in fact, made three arguments; I don't know whether you want me to deal with those at this stage as a matter of principle. I'm happy to if that's the panel's wish.

THE UMPIRE: Go ahead.

MR. HIGGINS: To begin with, they've cited Section 13 -- was it?

MS. JACOBSON: 1213.

MR. HIGGINS: -- 1213 of the New York Insurance Law. This has never been used by an arbitration panel. It is clear as to why it's never been used by an arbitration panel because it only applies to court proceedings. All the cases cited are court proceedings, there's no case that's been cited where

Page 12

Proceedings - 3/28/06

the arbitration panel ordered the security under 1213 and then the court approved the arbitrators' act.

They're all cases where there was a court proceeding, whether it's a confirmation of an arbitration award or a motion to compel arbitration, but there, in every case, is a court proceeding and the judge orders the security to be put up. There's no connection there. And that is a clear -- clearly stated in Section 1213 because it refers to the proceeding in which the court or the court where the proceeding is pending, so you don't have an arbitration pending before a court, you may have aspects of it but not the arbitration before the court.

Secondly, it's clear that the monies are to be paid into the clerk of the court, and that would only apply to a court proceeding, not to an arbitration proceeding. So it's clear that -- and there's no support for this,

Page 13

Proceedings - 3/28/06
1  it's clear that that section is utterly
2  irrelevant to this proceeding.
3      THE UMPIRE: Hold a second.
4      (Discussion off the record)
5      THE UMPIRE: I think it would
6  probably be efficient if we ask
7  questions as we go along, if that's okay
8  with the panel.
9      MR. HIGGINS: That's fine.
10     MR. HABER: Would you mind looking
11 at Exhibit B of Security's reply brief,
12 please.
13     MS. JACOBSON: It's also in our --
14     MR. HIGGINS: The new one?
15     MR. LEWNER: Yes.
16     MR. HABER: The case is American
17 Centennial versus Seguros la Republica.
18     MR. HIGGINS: That's it.
19     And what's the question?
20     MR. HABER: Well, I'm looking --
21 your position, if I understand it
22 correctly, is 1213 does not apply to
23 arbitrations.
24     MR. HIGGINS: Right.

Page 14

Proceedings - 3/28/06
1      MR. HABER: Second column of the
2  first page of that says, and I'm reading
3  in the second full paragraph, second to
4  the last sentence, "The contention that
5  the legislature did not intend 1213 to
6  apply to reinsurance must be rejected.
7  In addition, the language of the statute
8  is clear that it applies broadly to any
9  proceeding, including an arbitration
10 proceeding. Accordingly, based on our,"
11 and then there's another citation to
12 1213(c)(1)," "Accordingly, based on our
13 review of this issue, we find no error
14 in the magistrate judge's recommendation
15 and, therefore adopt, that
16 recommendation in full."
17     Please explain how this case is
18 distinguished and supports your position
19 that 1213 doesn't apply to arbitration.
20     MR. HIGGINS: Well, it does
21 broadly, as this says, apply to
22 arbitrations in the sense that once it
23 gets to court, just the fact that an
24 underlying procedure is arbitration

Page 15

Proceedings - 3/28/06
1  wouldn't alter the fact, but the judge
2  here ordered the security. It hadn't
3  been, it hadn't been -- the order hadn't
4  been issued by an arbitration panel so
5  we don't have a situation where the
6  arbitration panel ordered it under 1213,
7  so that -- well, number one, that issue
8  would be dicta, but number two --
9      MR. HABER: Yeah?
10     MR. HIGGINS: -- number two, this
11 is an underlying procedure, proceeding,
12 this arbitration. And as I said, there
13 are cases where you had a confirmation
14 proceeding in court and before the court
15 would allow a response to the
16 confirmation proceeding, the court
17 ordered that this security be put up
18 under 1213, and there have been cases
19 where there's a motion to compel
20 arbitration, there's very few cases, but
21 motion to compel arbitration where the
22 court ordered the security to be put up
23 before it would allow the respondent to
24 put in a response or an answer,

Page 16

Proceedings - 3/28/06
1  pleading, which is what this refers to,
2  in the court.
3      MR. HABER: Okay. Could you now
4  go to Exhibit C, which is the next case,
5  which is Northwestern National v. Kansa
6  and I'm looking at the third page, first
7  column under "Request for Bond," and
8  this is the bond that Kansa is supposed
9  to post to security and the last two
10 sentences say, "Accordingly, the parties
11 are instructed to meet and attempt to
12 resolve the amount of the bond to be
13 posted by Kansa. If the parties are
14 unable to reach agreement within two
15 weeks from the date of this order, the
16 arbitration panel will then resolve the
17 issue."
18     How does that support your
19 position?
20     MR. HIGGINS: Well, not the issue
21 of whether there'd be security, just the
22 amount. So the court is ordering the
23 security under Section 1213, it isn't
24 assigning that job to the panel, which

## 17

Proceedings - 3/28/06

is what is being suggested by the claimant.

MR. HABER: Are you --

MR. HIGGINS: All that the court is assigning to the parties for agreement or in default to the panel, is the amount of the security.

MR. HABER: I'm trying to understand, so your argument is that it is only a judge who may order the posting of security, not this panel?

MR. HIGGINS: Yes.

MR. HABER: And your authority for that position -- do you have affirmative authority or are you just saying you disagree with any reading of the cases other than your interpretation?

MR. HIGGINS: Well, I don't think there is a disagreement with my interpretation in terms of who ordered the security. Now, there are --

MR. HABER: I'm going to go out -- your opposing counsel I think is.

MR. HIGGINS: That there's

## 18

Proceedings - 3/28/06

security, that there's authority for an arbitration panel ordering security?

MR. HABER: You don't think they've taken that position?

MR. HIGGINS: They have taken that position, there's no authority for it. And I don't think you can read these cases as a matter of fact to interpret them that the panel issued the 1213 order and not a court. In every case, the court ordered the 1213.

MR. HABER: Okay.

MR. HIGGINS: And there is no authority going the other way, simply because the statute is clear.

MR. HABER: Okay.

THE UMPIRE: Let me see if I can clarify that for my own mind.

It's your position that an arbitration panel, per 1213, does not have authority?

MR. HIGGINS: Exactly.

THE UMPIRE: Not an arbitration panel doesn't have authority per se?

## 19

Proceedings - 3/28/06

MR. HIGGINS: We don't contest that.

THE UMPIRE: Thank you.

MR. HIGGINS: There are three grounds here, that's one of them.

The second ground is the ground that there's a contractual obligation, and that was dealt with briefly by Ms. Jacobson. There's a number of arguments against that. The primary argument is that that's final relief, and until we have -- until we have a hearing here, the panel shouldn't be in the business of enforcing one provision of the contract and refusing to enforce the other provisions of the contract. We say it's equally clear that these contracts only cover business which is written in accordance with the underwriting guidelines.

Now, we have to prove that and we'd like an opportunity to prove that, but to say that one provision is clear and, you know, object to the other

## 20

Proceedings - 3/28/06

provision is splitting the contract, and that's final relief. If we are ordered to put up security at the end of the case because the panel has determined that it's part of the relief that security should be granted, then that's what we'll deal with at the time and that's when we'll put up -- we're happy to put up the security at that time. We don't think that at this stage we should be looking at one aspect of the contract and not at the other aspect.

Secondly, the clause only applies to situations where credit for reinsurance is a problem. And there are a number of reasons why we shouldn't be thinking about prehearing security, which presumably would be under the control of the panel, as solving that problem. There's no contractual requirement that we put up security that is in the possession -- or under the control of the panel, for the simple reason that it wouldn't solve the credit

21

Proceedings - 3/28/06
for reinsurance problem because if it's
not unconditional, then the state won't
accept it, it's got to be utterly
unconditional. So if the panel decides
that security is there and it can only
be paid over if the judgment provides
for that, which is the standard forms
for security under the ARIAS forms, then
that does Security no good.
    Secondly, on that point, we don't
believe that there is an obligation
under the contract to provide security
for the amount that's being sought.
Number one, we question the number,
because we question our obligation in
light of the defenses that we have
raised.
    Secondly, we question the number
based on the security that -- based on
the amount of letters of credit that
Security is showing on its Schedule F.
There is no penalty for this contract,
so if there's no penalty, then there's
no right to claim a right under the

22

Proceedings - 3/28/06
contract for a letter of credit which
would cure the penalty. The fact that a
parent put up letters of credit we would
suggest is not a proper way to secure
under Schedule F. So the fact that they
have chosen to do this, and it cures
their problem, is not something that we
brought along. The problem is cured?
So be it.
    The last item -- well, and also,
sorry, just to go back to that item, if
you look at the amounts claimed on the
schedule, number one, they keep
changing, and, number two, the schedule
is not understandable in terms of what
the security should be. It deals with
various items, premium items, claim
items, and, you know, there are negative
items on the funds held, there are
positive items on the amount of the
losses, Schedule F only deals with
losses, so we shouldn't -- you know, we
shouldn't be obligated to secure things
like return premium or, as they put it,

23

Proceedings - 3/28/06
overpayment of premium, it's just not
covered by the treaty. And I think if
you push it all out and give us a credit
for the $4 million letter of credit, I'm
not sure that we owe them anything, even
under their interpretation.
    The last argument that's made, and
we think it's libelous, is that
Commercial Risk doesn't have the
wherewithal to satisfy a $6 million
letter of credit. We think it's just
outrageous for a company like RSA to
make against Commercial Risk and
ultimately SCOR, to question the ability
of SCOR to satisfy a judgment. We trust
that that's an argument that's -- an
advocate, a lawyer would put forward and
not RSA, but it's kind of a sad
commentary when that sort of
bloody-minded attitude is put forth in
an arbitration. We have this much
security in these two big companies
going at each other for a paltry
$6 million, it's just, we think,

24

Proceedings - 3/28/06
outrageous.
    Question was made as to whether a
an award would be enforceable in France.
That's unsupported by the claimant under
French law. I'm not an expert on French
law but I do know that France is a
signatory of the U.N. Convention for the
Enforcement of Foreign Arbitration
Awards, so, number one, there wouldn't
be any problem going to France and
getting it upheld and getting an order
confirming the award. As it wouldn't be
in this country if we had an arbitration
award in France. There's an assumption
that civilized countries should
recognize their judgments and also
should recognize their arbitration
awards. So we think that that is also a
fairly outrageous statement to make on
that issue.
    And I think I had another point.
    Also, a point was made that
there's a case that's been filed in, I
think Supreme Court New York, for an

**Page 25**

1  Proceedings - 3/28/06
2  additional 55 million.
3      MR. LEWNER: 49.
4      MS. JACOBSON: 48.
5      MR. HIGGINS: 48, sorry.
6      That's -- you know, I think that's
7  utterly improper for anyone to suggest
8  that that has any relevance here.
9  Number one, it's not SCOR France, the
10 parent company, it's SCOR U.S.
11     Secondly, I think what's being
12 asked is for the panel to not only judge
13 this case but to judge that case as to
14 whether there's any merit to that claim
15 either. We don't know what it's about.
16 I mean they claim they stopped paying
17 losses but, you know, who knows what
18 that dispute is about. It's in court,
19 it's not an arbitration, and the panel
20 here really has no ability to analyze
21 it, to figure out whether it has any
22 application here or whether it affects
23 the ability of the parent company or
24 could affect the ability of the parent
25 company to satisfy this judgment which

**Page 26**

1  Proceedings - 3/28/06
2  in this case is going to be, if they get
3  everything they want, $6 million, maybe
4  plus some interest. So that's the
5  arguments we have on the security issue.
6      THE UMPIRE: Thanks.
7      Any more questions of John
8  before -- Michelle?
9      MS. JACOBSON: I believe that
10 Mr. Higgins has actually combined the
11 two security motions because a lot of
12 the references were actually to DIG and
13 I believe that we were here to discuss
14 the non-DIG programs, NHE, ORS and HPP.
15 However --
16     MR. HIGGINS: I was mistaken, I
17 thought we were discussing -- we were
18 still in the organizational meeting when
19 we were discussing security.
20     THE UMPIRE: Yes, we're still in
21 the organizational meeting.
22     MS. JACOBSON: Right.
23     THE UMPIRE: I understand that
24 there are perhaps some grayish and
25 blurry lines here when we're talking

**Page 27**

1  Proceedings - 3/28/06
2  about security because we are going to
3  talk about security relative to both
4  contracts.
5      MS. JACOBSON: Okay, well, Mr. --
6      THE UMPIRE: I don't think that's
7  too much of a problem at the moment but
8  please go ahead.
9      MS. JACOBSON: Okay.
10     First of all, with respect to
11 Mr. Higgins' attempt to parse the cases
12 with respect to Section 1213, that it
13 was ordered by the court and not the
14 arbitration panel, I thoroughly disagree
15 with that, we've only cited two cases,
16 there are more cases.
17     If you turn to the actual statute
18 that we've appended to our reply brief
19 with respect to the DIG motion, you will
20 see that, we turn to Exhibit A, page 16
21 of 19, see under "Bond or Deposit" in
22 general there is a series of cases which
23 deal with Section 1213, the first of
24 which is dealing with an arbitration
25 panel's interim order for prejudgment

**Page 28**

1  Proceedings - 3/28/06
2  security.
3      THE UMPIRE: Hold on, just a
4  second.
5      MS. JACOBSON: That's the thin
6  one.
7      THE UMPIRE: It's actually page 15
8  but at the top --
9      MS. JACOBSON: Page 15 but it does
10 say page 16 of 19 at the top.
11     THE UMPIRE: Okay.
12     MS. JACOBSON: If you look to the
13 very first entry, there it is dealing
14 with an arbitration panel's interim
15 order, it was obviously being reviewed
16 by the court on prejudgment security.
17     So I think it is clear that 1213
18 does, in fact, apply to proceedings,
19 it's not limited to litigations, but in
20 any event, if I heard Mr. Higgins
21 correctly, he does not debate that the
22 panel has the inherent authority to
23 issue such awards, even if one were to
24 credit his argument under Section 1213.
25     Mr. Higgins' statement -- I'd like

---

29

Proceedings - 3/28/06

1 to respond to Mr. Higgins' statements
2 with respect to the contractual
3 provision. He's indicated that, in
4 essence, we're seeking final relief. I
5 mean that's not the case at all. In
6 both of our arbitration proceedings,
7 we're -- certainly we were entitled
8 under these provisions to completely
9 draw down on whatever we had, and we
10 haven't done so. We believe, however,
11 that these amounts should be set aside
12 in escrow, it's not akin to final
13 relief, and we would -- we assert that
14 the contract is clear that it does not
15 limit itself to matters not in dispute;
16 therefore, to the extent that we have
17 reserved and we have paid losses, and
18 that there is IBNR that we have set
19 aside, then they should post those sums
20 in an escrow amount per the terms of the
21 contract.
22    Mr. Higgins has discussed the
23 Schedule F. I think, frankly, that it's
24 shocking that Commercial Risk did not

---

30

Proceedings - 3/28/06

1 inform the panel that, indeed, it had
2 not posted the $29 million which appears
3 under LOCs. They know they haven't
4 posted that amount. In fact, there is
5 10.3 million that was as a result of
6 Royal's parent's LOC and to the extent
7 that Commercial Risk has contended that
8 in some regard that's improper, the
9 Delaware Insurance Department, which is
10 Royal Indemnity's domicile, has blessed
11 this very use of the parental LOC. It's
12 contained in the notes of the annual
13 statement of Royal Indemnity. So there
14 is nothing wrong with it.
15    However, they should not be
16 entitled to take credit for the parental
17 LOC that's out there. Their statement
18 that we solved the problem so that,
19 therefore, they don't have to abide
20 under their contractual obligations is
21 frankly -- I find it absurd.
22    Now, they express shock and dismay
23 over the fact that we said that they may
24 not have the wherewithal to satisfy any

---

31

Proceedings - 3/28/06

1 award here, and they said that they feel
2 it libelous. Well, to the extent that
3 we know that Commercial Risk has frankly
4 ceased paying on many millions of
5 dollars worth of obligations, we have a
6 problem with that. We don't think it's
7 libelous to assert that maybe that they
8 won't pay; their financial statements
9 show otherwise. They are relying
10 wholeheartedly on this guarantee that
11 has been posted by SCOR? Well, you
12 know, if you take a look at that
13 guarantee, it's addressed to whom it may
14 concern; that's not a contract that
15 anyone can rely on, to whom it may
16 concern.
17    And I would also indicate that if
18 you look at that SCOR guarantee, one of
19 them is dated July of '99. That's the
20 date of the first DIG contract that we
21 have. That parental guarantee is not
22 slapped on to the back of the
23 reinsurance contract, it is not our --
24 our reinsurance contract is with

---

32

Proceedings - 3/28/06

1 Commercial Risk, it's signed by
2 Commercial Risk and it's Commercial Risk
3 that we should look to to enforce any
4 obligations under the reinsurance
5 contract.
6    We, with all due respect, should
7 not have to go off to France to litigate
8 against the parent on a guarantee which
9 is certainly -- I'm not even sure if
10 it's a legal obligation under U.S. law
11 or French law.
12    And, certainly, I don't think that
13 Security Insurance Company of Hartford
14 should have to engage in ancillary
15 litigation in France to enforce
16 something here and that certainly
17 collateral should be posted.
18    MR. DIELMANN: I have a question.
19 Mr. Higgins said -- stated that there
20 are -- France is a signatory of the U.N.
21 agreement for enforcing arbitration
22 awards. Is this, indeed, correct, that
23 you have to go to France if the panel,
24 you know, gives you relief or can that

**Page 33**

Proceedings - 3/28/06
award be enforced in this country?
  MS. JACOBSON: Well, SCOR, the parent, is not a party to this arbitration. So if this panel -- this panel would have to somehow suck SCOR, the parent, into this arbitration on an alter ego theory.
  MR. DIELMANN: But is that not then a formality to have it confirmed in France? I mean what you are implying it seems to me that you basically have to struggle to get it enforced in France but if SCOR is a signatory, then surely the subsidiary -- you would have to just to get it confirmed or do I understand this incorrectly?
  MS. JACOBSON: No, I believe, with all due respect, I think you have it incorrectly. I mean here SCOR is not a party to this arbitration; they would not -- there would not be an award entered against SCOR in this arbitration unless they're brought in as a party. Therefore, there would be no award to

**Page 34**

Proceedings - 3/28/06
enforce here or overseas against SCOR. We would have to have an award against Commercial Risk. If Commercial Risk wouldn't pay, then we would be stuck with that parental guarantee and have to chase SCOR somewhere, either by commencing arbitration against SCOR somewhere or by litigating against SCOR somewhere. That's the fear.
  MR. HABER: Theo, isn't there a simple solution. If SCOR voluntarily wishes to submit to the jurisdiction of this arbitration panel and be bound by U.S. law and be subject to any judgment, wouldn't that solve the problem?
  MR. HIGGINS: That's something that may well happen but I don't have the authority, sitting here, to respond to that, but I'm certainly willing to respond to it in the next day or so.
  THE UMPIRE: Let me make sure I understand this, maybe I can --
  MR. HIGGINS: I can assure you that we didn't put that guarantee out as

**Page 35**

Proceedings - 3/28/06
something which is illusory.
  MR. HABER: Well, not --
  MR. HIGGINS: To whom it may concern is the world. It was sent to RSA, it was sent to all the cedents.
  MS. JACOBSON: With all due respect, no one in our organization recalls having been brought -- provided with that.
  THE UMPIRE: I tell you what, let's move on, I'm happy with understanding where I think we are.
  MR. DIELMANN: I haven't really understood what your suggestion, Marty, was.
  MR. HABER: Well, my suggestion is this, under American laws with regard to personal jurisdiction, because SCOR, the parent, is not a party here, they are not bound by anything legal.
  MR. DIELMANN: Okay.
  MR. HABER: They have signed a judgment, they have signed an arbitration treaty, if you will, that

**Page 36**

Proceedings - 3/28/06
says in the event they lose an arbitration in the United States and a judgment is against the parent --
  MR. DIELMANN: Right.
  MR. HABER: -- that judgment may be enforced in France, not a judgment against their subsidiary.
  MR. DIELMANN: Right.
  MR. HABER: So your question, in order to respond to your question completely, they would have to be subject to the jurisdiction of this panel and they are not.
  MR. DIELMANN: Okay.
  MR. HABER: I mean no one here is claiming that SCOR, the parent, is part of this case.
  MR. HIGGINS: No, we're not, but it's certainly not clear that anyone would have to go to France. SCOR's doing business everywhere including here.
  THE UMPIRE: Let me say something here for a second. As far as I

### Page 37

Proceedings - 3/28/06

1. understand it from following
2. Mr. Dielmann's question--I'll leave
3. Mr. Haber's question out of it for the
4. moment--in the event that this panel
5. found in favor of Security of Hartford,
6. that would be against Commercial Risk's
7. both Bermuda and Vermont --
8. MS. JACOBSON: That's right.
9. THE UMPIRE: -- where relevant.
10. If those companies -- and if there
11. were no security, with a small "S,"
12. posted, Security of Hartford would look
13. to Commercial Risk for satisfaction of
14. that award. In the event that
15. Commercial Risk failed to satisfy the
16. award, for whatever reason, it's
17. possible that Security could look to the
18. guarantee from SCOR as relief. In order
19. to satisfy that, it would need to write
20. to SCOR and say kindly pay us X amount
21. of dollars. If SCOR said, yes, end of
22. problem; if SCOR said no, however, then
23. I would imagine that Security of
24. Hartford would need to file litigation

### Page 38

Proceedings - 3/28/06

1. against SCOR, presumably in France,
2. under the terms of that guarantee.
3. Whether in France or the U.S., it would
4. need to file litigation, I'm just
5. assuming, but what I'm saying, it in
6. France; I would need to fight that
7. litigation in order to secure the award.
8. Is that a clear understanding of
9. that issue?
10. MS. JACOBSON: That is correct.
11. THE UMPIRE: As far as Mr. Haber's
12. question --
13. MR. HIGGINS: Well, could I
14. just --
15. THE UMPIRE: Go ahead.
16. MR. HIGGINS: One caveat to what
17. you just said. In the first instance,
18. it would be up to Security -- or, I'm
19. sorry, Commercial Risk to determine
20. whether they even satisfied the
21. judgment. I mean this is something that
22. only applies if there isn't enough
23. assets, and there's been no proof that
24. there isn't enough assets or that there

### Page 39

Proceedings - 3/28/06

1. won't be enough assets. You have to get
2. into the reserving of the company.
3. THE UMPIRE: In the event that
4. Commercial Risk paid the award that the
5. panel had given, it will be end of
6. story.
7. MR. HIGGINS: Yes.
8. THE UMPIRE: In the event that it
9. did not pay, for whatever reason,
10. whether it could, didn't want to or
11. couldn't because it was bust, makes no
12. difference.
13. MR. HIGGINS: I'm sorry, it does
14. make a difference on the first thing
15. that you said, because you can enforce
16. it against the company if they have the
17. funds. It's entitled to be entered in a
18. court and then enforced, entered as a
19. judgment and then enforced if they don't
20. want to pay. Now, if they're belly up,
21. then that would trigger what you're --
22. THE UMPIRE: Well, couldn't
23. Security pursue both angles --
24. MR. HIGGINS: Sure.

### Page 40

Proceedings - 3/28/06

1. THE UMPIRE: -- at the point in
2. time, i.e., pursue Commercial Risk,
3. let's assume that it's not in litigation
4. or even if it is, it's against the
5. receiver, and under the parental
6. guarantee, the guarantee I don't think
7. mentions the liquidation scenario, it's
8. just a blanket guarantee, what it's
9. worth is something else, I don't want to
10. get into that issue, but as a matter of
11. law, I think Security could pursue both
12. if they so choose?
13. MR. HIGGINS: If they believe that
14. it's clear that Commercial Risk can't
15. satisfy it, then they would be -- they
16. would be free to, you know, to litigate
17. under the guarantee and then pursue
18. rights against Security presumably at
19. the same time by filing a liquidation
20. proceeding or however. But the
21. guarantee is a standby, so, first,
22. they'd have to pursue Security, which is
23. normal, and if Security has sufficient
24. funds --

41

```
 1        Proceedings - 3/28/06
 2        THE UMPIRE: You mean Commercial
 3   Risk?
 4        MR. HIGGINS: I'm sorry, they have
 5   to pursue Commercial Risk, and if
 6   Commercial Risk has sufficient funds,
 7   then they'd be obligated to pay them.
 8        THE UMPIRE: Thank you.
 9        As far as Mr. Haber's question is
10   concerned, I would prefer that we didn't
11   raise the issue of bringing in any
12   parties yet until we've gone down
13   through stage one. I think that's a
14   little premature and I'd like to have
15   panel discussion on that first which we
16   could -- I think that's --
17        MR. HABER: That's perfectly fine
18   but I think when we deal with the
19   guarantee, and we're assuming facts not
20   in evidence, because it's not clear
21   under American law that this is a valid
22   guarantee, it might be under French law,
23   but we do not have an opinion of French
24   counsel that this is any sort of
25   enforceable guarantee because the first
```

42

```
 1        Proceedings - 3/28/06
 2   sentence says that "SCOR guarantees that
 3   Commercial Risk Reinsurance Company,"
 4   without determining which company,
 5   "shall perform its claims obligations
 6   when due." If I understand this case,
 7   there are two Commercial Risk
 8   reinsurance companies, correct?
 9        MR. HIGGINS: Yes.
10        MR. HABER: Which one does this
11   guarantee apply to?
12        MR. HIGGINS: Both of them.
13        MR. HABER: It doesn't say that,
14   they're two separate legal entities, you
15   have not specifically identified -- I
16   don't mean you personally, John, I don't
17   mean it that way, but SCOR has not
18   specifically identified the party whose
19   obligations it is guaranteeing. In
20   America, under the rules of strictissimi
21   juris that voids this to begin with
22   because you don't have a party whose
23   actual performance is guaranteed without
24   having the party completely identified
25   and here the party isn't. I think the
```

43

```
 1        Proceedings - 3/28/06
 2   guarantee is questionable. It may be
 3   perfectly valid under French law, I'm
 4   not suggesting it's not, but there's
 5   clearly no proof before the panel that
 6   it is.
 7        MR. HIGGINS: Well, that's just
 8   one of them. The other one names both
 9   companies.
10        MR. DIELMANN: May I just, you
11   know, just taking on what Mr. Haber
12   said, I mean, well, where is the
13   problem -- to clarify this, even to take
14   out the remotest possibility that SCOR
15   doesn't stand behind their subsidiary,
16   is that, you know, that there is a, a
17   specific guarantee, referring to the two
18   treaties and, if need be, to this
19   particular or the two arbitrations that
20   are currently pending, I mean I do not
21   know whether that is too specific but
22   surely I would say it would take away
23   even the doubts that obviously in the
24   claimant's mind that there may be a risk
25   that SCOR or Commercial Risk will
```

44

```
 1        Proceedings - 3/28/06
 2   talk -- walk away from any award being
 3   given by the panel?
 4        MR. HIGGINS: That is one thing I
 5   indicated earlier we'd discuss -- what
 6   you're suggesting is make it specific to
 7   these contracts --
 8        MR. DIELMANN: Yeah.
 9        MR. HIGGINS: -- and have SCOR,
10   the parent --
11        MR. DIELMANN: Right.
12        MR. HIGGINS: -- state that the
13   guarantee covers that specifically.
14        MR. DIELMANN: Exactly.
15        MR. HABER: But there's something
16   else, the language in the guarantee says
17   that there's a guarantee that they shall
18   perform its payment obligations when
19   due. This is a judgment in an
20   arbitration we're looking to be
21   guaranteed, not the performance of a
22   claims obligation when due, because in
23   theory, and only in theory, if this
24   panel ruled in favor of Security of
25   Hartford, we would be ruling that a
```

Page 45

Proceedings - 3/28/06
1  claims obligation -- a claims demand
2  made X months ago or X years ago,
3  whenever it was made, was due when made
4  and wasn't paid.
5      This guarantee is unclear in a
6  literal sense as to all of Commercial
7  Risk's obligations. It's only talking
8  about claims obligations when due. It
9  could mean there's judgment--I'm not
10 suggesting it doesn't--but it's -- at
11 this point in time the language is so
12 unclear as to require a court's
13 interpretation. Not the kind of thing
14 you want to bank on to enforce.
15     MR. HIGGINS: Well, I mean the
16 suggestion is that we clarify that to --
17     MR. HABER: A brand --
18     MR. HIGGINS: -- to alleviate
19 those concerns.
20     But, secondly, when you're dealing
21 with guarantees, before you can pursue
22 the parent, you have to enforce the
23 obligation, to the extent you can,
24 against the guaranteeing party.

Page 46

Proceedings - 3/28/06
1      MR. HABER: It depends on the
2  terms of the guarantee. Some are
3  guarantees of payment, some are
4  guarantees of performance. It depends
5  on the guarantee you enter into and what
6  the consideration is for the guarantee.
7  It's a little difficult on the July 1
8  '99 guarantee to understand how that was
9  consideration for the DIG contract since
10 it was the same date.
11     The March 9, 2001 guarantee, at
12 least I don't think the panel has seen
13 any evidence as to what the genesis was
14 for that document and what the
15 consideration is.
16     I'm just saying there are a lot of
17 open questions and as we all well know,
18 if you give a lawyer a chance, they can
19 make a thousand questions out of a
20 one-question issue. And there are
21 really a lot of questions here that are
22 unanswered and I don't think the
23 guarantee says precise -- and clearly,
24 you could clarify it by SCOR issuing a

Page 47

Proceedings - 3/28/06
1  document that says, "Without offset
2  defense or counterclaim, we guarantee
3  the full payment and performance of all
4  debts owed under the two contracts."
5  I'm not saying you agree to that
6  language, I'm not suggesting that; all
7  I'm saying is you could draft a document
8  that was a lot tighter.
9      MR. HIGGINS: Yes, and that's what
10 I'm going to discuss with the client.
11     MS. JACOBSON: And I have a
12 comment to that.
13     We entered into these contracts
14 with Commercial Risk. That is our
15 contracting party. We are entitled to
16 look to Commercial Risk, we're not -- we
17 don't have to look to anyone else,
18 because that's not -- no one else signed
19 that contract; Commercial Risk signed
20 that contract, Commercial Risk Vermont
21 and Commercial Risk Bermuda, those are
22 the folks that we are pursuing in this
23 arbitration. Frankly, these are the
24 only folks that we have a right to

Page 48

Proceedings - 3/28/06
1  pursue in this arbitration and we are
2  entitled to security from them. I don't
3  want other guarantees or that we may
4  pay, you know, the parent stands behind
5  us, I don't think that that does the
6  trick. That's not who we contracted
7  with.
8      THE UMPIRE: I think it's
9  probably -- now is probably a good time
10 to cut off this particular line of
11 discussion --
12     MS. JACOBSON: Yeah.
13     THE UMPIRE: -- (a) because I
14 think we'll start going round again, and
15 (b) I think from a procedural viewpoint
16 what we discussed earlier on is the
17 panel will discuss the issue. It may or
18 may not become relevant.
19     MS. JACOBSON: Okay.
20     THE UMPIRE: If it does become
21 relevant, we can revisit it and either
22 make an order or ask the parties to
23 comment some more but I think we've
24 probably added sufficiently enough from

**Page 49**

Proceedings - 3/28/06

the principle viewpoint other than my co-panelist who obviously doesn't agree with me.

MR. DIELMANN: No, I do agree with you.

THE UMPIRE: Good, let's move on.

MR. DIELMANN: No, again, I just have a very specific question. Is that correct or incorrect that, you know, Commercial Risk Vermont can -- does have under Article -- under the security clause you can take credit or not, and my question is, you know, does the contractual obligation in respect of the security requirement, does that also refer to Commercial Risk Vermont or not?

Because I think they only have to -- have to -- they only, you know, have to oblige if you can -- if, you know, Security of Hartford can take credit, my question is I'm not clear on this point whether that's correct or not.

MS. JACOBSON: I believe that

**Page 50**

Proceedings - 3/28/06

Commercial Risk Vermont is an admitted company.

MR. DIELMANN: Okay.

MS. JACOBSON: Authorized, authorized, I'm sorry.

MR. DIELMANN: So as far as if there's a security obligation under the Article 14, as far as DIG is concerned and other articles of a similar nature is concerned, they wouldn't have to post letters of credit; is that correct?

MS. JACOBSON: That would be correct under the security provisions in the contracts, apart from common law and statute -- that's correct.

MR. DIELMANN: And I have another question that refers to the net funds held.

Net funds held --

THE UMPIRE: Theo, can we leave that, I was going to ask you your first question, you've asked it, but I want to get into those details when we get into the security discussion.

**Page 51**

Proceedings - 3/28/06

MR. DIELMANN: Okay, fine.

THE UMPIRE: Maybe if we get back to the organizational meeting here for a moment at least.

I was incorrect at the beginning here, I moved too quickly, I should have asked everybody in the room to identify themselves, so as a break now it might be a good idea to do that.

I'll start here and then we'll move round to the left.

Obviously, David Thirkill, umpire.

MR. HABER: Martin Haber, party-appointed arbitrator for Security of Hartford.

MR. MEEHAN: James Meehan, I'm general counsel for Royal & SunAlliance USA and its affiliated insurance companies.

MR. LEFEBVRE: Andre Lefebvre, financial risk officer for Royal & SunAlliance USA.

MR. LEWNER: Andrew Lewner, from Stroock & Stroock & Lavan, for claimant.

**Page 52**

Proceedings - 3/28/06

MS. JACOBSON: I'm Michelle Jacobson, from Stroock & Stroock & Lavan, for the claimant.

MR. HIGGINS: John Higgins, D'Amato & Lynch, for the respondent.

MS. de LACROIX: Joelle de Lacroix, CRP.

MR. DIELMANN: Theo Dielmann, party-appointed arbitrator for Commercial Risk Vermont and Bermuda.

THE UMPIRE: Thank you.

As far as prehearing motions are concerned, obviously we have the motion for security. Are there any other prehearing motions that anybody wants to raise at this juncture?

MR. HIGGINS: Which one are we on?

THE UMPIRE: We're on the organizational meeting?

MR. HIGGINS: Non-DIG.

THE UMPIRE: Non-DIG.

MR. HIGGINS: I think we should discuss the consolidation issue. Should I deal with that?

### Page 53

Proceedings - 3/28/06

THE UMPIRE: Please.

MR. HIGGINS: We believe that consolidation -- not consolidation in a literal sense because we don't have or the panel doesn't have the authority under New York or Connecticut law to order parties to consolidate different contracts, so we're not asking for consolidation in a literal sense. What we're asking is for the panel to order that the discovery or disclosure in the hearings be held at the same time. I've seen that in many cases but -- and that's what we're suggesting.

Now, the objection to that, as far as we know, from Security is that we're on a very tight schedule in the DIG arbitration and it will interfere with the ability to complete the schedule and it will cause problems timewise for us to do that. And I think that if that's the case, if that's -- if there's merit to that argument, then we would be willing to yield on that point so long

### Page 54

Proceedings - 3/28/06

as we don't end up doing the same thing, which is pushing this arbitration, the non-DIG arbitration, along at the same time as the other and, you know, creating the same problem that's being objected to.

So what we would suggest, if the panel wants to entertain it, is that we have -- that we put this one off and have it done after the DIG arbitration. And that's perfectly acceptable to us.

MS. JACOBSON: Okay. Well, we, despite what Mr. Higgins is saying that he's not seeking consolidation, I think, in fact, it would be a de facto consolidation, which is not required either contractually, you know, in any of the agreements, and we don't agree to it and I think that's been made clear.

We agree to consolidate NHE, ORS and HPP--those were actually three separate arbitrations--we agreed to consolidate them into one, having -- leaving us with two arbitrations.

### Page 55

Proceedings - 3/28/06

There are such disparate facts with respect to each of those programs. In one we have a set of three disparate facts and DIG has its own set of facts. We don't believe that there is that much of a substantial overlap. I believe the contention is violation of underwriting guidelines. The guidelines are different in all of the arbitrations.

If what Mr. Higgins is suggesting is to have the DIG arbitration in December, as scheduled, and then have a later date for the non-DIG, keeping them separate, that's fine with us, and we would propose an end-of-January hearing date if that's acceptable to the panel, just splitting them up, keeping them separate.

THE UMPIRE: Okay, let me make a couple of points. The panel has already chatted datewise at least, and while I don't have the specific dates – are you okay?

MS. JACOBSON: Yeah.

### Page 56

Proceedings - 3/28/06

THE UMPIRE: -- while I don't have the specific dates, and we can come to those in a second, the first date we could offer you would be March anyway, and, in effect, since we had already reserved the whole -- the whole week in December, I don't remember the exact dates, but we reserved the whole week and I think the impression that we gained when we discussed this is we'd need all of that time for the DIG arbitration.

MS. JACOBSON: That's right.

THE UMPIRE: I mean just as a matter of fact we want to be able to go --

MR. HABER: December 11th.

THE UMPIRE: December 11th, thank you, Marty.

We wouldn't be able to go until March anyway.

Talking a little more generally, and again I welcome any input from my co-panelists here, since the panel has

## Page 57

Proceedings - 3/28/06

not heard from either of you relative to discovery issues in relation to the DIG contract, we assume one of two things, either you're getting along famously or you haven't chatted at all but in either case, obviously there's no issues yet before us on that. It would seem to me, as a matter of logic, that if there's auditors going in, just from an efficiency viewpoint, one would imagine that it would make sense for them to sort of look at the two or three if that was feasible but, again, if it is a problem to either of you, please go ahead and organize it as you think best and come to us with any issues as they arise.

As far as dates are concerned -- what was that date again, Marty?

MR. HABER: March 26th is my earlier --

THE UMPIRE: Okay, that's good. I'm free -- are you free?

MR. DIELMANN: Yes.

## Page 58

Proceedings - 3/28/06

THE UMPIRE: Again, do you think with the three that a week is sufficient?

MS. JACOBSON: I believe so.

THE UMPIRE: So we could reserve off -- if that was okay with you, Mr. Higgins, also, the week of 26th of March '07?

MR. HIGGINS: Should be okay.

THE UMPIRE: Is there anything strange about that --

MR. HABER: 26th is a Monday.

THE UMPIRE: -- apart from it being, the 29th being Mr. Haber's next wedding anniversary after tomorrow?

MS. JACOBSON: We were attempting to figure out which week it was Good Friday and I can't -- according to my list it's wrong. It must be the 23rd.

THE UMPIRE: The 23rd is Good Friday?

MS. JACOBSON: I was just trying to figure it out but apparently the schedule that I have of holidays has to

## Page 59

Proceedings - 3/28/06

be wrong because I have Easter Sunday being on March 27th in 2007, which it certainly isn't the case.

MR. HABER: That's a Monday.

THE UMPIRE: Let's put it this way, let's reserve that week.

MS. JACOBSON: Yes.

THE UMPIRE: If it so transpires there's a holiday at the end of it and we need to go over to the following week and come back, we'll do that but I think that's important that we at least get it on the calendar.

MS. JACOBSON: I agree with you.

MR. HABER: Unless you want to pick the week of April 2nd and then be sure?

MR. HIGGINS: That's probably better anyway because I get concerned about the suggestion of January but once this one, the DIG one is over, we're going to, you know, we're going to have to shift gears and have some time to prepare papers on the other.

## Page 60

Proceedings - 3/28/06

THE UMPIRE: I actually have no problem if Mr. Dielmann doesn't with either of those.

MR. DIELMANN: No.

THE UMPIRE: And I don't think it's going to make that much difference.

MS. JACOBSON: If my notes are correct, Passover may be the following week, which is April 2nd, so we would want to do it the 26th.

THE UMPIRE: Okay. Did you hear that, Mr. Higgins?

MS. de LACROIX: I'm trying to look at his journal and it seems that he's going to a seminar in April, but I can't see anything -- I'm sorry.

THE UMPIRE: That's okay. Let's put in the week of the 26th now and if it transpires that it's a big issue either for Easter or Passover, we'll revisit it.

MR. HABER: So we're at the 26th?

THE UMPIRE: 26th.

MR. HABER: Okay, done.

61

1  Proceedings - 3/28/06
2  MR. DIELMANN: Yeah.
3  MR. HIGGINS: So the week of the
4  2nd, April?
5  THE UMPIRE: No, the 26th, there's
6  a question probably of Passover in that
7  week.
8  MR. LEWNER: Passover is the first
9  two days, April 2nd and April 3rd of
10 that year.
11 MS. JACOBSON: We're better off in
12 the March dates it appears.
13 THE UMPIRE: Okay, back to the
14 agenda, I think we're down -- could we
15 take it that the parties would like
16 similar procedural issues to that we
17 discussed and agreed on in the other
18 matter?
19 MR. HIGGINS: Yes.
20 MS. JACOBSON: Yes.
21 THE UMPIRE: And ex parte
22 communication in the same way, I think
23 we said at the filing of the initial
24 prehearing briefs?
25 MS. JACOBSON: Yes.

62

1  Proceedings - 3/28/06
2  MR. HIGGINS: Yes.
3  THE UMPIRE: Dates and locations
4  we've done.
5  MS. JACOBSON: Well, we'll offer
6  to hold -- I don't think we discussed
7  location but we'll offer our --
8  MR. HIGGINS: We can discuss that
9  much later. I prefer to avoid hotel
10 expenses and all the rest of that.
11 MS. JACOBSON: That's why we're
12 offering.
13 THE UMPIRE: The panel will not
14 insist on being in a hotel if the
15 parties can agree on a location.
16 MS. JACOBSON: Okay.
17 THE UMPIRE: And, again, I think
18 we're all agreed in New York --
19 MR. HIGGINS: Yes.
20 THE UMPIRE: -- as before.
21 Please correct my memory if it's
22 incorrect, but I don't think we actually
23 discussed the form of award, whether you
24 want a reasoned award or not in the
25 other matter, and I raise it now, it

63

1  Proceedings - 3/28/06
2  wasn't on the agenda here. If
3  necessary, we could revisit that one
4  officially but if unofficially if we
5  come to the same conclusion here, I
6  think it will be much more efficient.
7  MS. JACOBSON: We would request a
8  reasoned award.
9  MR. HIGGINS: What was that, I'm
10 sorry?
11 MS. JACOBSON: We request a
12 reasoned award.
13 MR. HIGGINS: We agree.
14 THE UMPIRE: Okay. I don't think
15 this particular panel is afraid of
16 writing written awards.
17 So if there's no other matters
18 before this particular organizational
19 meeting panel, we'd like to adjourn it.
20 Do you have any other matters?
21 MS. JACOBSON: I don't believe so.
22 MR. HIGGINS: We don't.
23 THE UMPIRE: So we're going --
24 we'll adjourn the organizational meeting
25 and take a 10-, 15-minute break?

64

1  Proceedings - 3/28/06
2  MR. HABER: 10 is fine.
3  THE UMPIRE: 10 is fine.
4  (Time noted: 11:12 a.m.)

```
                                                              65
 1
 2              C E R T I F I C A T E
 3
 4         I, ANDREW WALKER, a Registered
 5    Professional Reporter and Notary Public,
 6    do hereby certify:
 7         I reported the proceedings in the
 8    within-entitled matter, and that the
 9    within transcript is a true record of
10    such proceedings.
11         I further certify that I am not
12    related, by blood or marriage, to any of
13    the parties in this matter and that I am
14    in no way interested in the outcome of
15    this matter.
16         IN WITNESS WHEREOF, I have
17    hereunto set my hand this_____day
18    of_____, 2006.
19
20    _____
             ANDREW WALKER, RPR
21
22
23
24
25
```