# EXHIBIT 14

**1**

```
1   - - - - - - - - - - - - - - - - - - - - - -x
2      In the Matter of the Arbitration
3           -of-
4   SECURITY INSURANCE COMPANY OF HARTFORD Itself
5   and as Successor in Interest to THE FIRE AND
    CASUALTY INSURANCE COMPANY OF CONNECTICUT and
6   THE CONNECTICUT INDEMNITY COMPANY,
7
              Claimant,
8
           -against-
9
    COMMERCIAL RISK REINSURANCE COMPANY LIMITED
10  (BERMUDA) and COMMERCIAL RISK RE-INSURANCE
    COMPANY (VERMONT),
11
              Respondents.
12
    - - - - - - - - - - - - - - - - - - - - - - -x
13
              February 22, 2006
14            10:05 a.m.
15            Stroock & Stroock & Lavan LLP
              180 Maiden Lane
16            New York, New York
17
18       ORGANIZATIONAL MEETING
19  BEFORE:
20
         DAVID A. THIRKILL, Umpire
21
         MARTIN D. HABER, ESQ., Arbitrator
22
         THEODOR DIELMANN, Arbitrator
23
24
    Reported by:
25  ANDREW WALKER, RPR (1991)
```

**2**

```
1
2   A P P E A R A N C E S :
3   STROOCK & STROOCK & LAVAN LLP
         Attorneys for Claimant
4        180 Maiden Lane
         New York, New York  10038-4982
5
    BY:  ROBERT LEWIN, ESQ.
6        MICHELLE L. JACOBSON, ESQ.
7
8   D'AMATO & LYNCH
         Attorneys for Respondents
9        70 Pine Street
         New York, New York  10270
10
    BY:  JOHN P. HIGGINS, ESQ.
11
12  ALSO PRESENT:
13
    BRIAN THIBODEAU, ESQ.
14  Senior Counsel
    Royal & SunAlliance
15
    DENNIS T. HAVER, ESQ.
16  Assistant General Counsel
    Royal & SunAlliance
17
    ANDRE LEFEBVRE
18  Financial Risk Officer
    Royal & SunAlliance
19
    JOELLE de LACROIX
20  CRP
21
22
23
24
25
```

**3**

```
1   Proceedings - February 22, 2006
2       THE UMPIRE:  Let's all go on the
3   record.
4       Good morning, we are at the
5   organizational meeting in the matter of
6   an arbitration between Security
7   Insurance Company of Hartford and
8   others, petitioners, and Commercial Risk
9   Reinsurance Company Limited (Bermuda)
10  and Commercial Risk Re-Insurance Company
11  (Vermont), respondents.
12      Let's do an identification of
13  everybody in the room, going this way
14  round.  I'll start.
15      I'm David Thirkill, umpire in this
16  matter.
17      MR. HABER:  Martin D. Haber, I'm
18  the party-appointed arbitrator for
19  Security of Hartford.
20      MR. THIBODEAU:  Brian Thibodeau,
21  senior counsel of Royal & SunAlliance.
22      MR. LEFEBVRE:  Andre Lefebvre,
23  financial risk officer of Royal &
24  SunAlliance.
25      MS. JACOBSON:  Michelle Jacobson,
```

**4**

```
1   Proceedings - February 22, 2006
2   Stroock & Stroock & Lavan, for the
3   claimants.
4       MR. HAVER:  Dennis Haver,
5   assistant general counsel with Security,
6   part of the Royal & SunAlliance group of
7   companies.
8       MR. LEWIN:  Robert Lewin, from
9   Stroock & Stroock & Lavan, for the
10  claimants.
11      MR. HIGGINS:  John Higgins,
12  D'Amato & Lynch, for the respondents.
13      MS. LACROIX:  Joelle de Lacroix,
14  Commercial Risk.
15      THE UMPIRE:  Thank you.
16      MR. DIELMANN:  I'm Theodor
17  Dielmann, and I'm the party-appointed
18  arbitrator for Commercial Risk.
19      THE UMPIRE:  I had circulated an
20  agenda.  Does everybody have that or
21  would anybody like a copy?
22      We're all good to go.  Let's start
23  off with disclosures by the panel.  I'll
24  go first.
25      As far as my fellow panelists are
```

5

1  Proceedings - February 22, 2006
2  concerned, starting with Mr. Dielmann,
3  whom I've known for 20 years, our first
4  meeting was conducting business between
5  our then respective employers. I've
6  seen him many times particularly in the
7  last five years or so, mainly in social
8  contexts, such as ARIAS meetings and so
9  on. I know there were a number of
10 business dealings between my immediately
11 preceding employer, RiverStone Group,
12 and companies that Mr. Dielmann
13 represented but I was not directly
14 involved in any of those. Mr. Dielmann
15 and I have come close to working
16 together on panels but this is the first
17 time we have ever done so.
18     As far as Mr. Haber is concerned,
19 I met him first several years ago when
20 he was part of the faculty at an ARIAS
21 intensive training workshop and I was a
22 mere student. I have met him many
23 times, again, in social and ARIAS type
24 contexts and at industry conferences or
25 seminars since. Like Mr. Dielmann, I

6

1  Proceedings - February 22, 2006
2  know Mr. Haber and I have come close to
3  working together on panels but this is
4  the first time we have done so.
5  Mr. Haber was a party-appointed
6  arbitrator a number of times, I don't
7  know how many, for companies that were
8  managed or associated with my former
9  employer, RiverStone, but I was never
10 involved in any of those.
11     As far as counsel is concerned,
12 I've met Mr. Lewin on many occasions, in
13 the last few years particularly. I
14 believe, again, he also has represented
15 some RiverStone or Fairfax associated
16 companies but not anything that I've
17 directly worked on.
18     Mr. Haver and I have not met prior
19 to this morning although we've known of
20 each other's existence for some years,
21 which I'll come back to in a moment.
22     I don't believe I've met any of
23 the other representatives heretofore of
24 Security although I did find out that
25 Mr. Lefebvre lives not 20 miles from

7

1  Proceedings - February 22, 2006
2  where I live in New Hampshire. I did
3  not know that until this morning.
4     Mr. Higgins and I, I don't believe
5  we've had the pleasure of meeting, we
6  might have seen each other at ARIAS type
7  contexts, but I don't believe so.
8     Ms. Lacroix, I believe I've met
9  you somewhere in our careers in
10 reinsurance, I just don't recall where
11 but I know we have met sometime, forgive
12 me if your memory is better than mine.
13     As far as the parties are
14 concerned, when I was a litigation
15 manager at RiverStone I was involved in
16 what turned out to be quite a complex
17 dispute that did involve Security of
18 Hartford that I believe Mr. Haver was
19 directly involved in managing and, as I
20 say, I was involved in the litigation
21 side of that. We never did meet during
22 it although I think we probably read
23 each other's correspondence quite
24 extensively. It was a matter that did
25 settle eventually, I believe last year.

8

1  Proceedings - February 22, 2006
2     I was also involved at RiverStone
3  in trying to resolve some business
4  issues such as commutations and so on
5  with a company, my memory tells me it's
6  Connecticut Indemnity, an affiliate of
7  Security of Hartford, for yet another
8  affiliate of the Fairfax group.
9     As far as Commercial Risk is
10 concerned, either of the companies, I
11 have had no business relationship with
12 them.
13     Now, my memory may be slightly
14 incorrect here when I was putting
15 together these disclosures but I think
16 that when Commercial Risk first opened
17 its doors in Bermuda, it was in the same
18 building, ironically enough the
19 Continental Insurance building, that I
20 worked in for a former employer of mine
21 called Forum Re. And I did know well, I
22 can't recall whether he was then
23 president or at least a senior officer
24 in the company, a man called Graham
25 Pewter. Which leads me to add that I

9

1 Proceedings - February 22, 2006
2 don't know that this amounts to a
3 disclosure yet but as I read the briefs,
4 it did occur to me that if either or
5 both sides call witnesses that have a
6 Bermudian connection, such as
7 individuals from Commercial Risk, from
8 Legion Insurance Company, or from
9 H&H Park, the brokers involved here, I
10 may well know them personally because I
11 lived in Bermuda twice so I'm just
12 giving predisclosure of that were it to
13 come up.
14        I would add that during my over
15 35 years' career in the reinsurance
16 business, which included over 25 years
17 as a reinsurance underwriter, I know
18 that I was involved in business
19 relationships, I could not specify them
20 at all here, that would involve
21 virtually all of the companies here on a
22 reinsurance or ceded or assumed basis
23 other than Commercial Risk, I don't
24 think anything there.
25        Those are my disclosures.

10

1 Proceedings - February 22, 2006
2 Obviously I welcome any questions.
3        MR. LEWIN: We have no questions.
4        MR. HIGGINS: We have no
5 questions.
6        THE UMPIRE: Thank you.
7        MR. HABER: Thank you.
8        Again, I'm Martin Haber,
9 party-appointed arbitrator for Security
10 of Hartford in this matter.
11       First as to my colleagues, I will
12 reiterate exactly what Mr. Thirkill has
13 said about our relationship. I have
14 nothing really further to add to that.
15       Mr. Dielmann and I met, I guess
16 this is the second time of our
17 face-to-face meeting on his last trip
18 when this -- to America when this case
19 was first starting, he and I did met for
20 lunch and we had a very pleasant
21 discussion about how we would be working
22 together on this matter.
23       The only other disclosure I have
24 is, with regard to Mr. Dielmann, is
25 there is another case pending involving

11

1 Proceedings - February 22, 2006
2 the same two parties but different
3 transactions where he and I are both
4 party-appointed arbitrators, and the
5 counsel is the same, the only difference
6 is we don't have an umpire.
7        And that's my disclosures as to
8 the panel.
9        As to Security of Hartford and the
10 Royal & SunAlliance Group, let me
11 preface my disclosures by saying in my
12 former life I was general counsel to the
13 Continental Corporation, that means
14 every person in this room has either
15 sued me, been sued by me, engaged in
16 reinsurance transactions with us, both
17 as cedent and assuming company. I have
18 no recollection of any of that but if
19 someone wishes to remind me, I will
20 search my memory and disclose as much as
21 I can recollect.
22       I believe disclosure is an ongoing
23 obligation and I will endeavor to
24 disclose everything necessary to the
25 point of boredom for all of you up

12

1 Proceedings - February 22, 2006
2 through the final judgment or settlement
3 of this case.
4        With regard to Security of
5 Hartford, as I said, there are two other
6 cases -- there was one other case
7 pending, and in 1998, prior to the
8 purchase of Security of Hartford by the
9 Royal & Sun group, I think they had a
10 premium finance dispute in the State of
11 South Carolina and I was hired by the
12 Orion Capital Group, which was the prior
13 owner, as an expert witness regarding
14 premium financing. That case settled in
15 1998.
16       With regard to SCOR, there were
17 three matters, one of which is pending
18 but I am told is inches away from
19 settlement and there is a settlement
20 negotiation going on now between SCOR
21 and the other party. No counsel in this
22 room is involved and substantively there
23 are no issues that I know that are
24 similar.
25       The Royal cases were the other

13

1    Proceedings - February 22, 2006
2    things, as I said, that I've disclosed.
3        With regard to D'Amato & Lynch,
4    there were a total of three cases in
5    which I was involved, other than this
6    one. One is the other Royal case as
7    mentioned previously. We had a case
8    where I was appointed for a client
9    opposite to D'Amato & Lynch's client
10   that settled in February of 2001, and
11   another case that went to judgment in
12   February of 2004.
13       As to the Stroock law firm, there
14   were nine matters in total where I was
15   involved. Of the nine matters, with the
16   exception of one where I was appointed
17   by a client opposed to Stroock's client,
18   I have been appointed by Stroock in, as
19   I said, eight other matters.
20       Of the eight matters, two matters
21   are pending and -- not counting the
22   Royal cases. And I am told one of those
23   two matters might be settling but,
24   again, no one has told me anything more
25   specific, and in the two matters that

14

1    Proceedings - February 22, 2006
2    are pending, we've not even appointed an
3    umpire yet so I have no idea how that's
4    going to go.
5        Four of the matters went to
6    judgment and two others were settled.
7        And those are the sum total of my
8    Stroock disclosures.
9        I am pleased to answer -- oh, yes,
10   one other thing, Mr. Haver and I know
11   each other probably north of 25 years.
12   When he was employed solely by the Royal
13   and when the Royal was here in New York,
14   we were involved in various lobbying
15   efforts, for want of a better term,
16   involving the American Insurance
17   Association.
18       And I believe those are the sum
19   total of my disclosures and I'm pleased
20   to answer any questions.
21       Mr. Lewin?
22       MR. LEWIN: No questions.
23       MR. HAVER: Just for the sake of
24   this, my recollection is you served as
25   an umpire involving The Fire and

15

1    Proceedings - February 22, 2006
2    Casualty Insurance Company in an
3    arbitration and The Fire and Casualty
4    Company is a --
5        MR. HABER: I'm sorry, you're
6    absolutely right, let me amend.
7        There was another arbitration that
8    did, in fact, go to judgment. My
9    problem is because so many companies
10   have so many subsidiaries it's very
11   difficult to remember, but I thank
12   Mr. Haver for reminding me. I was the
13   umpire in a case that went to judgment
14   three years ago, I'm going to say,
15   involving a different affiliate and
16   another company involving transactions
17   in California that have nothing to do
18   with this.
19       MR. HIGGINS: No questions.
20       MR. LEWIN: We have no questions.
21       THE UMPIRE: Let me supplement
22   mine with two things that you jogged my
23   memory on there.
24       One is the panel that you're
25   talking about earlier on with

16

1    Proceedings - February 22, 2006
2    Mr. Dielmann, I believe that I filled up
3    a questionnaire form or the same
4    questionnaire form as was filled up for
5    this one. I'm delighted to hear that an
6    umpire hasn't been selected. Which also
7    leads me -- as far that umpire
8    questionnaire form, and I'm sorry I
9    forgot to mention it earlier, but I
10   believe and my hope is that I put on the
11   original questionnaire form is that I am
12   currently an umpire in a matter where
13   Stroock & Stroock & Lavan's West
14   Coast -- a West Coast office, so Jim
15   Fitzgerald, I don't remember which
16   particular office, is the counsel. I do
17   not know who nominated me for that but I
18   believe I put it on the questionnaire
19   form, I just forgot it this morning.
20   Sorry.
21       MR. DIELMANN: Compared to my
22   esteemed co-panelists, I am just a blank
23   sheet, so I can cut this short.
24       As far as the panel is concerned,
25   you've heard what they said, there is

17

1    Proceedings - February 22, 2006
2    nothing to add other than to say who
3    doesn't know Marty has never been to an
4    ARIAS meeting.
5         As far as the parties are
6    concerned, I have no relationship
7    whatsoever other than, you know, this
8    particular arbitration.
9         As far as the legal counsel are
10   concerned, you know, it both comes back
11   to when I did my round I think four or
12   five years ago, I visited both
13   Mr. Higgins and some gentleman from
14   Stroock & Stroock. Somehow, I do not
15   know how they -- Mr. Higgins dug up my
16   name again, but there is a present that
17   I still have in my cupboard, a T-shirt
18   with Stroock & Stroock on it, but the
19   color doesn't suit me so well so I
20   haven't put it on yet.
21        So this is all I have to say.
22        MR. HIGGINS: We have baseball
23   hats.
24        MR. LEWIN: What color?
25        MR. DIELMANN: It was black.

18

1    Proceedings - February 22, 2006
2         THE UMPIRE: The umpire refuses to
3    wear a black hat.
4         MR. LEWIN: We have no questions.
5         THE UMPIRE: Any questions of
6    Mr. Dielmann?
7         MR. HIGGINS: No questions.
8         THE UMPIRE: So can I take it that
9    the parties accept the panel as
10   constituted?
11        MR. LEWIN: Yes.
12        THE UMPIRE: And has -- thank you.
13        Has either of you prepared hold
14   harmless forms, the customary ARIAS
15   type?
16        MR. LEWIN: Yes. Would you like
17   to sign them?
18        THE UMPIRE: We'd be very
19   grateful.
20        MR. LEWIN: Do you want us to take
21   a moment to sign this and the
22   confidentiality, should we do this at
23   the same time or is that acceptable?
24        THE UMPIRE: If that's okay with
25   you?

19

1    Proceedings - February 22, 2006
2         MR. HIGGINS: I just have a couple
3    questions on the confidentiality.
4         THE UMPIRE: Okay, why don't you
5    do the hold harmless and then we'll do
6    the confidentiality.
7         MR. LEWIN: Fair enough.
8         THE UMPIRE: Did you want to go
9    ahead with comments on the
10   confidentiality?
11        MR. HIGGINS: We did discuss, I
12   did discuss with an associate from
13   Stroock, who is not here today, the
14   one -- the change that they indicated
15   they wanted which was disclosure
16   essentially only on a judgment -- I'm
17   sorry, on a court order which would
18   require it, disclosure. And some other
19   provisions in the original agreement.
20   We don't have a problem with that.
21        We'd like to make sure that to the
22   necessary extent reinsurers can be made
23   aware of this arbitration if we need to
24   give reinsurers information, you know,
25   in the ordinary course of business that

20

1    Proceedings - February 22, 2006
2    provides for auditors.
3         Does anyone have a problem with
4    that?
5         MS. JACOBSON: Actually, it's the
6    typical ARIAS form which provides that
7    you may disclose to retrocessionaires.
8         MR. HIGGINS: Where is that?
9         MS. JACOBSON: Let me give you a
10   copy, John.
11        MR. HABER: Michelle, out loud for
12   the record.
13        MS. JACOBSON: 3(a) says,
14   "Disclosure of arbitration information
15   may be made: (a) to the extent necessary
16   to obtain compliance with any interim
17   decisions or the final award herein, or
18   to secure payment from
19   retrocessionaires." So the form would
20   provide for that.
21        MR. HIGGINS: Okay.
22        The other question I had, the form
23   talks about disclosures pursuant to
24   subparagraphs (a) and (c), it seems to
25   me to be a bit onerous or complicated