# EXHIBIT 27

```
                                                    1
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3   COMMERCIAL RISK REINSURANCE
     COMPANY LTD.,
 4
              Plaintiff,
 5
          v.                    07 Civ. 2772 (VM)
 6
     SECURITY INSURANCE COMPANY OF
 7   HARTFORD,
 8            Defendant.
     ------------------------------x
 9
                                April 9, 2007
10                              5:17 p.m.
11   Before:
                    HON. VICTOR MARRERO,
12
                          District Judge
13
                         APPEARANCES
14
     D'AMATO & LYNCH
15       Attorneys for Plaintiff
     BY: JOHN P. HIGGINS
16       EDWARD ROTH
         JOHN MUCCIFORI
17
     STROOCK & STROOCK & LAVAN, L.L.P.
18       Attorneys for Defendant
     BY: REGAN A. SHULMAN
19       MICHELE L. JACOBSON
20
21
22
23
24
25
```

**Page 2**

1  (Case called)
2  THE COURT: This is a proceeding in the matter of
3  Commercial Risk Reinsurance Company Limited, and others, vers
4  Security Insurance Company of Hartford, docket number 07 Civil
5  27. I was reading, perhaps this is a typo, but it says 07
6  civil 2722. The appearance sheet that the parties have signed
7  says that it is 07 civil 2772, so it is one or the other.
8  The plaintiff's submission in support of its motion is
9  docketed as 07 civil 2772.
10  MR. ROTH: Your Honor, the order to show cause that
11  your Honor signed has 2772, although it is in my handwriting I
12  do believe that is the number that was assigned by the Court.
13  THE COURT: Be that as it may, whatever the number is,
14  is simple to verify, but at least we don't have the parties
15  wrong.
16  Now, the matter is here on the plaintiff's motion for
17  a preliminary injunction. The underlying dispute arises from
18  an arbitration proceeding in which an arbitrator issued an
19  award and the defendants are seeking to draw down upon some
20  related letter of credit in order to satisfy the arbitration
21  award. The plaintiffs are seeking to prevent the defendants
22  from drawing down on that letter of credit.
23  Why don't we just briefly go over the ground rules as
24  to how much time we need for this argument. It is late in the
25  day, as you know. We accommodated this request because the

**Page 3**

1  Court has a trial through the balance of this week and this is
2  the only time that we could do on the short schedule that the
3  parties indicated they have before the sky falls.
4  For the plaintiffs, either Mr. Higgins or Mr. Roth,
5  who speaks?
6  MR. HIGGINS: I will, your Honor. It is Mr. Higgins.
7  THE COURT: All right.
8  MR. HIGGINS: Has the time limit been established? I
9  shouldn't take too long.
10  THE COURT: Why don't you indicate what you think you
11  need. Let me just indicate that we have received your papers,
12  the original petition, the memoranda from both sides and have
13  reviewed them, so at least we have submission familiarity with
14  the basic issues. You need not go over, in any detail, matters
15  that you already covered.
16  If there is something that you believe requires
17  additional emphasis or that is not sufficiently covered in the
18  material, perhaps you can concentrate on that.
19  MR. HIGGINS: Thank you, your Honor.
20  THE COURT: How much time do you think you need for
21  that purpose?
22  MR. HIGGINS: No more than 10 minutes.
23  THE COURT: All right.
24  Now, Ms. Jacobson or Ms. Shulman, who speaks?
25  MS. JACOBSON: Ms. Jacobson.

**Page 4**

1  THE COURT: Is 10 minutes sufficient?
2  MS. JACOBSON: I would say somewhere between 10 and
3  15.
4  THE COURT: Why don't we then begin with plaintiffs
5  having an initial 10 minutes.
6  MR. HIGGINS: Thank you, your Honor. I gather my
7  appearance has been noted?
8  THE COURT: Yes. We have the notice of appearance
9  that the parties have submitted and the court reporter has a
10  copy of it, so that that will be entered as part of the
11  transcript of this proceeding.
12  MR. HIGGINS: Thank you.
13  We would initially like to seek the Court's indulgence
14  in modifying the papers to include an additional letter of
15  credit which was located and disclosed by respondents here. It
16  is letter of credit 91889855 of BNP Peribas in the amount of
17  $638,498.
18  We apologize for the confusion. Actually, there were
19  at least five and perhaps more letters of credit issued around
20  the same time and this one seemed to get lost in the shuffle.
21  Two letters of credit were delivered as collateral
22  security in this arbitration to Stroock & Stroock & Lavan under
23  the order of the arbitration panel as a provisional remedy.
24  This is a very odd situation because we're faced now with a
25  circumstance where we are seeking a provisional remedy to

5

1  protect the integrity of provisional remedy.
2      We didn't dispute the power of the arbitration panel
3  below to order us to put up the collateral security, but we do
4  dispute the power of the arbitration panel to allow the
5  collateral security to be paid over to the petitioner beneath
6  without first obtaining a confirmation of the award and then
7  having it reduced to a judgment.
8      Here we have the opposite of what you would normally
9  see, which is a plaintiff trying to protect the status quo by
10 restraining a defendant from running off with the money, so to
11 speak, whereas here we have placed the collateral up and what
12 we are seeking to do is keep it there pending resolution of our
13 motion and pending proceedings in this court to determine
14 whether or not the plaintiff is entitled to the funds. And, if
15 so, they'll be there. The security is going nowhere. And they
16 can draw it down or we may otherwise pay it if need be. But we
17 don't believe the arbitration panel has the authority to
18 enforce its own award, as such.
19      So, as I said, this is a very unusual circumstance.
20 We found no cases which are on these facts and none were cited
21 on these facts by our opponents.
22      THE COURT: Mr. Higgins, a question that this issue
23 raised when the Court read the papers in your submission.
24 Under the fact session you state that it is your view that the
25 parties agreed under the treaties to submit any difference of

6

1  dispute to arbitration but then you say arbitration clauses do
2  not submit award enforcement in compliance to the jurisdiction
3  of the arbitrators.
4      But you do acknowledge that you put up letters of
5  credit for the purposes of supporting whatever award may or may
6  not have come under the arbitration proceeding?
7      MR. HIGGINS: Yes, your Honor.
8      THE COURT: So, in that case, the question is whether
9  the draw down or the letters of credit, whether or not it comes
10 from the arbitrator comes from contractual agreement of the
11 parties is binded in the treaties that are integrally connected
12 with the arbitration proceeding.
13     MR. HIGGINS: Well, the underlying debt does, if there
14 is an underlying debt. That comes from the underlying treaty
15 and there is an agreement to arbitrate. And what we've
16 assigned to the panel of arbitrators is the right and duty to
17 decide the merits of the dispute. We haven't assigned any
18 right of enforcement. And the cases are clear that arbitrators
19 don't have the power to enforce their own awards. You have to
20 go to the Court to do that. They couldn't issue a warrant.
21 They couldn't ask a sheriff or a marshal to execute. And in
22 this case the very nature of what the arbitrators awarded in
23 the way of collateral is what the Courts have supported, which
24 is a provisional remedy. The proviso of the provisional remedy
25 is a judgment. It is so that the money will be there to

7

1  satisfy a judgment. If it can be paid over, either before or
2  after an award, then it loses its provisional character and it
3  becomes a final relief as opposed to a provisional relief
4  because it's payment of money --
5      THE COURT: Let me interrupt.
6      Could not parties by a separate agreement, such as
7  letter of credit agreement, provide among themselves that the
8  letter of credit could be drawn down as enforcement of an
9  arbitration award, whether or not the arbitrators so order or
10 whether or not it is within the jurisdiction?
11     Even if it were not within their jurisdiction, could
12 not the parties agree that upon the award the prevailing party
13 could draw down a letter?
14     MR. HIGGINS: Of course, your Honor. The parties
15 could agree but here they haven't. There is no --
16     THE COURT: Is that a matter of dispute then? And I
17 think that is what I gather is exactly what the defendants are
18 disputing. If that's the case then on what basis can this
19 Court grant preliminary injunctive relief?
20     MR. HIGGINS: I'm not exactly sure what the agreement
21 that the respondents are alleging was made other than --
22     THE COURT: That's why we have a factual dispute.
23     MR. HIGGINS: Well, I mean if there is an allegation
24 that there is an agreement of course we have a factual dispute
25 because I'm not aware of any. The citation --

8

1      THE COURT: You are also counsel to the plaintiff?
2      MR. HIGGINS: Here we are counsel to the plaintiff,
3  yes; but the defendant is alleging this agreement and they
4  haven't identified -- they haven't identified what it is. So I
5  suppose there is disagreement in that way.
6      But the point is that the arbitration clause itself
7  doesn't come close to assigning that right to the arbitration
8  panel. It says that judgment on an award can be entered in any
9  Court of jurisdiction and that's exactly what we think they
10 should attempt to do, is enter judgment on the award, get the
11 thing confirmed, and if they have a right to do that, and then
12 take advantage of the collateral that was required to put up.
13     What they attempt here is very analogous to a Court
14 giving a provisional remedy and then paying over the money to
15 one of the litigants before entering a judgment. It would be
16 the same thing. And I'm sure that that wouldn't appeal to your
17 Honor in terms of the way that it should happen.
18     Now, could two parties agree that anyone, the Court or
19 anyone else has the power to do that? Of course. But that
20 would be a very unusual agreement and I should think that that
21 should be very specific and shouldn't be -- one shouldn't look
22 for that agreement in a normal arbitration clause or in a
23 normal reinsurance or contractual relationship.
24     As I said, the cases are clear, arbitrators don't have
25 the power to enforce their own judgments.

9

1    Now, in this case it is a compulsion. The award says
2    pay within 30 days or lose the security. And they're the ones
3    that put -- the panel ordered it put up as a provisional remedy
4    and now the provision -- the judgment is being ignored.
5         So, that's what we have to say about that. I don't
6    know whether it pays, really, to get in too much into the
7    standards of irreparable harm and likelihood of success on the
8    merits but we would say here --
9         THE COURT: Why don't we touch on the question of
10   irreparable harm here, Mr. Higgins because that, too, is an
11   important concern. To what extent is what you are concerned
12   about really a question of dollars and cents?
13        MR. HIGGINS: Well, it is.
14        THE COURT: You put up money. They have your money.
15   If they have wrongfully drawn down upon it and you prevail on
16   the merits, you get it back, with interest. How is that
17   irreparable harm?
18        MR. HIGGINS: Well, that, in itself, we would
19   acknowledge isn't irreparable harm.
20        THE COURT: Then what is?
21        MR. HIGGINS: The abuse of the process itself.
22   Because, as I said, if that can be done in this case that can
23   be done in any case. You can order collateral security put up
24   and then you can just willy nilly pay it over to the other
25   side. There is nothing to stop you under this theory that the

10

1    defense has put forward. There is no requirement that there be
2    an arbitration award. I mean, there is in this case but there
3    would be no requirement that there would be.
4         THE COURT: But you are positing a set of facts that
5    are not what is before the Court now. It is not a question of
6    willy nilly. It is a question of whether there is a sufficient
7    basis for a draw down upon there being at least a colorable
8    arbitration award that the parties have gone through, the
9    process, and at least a colorable basis under the treaties
10   agreement for the draw down to occur before a judgment is
11   rendered confirming the award -- assuming that that is the
12   basis upon which the defendants are claiming that they have a
13   right to the draw down before the confirmation of the award.
14        MR. HIGGINS: Well, the second point we would
15   certainly dispute: That there is a basis in the contract.
16   Because we are dealing here only with the arbitration clause.
17        The subject of the arbitration was to enforce the
18   contract and we had some defenses to the contract so that is in
19   quasi-judicial proceedings in the arbitration and now it is in
20   judicial proceedings. And, yes, it is a matter of money. A
21   letter of credit is always a matter of money. Other collateral
22   is a matter of money.
23        If it is posted as a provisional remedy, as I say, if
24   the proviso isn't getting a judgment, then it is always the
25   case that there is no irreparable harm in taking it. It is

11

1    just money. I think that the irreparable harm is in, as I
2    said, it is an abuse of the process. It is a violation of the
3    provisional nature of the security itself. It is converting it
4    from provisional remedy to a non-provisional remedy.
5         Now, as your Honor pointed out, there is nothing to
6    stop parties from altering those relationships but it hasn't
7    been done in this case. Nothing that the respondent has
8    pointed to has indicated that there was any intent of the
9    parties, or even at the time of the panel to make this other
10   than a provisional remedy. And we suggest that that's the
11   irreparable harm here.
12        In terms of success on the merits, we have referred to
13   a few very serious questions here which don't go to the normal
14   thing you might see which is that the arbitrators made a
15   mistake of law or mistake of fact. Here, none of our defenses
16   really relate to that. The most important one here is that
17   they refused evidence and that is standard under Section 10,
18   paragraph 3, of the FAA, and that section refers to that as
19   arbitrator misconduct.
20        Now, you know, the other side cited some cases but
21   those cases are easily distinguishable. Here it was our only
22   witness on these points and it was rebuttal. And the cases
23   cited against the three witnesses, this was offered as the
24   fourth and the party offering them would not so much as
25   indicate what is being proffered for and the arbitrators just

12

1    said it was cumulative and the Court supported that.
2         That's the main case in support of the defense against
3    our position.
4         THE COURT: Let's discuss that for a moment because,
5    again, the Court is familiar with the law in this case having
6    itself rendered numerous opinions on the question of the scope
7    of the arbitrator's determination of what is relevant and what
8    is cumulative.
9         I think that the standard is fairly deferential on
10   that issue. If an arbitrator denies evidence entirely to one
11   side it is one thing. But if it is a question of whether the
12   arbitrator, in good faith, believes that a particular proffer
13   of evidence is cumulative, as you know, the doctrine on that is
14   that the Courts are not going to second-guess arbitration
15   awards. Otherwise, the entire process would be undermined.
16        MR. HIGGINS: Yes, your Honor. And our cases and our
17   statements on that are more prophylactic than anything else.
18   The arbitrators here did not find that this evidence was
19   cumulative. And in fact that would have been a very difficult
20   thing for any arbitrator to find.
21        This was our witness in rebuttal to the witness put by
22   the petitioners below on the issue of damages -- several
23   aspects of damages. And I don't think -- it was our only
24   witness and what the panel said, it is indicated in the brief,
25   is that they were going to deny us the right to put this

13

1   witness on and they were going to accept the numbers being put
2   forth by the other side. And if they thought they needed more
3   help after -- actually they didn't say it that way.
4       After they decided the substantive issues, they would
5   come back to the parties. And in this case no one came back
6   and we were prevented from putting on our only witness on
7   really the only issue in the case which was how much we owe.
8       And so, it isn't cumulative and discretion stops
9   somewhere. And I think that discretion has to stop well before
10  this. We only called three witnesses. It isn't as if we
11  dragged this thing on forever.
12      THE COURT: Isn't there some issue, Mr. Higgins, about
13  the timeliness of the witness?
14      MR. HIGGINS: Well, two things, your Honor. There
15  wasn't an order other than a preliminary witness list. It was
16  never characterized as anything else. And so, we were
17  certainly not on notice that we had any obligation to provide
18  any other witness list, firstly.
19      Secondly, we did give notice a month before the
20  hearing that we would be putting this witness on as a rebuttal
21  witness. I'm not sure we actually used the word "rebuttal" but
22  we did put in our papers a very lengthy exchange of
23  correspondence. And I hope we don't bore the Court with all of
24  it, but we made a very strenuous attempt to extract evidence of
25  damages from the other side. And it only became apparent that

14

1   we weren't really going to be able to get sufficient evidence
2   of damages from the other side that we decided we had to put on
3   a witness.
4       We never had an expectation of putting on a witness
5   because in these cases the accounting usually works itself out.
6   Here, it never did. The other side never put on sufficient
7   evidence and so we were forced to put on -- well, we were
8   forced to attempt to put on a witness to straighten the
9   situation out.
10      One of the most critical elements of it was there was
11  very -- well, actually no evidence of distribution of cash
12  position and what was put in was wrong. And we would have put
13  a witness in that would have explained that and that would have
14  caused a very dramatic $3 million shift in the award if it had
15  been done properly. And we didn't have any witness on that
16  because we were prevented from putting that in and we were
17  prevented from putting exhibits in which would have been
18  testified to.
19      THE COURT: All right. Thank you, Mr. Higgins. Why
20  don't we give the defendants the floor?
21      MS. JACOBSON: Thank you, your Honor. The first thing
22  I would like to address is the notion of the security and the
23  issue of irreparable harm.
24      Contrary to what the petitioner's position is, the
25  contract specifically deals with the posting of security.

15

1   That's annexed as Exhibit 1 to my declaration, specifically at
2   pages 7 through 9. In that security provision Commercial Risk
3   was supposed to post the entirety of the amounts that were
4   shown to be owing; whatever my client told them was owing
5   should have been posted.
6       If we turn to page 8 of the contract, that talks about
7   when letters of credit can be drawn down. Essentially it says
8   that if the reinsurer fails to discharge any of its payment
9   obligations, any security that's been posted can be drawn down.
10  It is an unconditional right to draw down security. It doesn't
11  require going anywhere and that's what the contract does
12  provide.
13      Now, if we turn to --
14      THE COURT: Is it your contention that that is what
15  the arbitrator, in essence, interpreted the contract to say and
16  ruled on?
17      MS. JACOBSON: That is our contention.
18      And, in fact, if we take a look at Exhibit number 5 to
19  my declaration which is the actual order imposing the
20  requirement that pre-hearing security be posted, we see in the
21  order that the panel says that the security shall be in the
22  form acceptable to Security Insurance Company of Hartford,
23  i.e., a regulation 114-type security trust fund or a clean,
24  irrevocable letter of credit, or cash.
25      And if we turn back to the security provision in the

16

1   contract, at page 7 at the very first paragraph it talks about
2   a regulation 114 trust or clean irrevocable and unconditional
3   letter of credit. That is exactly what the panel was doing.
4   And, in fact, on the security motion we argued that this
5   provision of the contract required the posting of security,
6   among other things, including the disastrous financial
7   condition of reinsurer here, Commercial Risk.
8       So, it is our absolute contention that the right to
9   the security derives from the contract. It is unconditional
10  and it commits us to draw down without any order of the panel.
11      Now, when the panel, however, issued its pre-hearing
12  security order at Exhibits 5, it imposed an impediment toward
13  the draw down. It said to us, We are going to require the
14  posting of the pre-hearing security but you can't draw on it
15  absent further written instructions from the panel.
16      So, that meant that we couldn't just draw down. It
17  provided an additional impediment.
18      Now, that award was entered by the panel, it was
19  not -- Commercial Risk didn't move to vacate it but what that
20  award said was -- the only inference you can obtain from that
21  order is that when the panel issues a written instruction to
22  draw it down, it can be drawn down. There was no motion to
23  vacated it.
24      That was the order of the panel and that is the
25  understanding that certainly my client has vis-a-vis the whole

17

1  letter of credit issue, completely derived from the contract.
2      Therefore, it is the contract that is self-executing.
3  It is not the final award.
4      THE COURT: A question: What is your contention with
5  regard to whether or not the arbitrator's requesting the
6  posting of pre-award security was permissible under the
7  contract itself?
8      MS. JACOBSON: Well, very clearly, if we turn to the
9  arbitration clause which is at page -- begins at page 15 and
10 goes on to 16, and that's still in Exhibit 1, it says: Any
11 dispute or difference between the company and any reinsurer
12 relating to the interpretation or performance of this contract
13 including its formation or validity, or any transaction under
14 this contract, whether arising before or after termination,
15 shall be subject to arbitration.
16     So, clearly, issues of the adequacy of letters of
17 credit, etc., would be subject to arbitration. And also draw
18 downs, if that was an issue.
19     And if we go down further in the arbitration clause
20 also on page 16 it says: The arbitrator shall have the power
21 to determine all procedural issues for the holding of the
22 arbitration, including but not limited to inspection of
23 documents, examination of witnesses -- importantly -- and any
24 matter -- other matter relating to the conduct of the
25 arbitration. The arbitrator shall interpret this contract as

18

1  an honorable engagement and not as merely a legal obligation.
2  They are relieved of all judicial formality and may abstain
3  from following the strict rules of law. The arbitrators may
4  award interest and costs.
5      So, it is a very permissive clause. It gives the
6  arbitrators expansive powers to determine the shape and the
7  scope of the arbitration proceeding and the procedures that are
8  to be followed in that proceeding.
9      THE COURT: Does that suggest that the issue of
10 whether or not the arbitrators have the authority, which
11 Mr. Higgins is challenging, to order some form of enforcement,
12 is itself an arbitration issue?
13     MS. JACOBSON: Yes. I mean, we believe that this is a
14 very expansive provision and I would like to --
15     THE COURT: Let me ask, was there any discussion or
16 attempt at any time to bring this matter to the arbitration as
17 an additional dispute between the parties? And by this matter
18 I mean the plaintiff's challenge here or contention that the
19 arbitrators did not have the authority to issue an enforcement
20 order.
21     MS. JACOBSON: No, Commercial Risk did not -- did not
22 go to the arbitration panel with that kind of complaint. In
23 fact, the first time we heard of any such complaint was when we
24 learned that there was a TRO application.
25     THE COURT: Well, is it your contention now that if in

19

1  fact there is such a dispute, it is one that should be brought
2  back to the arbitrators?
3      MS. JACOBSON: I don't -- I mean, if they wanted to
4  make an application to the arbitrators I suppose that they
5  could. I think the word is plain and unambiguous and permits
6  us to draw down.
7      And I might also point out Mr. Higgins spoke lengthily
8  about the opportunity to go into court and get a judgment and
9  how important that was. This arbitration clause says: The
10 decision, in writing, of the majority of the arbitrators shall
11 be final and binding upon both parties. Judgment may be
12 entered.
13     Not requiring that judgment be entered in order for
14 certain parties of the award to be effectuated, may be.
15     THE COURT: All right. Anything else?
16     MS. JACOBSON: If I might, I would like to discuss the
17 exclusion of Mr. Passis as a witness.
18     I think the description of Mr. Passis' exclusion
19 omitted certain items and was incorrect in certain regards.
20 First of all, Mr. Passis was not on the preliminary witness
21 list and did not show up until February.
22     Now, I think it is important to note that this
23 arbitration was scheduled to go forward in December and all
24 fact discovery had truly been ended in November. We were on
25 the cusp of the arbitration hearing. I think two weeks before

20

1  the hearing we got word that Commercial Risk's party arbitrator
2  was ill so the hearing got put off.
3      Okay. That's the very end of November we get that
4  decision. Mr. Passis was not even on the radar screen and we
5  were supposed to go to hearing within two weeks. In fact, the
6  parties were already drafting their pre-hearing briefs; no
7  mention of Mr. Passis.
8      If Mr. Passis and his testimony was so material we
9  should have heard about him long before February.
10     Now, there was no realistic opportunity to depose
11 Mr. Passis. Mr. Passis was not a percipient witness. He
12 wasn't around at the time that all of the events took place.
13     According to Mr. Higgins at the hearing, and that's in
14 Exhibit 14, page 1001, Mr. Passis was going to "authenticate
15 certain statements that were being put in by Commercial Risk."
16     And specifically, when asked whether Mr. Passis'
17 testimony might "affect the panel's view of what damage would
18 be" the award -- the damages award should be, the response was
19 It could be. And that's on page 1005. Not definitive.
20     In fact the umpire asked: So that's a purely
21 hypothetical?
22     And the answer was: Yes.
23     That's all detailed, the transcript on Exhibit 14 to
24 my declaration, page 1005.
25     Now, despite what Mr. Higgins said, the panel actually

21

1  took in Mr. Passis' damages exhibits, exhibits numbers 222 and
2  223, and that's at Exhibit 19 of my declaration at page 1206.
3  And they were permitted, by the panel's ruling, to
4  cross-examine -- to call for cross-examination one of our
5  witnesses for a second time on those very same exhibits. And
6  they did.
7      And lastly I would like to say that it is clear that
8  the panel must have taken into account some of what was in
9  those exhibits because we were not -- my client was not given
10 all of the interests that it was seeking. It got only about
11 one third. We don't know precisely what they did but, very
12 plainly, they didn't buy what we said lock, stock and barrel.
13     We don't believe that Commercial Risk satisfies any of
14 the prongs for a preliminary injunction. They can't show
15 irreparable harm. We are only talking about money here and
16 there is, in light of the fact that it is nearly insurmountable
17 to wage challenge to an arbitration award on a motion to
18 vacate, they don't show the second prong either.
19     Thank you.
20     THE COURT: Thank you.
21     Mr. Higgins, do you have another response?
22     MR. HIGGINS: I have a few responses or observations.
23 Thank you, your Honor.
24     On the point of what was being ordered, it is pretty
25 clear that we were not putting up a letter of credit under the

22

1  contract, we were putting up a letter of credit because we were
2  told to by the panel, and that the constriction or restriction
3  on the ability to draw down, though we don't agree with it,
4  necessarily, was not something that we fought at that point
5  because it protected the letter of credit. We would have had
6  to have a crystal ball to ascertain that the panel would allow
7  the letter of credit to be paid over before judgment because
8  that's the standard by which the Courts permit arbitrators to
9  require provisional remedies. There are no cases which permit
10 arbitrators to make decisions on the merits without a hearing.
11 And this arbitration clause certainly doesn't do that; allow --
12     THE COURT: Is it your view, Mr. Higgins, that there
13 is nothing at all in the treaties and the contract between the
14 parties that gave authority for the posting of pre-arbitration
15 security?
16     MR. HIGGINS: Yes. That is our position.
17     THE COURT: So you think --
18     MR. HIGGINS: There is a letter of credit requirement
19 in the ordinary course but in this case one can't really argue
20 that that's what the panel was doing, because there is only a
21 requirement for, in regulatory parlance, unadmitted or
22 non-admitted security which, admittedly, to circle around, the
23 Bermuda company was but the Vermont company was not.
24     So, the Vermont company was not required to post
25 security but, nevertheless, the panel required security to be

23

1  posted by -- well, jointly the panel just called it Commercial.
2      And so, the panel wasn't -- obviously wasn't trying to
3  enforce provisions under the contract and we don't believe
4  that, without a hearing, we don't think that the arbitrators
5  had the power to do that. Certainly not to order delivery of
6  unencumbered collateral security as a provisional remedy.
7      THE COURT: At any time did you challenge the
8  arbitrator's authority to make such a requirement?
9      MR. HIGGINS: I'm sorry. I don't know what
10 requirement your Honor is referring to.
11     THE COURT: The posting of the pre-arbitration
12 security.
13     MR. HIGGINS: No, we did not challenge it. We put up
14 the security. We challenged it in the first instance on motion
15 but once we were ordered to do it, we put it up because we
16 don't challenge the authority to, of the panel.
17     THE COURT: Could that be construed as a form of
18 waiver?
19     MR. HIGGINS: Well, no, we don't dispute the power of
20 panel to order provisional remedies. We think the law is
21 fairly clear on that. But we do dispute the notion that that
22 provisional remedy can be something other than a provisional
23 remedy, something other than collateral security for, to
24 securitize an eventual judgment. We certainly challenge that
25 notion. And we would have, if they had ordered us to pay the

24

1  money over, we would have challenged it, of course. But it was
2  in the form of letters of credit, it was delivered to counsel
3  and not to the other party, which we insisted on, but it was
4  done and there was the incumbents on it in terms of drawing.
5      I don't think anything has happened since that time
6  which alters the character of the relief. And the only thing
7  that's happened is that the panel has taken it upon themselves
8  to not only render the award but satisfy it.
9      THE COURT: Anything else?
10     MR. HIGGINS: Well, just one minor point going back to
11 the 'may enter.'
12     The reason it is 'may' is because there is no
13 requirement to do it. It is just that if it can't be
14 satisfied. Otherwise, it has to be entered and the 'may'
15 language also refers to the fact that there are many Courts
16 that may have jurisdiction and says it may be entered in any
17 Court's jurisdiction.
18     So, I don't think that that has any significance in
19 terms of statute.
20     THE COURT: All right. I thank you.
21     The Court has reviewed these papers closely when they
22 were filed and the additional briefing that the Court received
23 as of today. I have heard the arguments of the parties here at
24 this proceeding. On this basis I am not persuaded that the
25 plaintiffs have made out any of the prongs necessary to support

25

1  the granting of the application. I am not persuaded that the
2  plaintiffs have indicated that they would suffer irreparable
3  harm here.
4      In view of what is at stake -- which is essentially a
5  money dispute -- the money dispute is literally resolvable by
6  the party that may win on the merits ultimately paying back
7  what may have been improperly drawn down, if in fact the
8  plaintiffs were to prevail on the merits.
9      I don't see where that irreparable harm comes in.
10 Plaintiffs indicate that their view of the irreparable harm
11 enters in the issue of what they characterize as the improper
12 or abuse of the process. Again, I'm not persuaded that that is
13 the case here.
14     Under the applicable doctrine, the arbitrators have a
15 fairly extensive latitude to interpret the scope of arbitration
16 and make appropriate rulings concerning on that scope. Those
17 determinations ordinarily are entitled to substantial deference
18 by the Court except as has been indicated in the cases of clear
19 abuse of legal acts or illegal acts or other forms of
20 impropriety.
21     I don't believe that there is sufficient evidence that
22 the standard has been met here.
23     On those grounds, the issue of whether or not the
24 arbitrators improperly excluded evidence, in my view, has not
25 been compellingly demonstrated to the point warranting the

26

1  extraordinary remedy not only of denial of the confirmation of
2  arbitration award but also of granting of preliminary
3  injunctive relief.
4      I also do not believe that the plaintiffs are likely
5  to succeed on the merits given the language of the contract
6  that is at issue here, the parties' agreements, and I also am
7  not persuaded that there are sufficient issues going to the
8  merits as to make the plaintiff's claims later on for
9  litigation and the balance of equities tilting decidedly in the
10 plaintiff's favor because the Court believes that in the
11 reading of the contract that there is sufficient support in the
12 underlying agreements for the posting of the letter of credit
13 and for the draw down of the letter of credit absent a
14 confirmation award.
15     To the extent that there is any dispute regarding that
16 question, that, in itself, as the Court suggested earlier, may
17 be an arbitrable issue that should be -- that would be within
18 the scope of the arbitration dispute and should be resolved in
19 that forum and not in this Court.
20     So, for these essential reasons, the Court will deny
21 the plaintiff's application. If the parties seek any further
22 litigation in this matter, they should confer and develop a
23 proposed case management plan setting forth the time tables for
24 any additional pretrial proceedings, and you should submit that
25 to the Court for review and enforcement within 10 days of

27

1  today.
2      Thank you.
3      MR. HIGGINS: Thank you, your Honor.
4      MS. JACOBSON: Thank you, your Honor.
5              o0o