**TO BE FILED
UNDER SEAL**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
In the Matter of the Arbitration of      : Docket No. _____
          :
SECURITY INSURANCE COMPANY OF HARTFORD :
Itself and as Successor in Interest to     :
THE FIRE AND CASUALTY INSURANCE COMPANY :
OF CONNECTICUT and THE CONNECTICUT   :
INDEMNITY COMPANY,         :
          :
          Petitioner,   :
          :
      -against-     :
          :
COMMERCIAL RISK REINSURANCE COMPANY  :
LIMITED (BERMUDA) and COMMERCIAL RISK RE- :
INSURANCE COMPANY (VERMONT),   :
          :
          Respondents. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## SECURITY INSURANCE COMPANY OF
## HARTFORD'S PETITION TO COMPEL ARBITRATION

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400

*Attorneys for Petitioner*

Of Counsel:
   Michele L. Jacobson
   Regan A. Shulman
   Andrew Lewner
   Christian Fletcher

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ii

PRELIMINARY STATEMENT ....................................................................................1

STATEMENT OF FACTS............................................................................................3

ARGUMENT

POINT I    RESPONDENTS SHOULD BE COMPELLED
           TO ARBITRATE WITH THE EXISTING UMPIRE
           ON THE AGREED-UPON HEARING DATES ....................................................11

A. The Parties Selected A Panel In Accordance With The
   Treaties And Are Bound By The Result ..............................................................12

B. The Resignation of Commercial Risk's Arbitrator Requires
   Only His Replacement, Not the Reconstruction of the
   Entire Panel ...................................................................................................14

C. Policy Considerations Militate Against Permitting
   Commercial Risk To Replace The Umpire They Jointly Selected .........................19

D. Respondents' Refusal to Arbitrate Is A Delay Tactic That Should
   Not Be Countenanced; Under The Convention And The FAA,
   Respondents Should Be Directed to Proceed With The Arbitration
   On The June 25-29 Dates As They Previously Agreed .......................................21

POINT II   PETITIONER IS ENTITLED TO AN ORDER APPOINTING
           A SUBSTITUTE ARBITRATOR WHO IS ELIGIBLE
           UNDER THE TREATIES AND AVAILABLE ON THE
           PREVIOUSLY AGREED-UPON HEARING DATES ..........................................22

CONCLUSION ......................................................................................................25

# TABLE OF AUTHORITIES

## CASES

Arista Marketing Associates Inc. v. Peer Group, Inc.,
    720 A.2d 659 (N.J. Super. 1998) .................................................. 14, 15, 16, 19, 20

Astra Footwear Industry v. Harwyn International Inc.,
    442 F. Supp. 907 (S.D.N.Y. 1978) ........................................................... 23, 24

Dow Corning Corp. v. Safety National Casualty Corp.,
    335 F.3d 742 (8th Cir. 2003) .......................................................... 15, 17, 19, 20

Home Ins. Co. v. Banco de Seguros del Estado (Uruguay),
    No. 98-Civ-6022, 1999 U.S. Dist. LEXIS 22478 (S.D.N.Y. Feb. 24, 1999) .................... 15

Lucent Technologies Inc. v. Tatung Co.,
    379 F.3d 24 (2d Cir. 2004) ........................................................................ 23

Marine Products Export Corp. v. M.T. Globe Galaxy,
    977 F.2d 66 (2d Cir. 1992) ........................................................................ 18

National American Ins. Co. v. Transamerica Occidental Life Ins. Co.,
    328 F.3d 462 (8th Cir. 2003) ................................................ 15, 16, 19, 20, 21, 22

Pacific Reinsurance Management Corp. v. Ohio Reinsurance Corp.,
    814 F.2d 1324 (9th Cir. 1987) ..................................................................... 24

Pemex Refinacion v. Tbilisi Shipping Co., No1 04-Civ-02705,
    2004 WL. 1944450 (S.D.N.Y. Aug. 31, 2004) ......................................................... 18

In re Salomon Inc. S'holders' Derivative Litigation,
    68 F.3d 554 (2d Cir. 1995) ........................................................................ 23

Trade & Transport v. National Petroleum Charterers,
    931 F.2d 191 (2d Cir. 1991) .............................................................. 15, 16, 18, 19

Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc.,
    126 F.3d 15 (2d Cir 1997) ......................................................................... 11

## STATUTES

9 U.S.C. § 4 ................................................................................... 12, 22, 25

9 U.S.C. § 5 ...................................................................................... 23, 25

9 U.S.C. § 201 ....................................................................................... 11

ii

9 U.S.C. § 202 ............................................................................................ 11

9 U.S.C. § 206 ............................................................................................ 22

9 U.S.C. § 208 ............................................................................................ 11

## OTHER AUTHORITIES

AAA Code of Ethics for Arbitrators in Commercial Disputes, Canon I.H .................................. 20

ABA Code of Ethics for Arbitrators in Commercial Disputes; Canon I.H ................................. 20

ARIAS-US Code of Conduct, Canon IV ............................................................... 20-21

JAMS' Arbitrators Ethics Guidelines, VII.b ............................................................. 21

## PRELIMINARY STATEMENT

Petitioner Security Insurance Company of Hartford, itself and as successor in interest to the Fire and Casualty Company of Connecticut and the Connecticut Indemnity Company ("SICH" or "Petitioner") petitions this Court for an Order under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201, et. seq. and the Federal Arbitration Act, 9 U.S.C.§§ 1, et seq., compelling Respondents Commercial Risk Reinsurance Company Limited (Bermuda) ("Commercial Risk Bermuda") and Commercial Risk Re-insurance Company (Vermont)("Commercial Risk Vermont")(together, "Commercial Risk" or "Respondents") to arbitrate their disputes as previously agreed by the parties and the arbitration panel on June 25-29, 2007. Due to the unexplained resignation of its party appointed arbitrator from a tripartite panel, Commercial Risk has taken the untenable position that this arbitration, which is nearly two years old, must revert to square one, with SICH re-designating its party appointed arbitrator and the parties selecting a new umpire. Commercial Risk's attempt to manipulate the arbitral process should not be countenanced by the Court.

SICH and Commercial Risk are currently engaged in two arbitrations – the consolidated arbitration at issue in this proceeding which arises out of five similar quota share reinsurance contracts between the parties (the "Treaties") and is denominated the "Non-DIG Arbitration," and another arising out of two additional quota share reinsurance contracts between the parties and is denominated the "DIG Arbitration." The same arbitrators – Martin Haber (appointed by SICH), Theodor Dielmann (appointed by Commercial Risk) and David Thirkill (jointly selected as Umpire by the parties in accordance with the Treaties) – serve on the Panels for both the DIG and Non-DIG Arbitrations.

Shortly after a majority of the Panel in the DIG Arbitration rendered a more than $22 million post-Hearing Award in favor of SICH, Commercial Risk's party appointed arbitrator

withdrew from the DIG and Non-DIG Arbitrations <u>without any explanation whatsoever</u>. Seizing on the excuse of its party appointed arbitrator's withdrawal, Commercial Risk has attempted to unseat the Umpire in the Non-DIG Arbitration who it logically presumes ruled against it in the DIG Arbitration. Thus, although David Thirkill, the Umpire for the DIG and Non-DIG Arbitrations, was duly selected by the parties in accordance with the terms of the Treaties, and was accepted by Commercial Risk and SICH, Commercial Risk has now refused to proceed with the Non-DIG Arbitration until a new Umpire is selected. Moreover, while Commercial Risk has appointed a substitute arbitrator – Peter Gentile – Mr. Gentile has refused to disclose information regarding potential conflicts and indicated that the Non-DIG Arbitration Hearing – which had been rescheduled from March 2007 to accommodate Commercial Risk's initially appointed arbitrator – will not go forward on June 25-29, 2007, as scheduled and agreed upon by the parties.

Based on the unconfirmed presumption that appropriate disclosures, if made, would reveal Mr. Gentile to be disinterested, as that term is used in the Treaties, SICH seeks to compel Commercial Risk to proceed with the Non-DIG Arbitration with the Umpire duly selected by the parties in accordance with the terms of the Treaties, on the June 25-29, 2007 dates previously agreed to by the parties and their selected arbitrators.

Because the Umpire in the Non-DIG Arbitration was selected by the parties in accordance with the Treaties and there were no issues pending before the Panel at the time Mr. Dielmann withdrew, there is no basis in law or fact for Commercial Risk to insist on the Umpire's replacement. Significantly, Commercial Risk's flat refusal to disclose their communications with Mr. Dielmann concerning the reasons for his withdrawal demonstrate that Commercial Risk's motive is to manipulate the Arbitration process to rid itself of an Umpire

who seemingly rendered an unfavorable Award and to further delay payment of its long overdue obligations to SICH. Commercial Risk's conduct should not be condoned by this Court. Commercial Risk should not be given the opportunity to start the Arbitration process anew and should be directed to proceed with the Arbitration as scheduled with the existing Umpire.

Alternatively, because at this time, Mr. Gentile has refused to respond to requests for information from which SICH could determine whether he is disinterested and thus, eligible to serve as an arbitrator under the terms of the Treaties, SICH seeks this Court's appointment of an unquestionably eligible arbitrator.

## STATEMENT OF FACTS

SICH and Commercial Risk entered into multiple written reinsurance contracts, or Treaties. Declaration of Michele L. Jacobson in Support of Petition for Order Compelling Arbitration (" Jacobson Dec.") ¶¶ 3-7 and Exhibits 1-5. The Treaties memorialize agreements by Respondents, as subscribing reinsurers, to accept a percentage share of SICH's interests and liabilities in relation to workers compensation programs that SICH insures. Id.

Five Treaties are at issue in the Non-DIG Arbitration: the Quota Share Reinsurance Contract incepting May 1, 2000 between SICH and Commercial Risk which reinsures losses arising out of the HPP Workers Compensation Program; the Quota Share Reinsurance Contract incepting May 1, 2001 between SICH and Commercial Risk which reinsures losses arising out of the HPP Workers Compensation Program; the Quota Share Reinsurance Contract incepting March 15, 2000 between SICH and Commercial Risk which reinsures losses arising out of the NHE Workers Compensation Program; the Quota Share Reinsurance Contract incepting March 15, 2001 between SICH and Commercial Risk which reinsures losses arising out of the NHE Workers Compensation Program; and the Quota Share Reinsurance Contract incepting September 1, 2001 between SICH and Commercial Risk which reinsures losses arising out of the

ORS Workers Compensation Program.  Id.

The Treaties are identical in all material respects other than program name, quota share percentage, limits and inception date.  The Arbitration Clause in the Treaties (Article 32) provides:

> As a condition precedent to any right of action hereunder, any dispute or difference between the Company [SICH] and any Reinsurer [Commercial Risk] relating to the interpretation or performance of this Contract, including its formation or validity, or any transaction under this Contract, whether arising before or after termination, shall be submitted to arbitration.
>
> * * *
>
> Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator.  If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration, the requesting party may appoint a second arbitrator.
>
> * * *
>
> All arbitrators shall be active or retired officers of insurance or reinsurance companies, or Lloyd's London Underwriters, and disinterested in the outcome of the arbitration.
>
> * * *
>
> The decision in writing of a majority of the arbitrators shall be final and binding upon both parties.

See Jacobson Dec., Exhibits 1-2 at 18-19, Exhibits 3-4 at 16-17, Exhibit 5 at 22-23.

In August 2005, SICH served Commercial Risk Bermuda and Commercial Risk Vermont with three Demands for Arbitration under the Treaties – one for each workers compensation program – as a result of Commercial Risk's failure to pay amounts due to SICH thereunder. Jacobson Dec., Exhibit 6.

In accordance with the terms of the Treaties, in its Arbitration Demands, SICH identified Martin Haber, the former Chief Legal Officer of the Continental Corporation (now CNA), as its party appointed arbitrator for each of the disputes, and requested that Commercial Risk appoint

-4-

an arbitrator. Jacobson Dec. ¶ 10. By letter dated September 15, 2005, counsel for Commercial

Risk appointed Theodor Dielmann, a former officer of Hannover Reinsurance Company, as its

party appointed arbitrator for each of the disputes. Jacobson Dec., Exhibit 8. By mid-

November, 2005, counsel for SICH and Commercial Risk had agreed to consolidate the three

disputes into one arbitration. Jacobson Dec. ¶ 12 and Exhibits 7, 9 and 10.

In accordance with the procedure agreed upon by the parties and both Messrs. Haber and

Dielmann, and as commonly done in the reinsurance industry, the parties exchanged lists of

acceptable Umpire candidates, which were narrowed to one mutually acceptable Umpire

candidate per party. Jacobson Dec. ¶ 12 and Exhibits 9 and 10. As part of the Umpire selection

process, counsel for SICH and Commercial Risk jointly sent out questionnaires to all of the

proposed Umpire candidates in order to ascertain whether any of them had conflicts that would

render them "interested," or scheduling issues which would prevent the prompt scheduling of a

hearing. Jacobson Dec. ¶ 12 and Exhibit 11. The Umpire was to be chosen from the list of the

party who successfully predicted whether the last digit of the Dow Jones index on a selected day

was odd or even. Jacobson Dec. ¶ 12. Based on this agreed-upon process, on or about March 1,

2006, the parties selected Mr. David Thirkill, to be the Umpire in this dispute.[1] Jacobson Dec. ¶

13. Mr. Thirkill accepted the appointment as Umpire in the Non-DIG matter and scheduled an

organizational meeting for March 28, 2006. Jacobson Dec. ¶ 13 and Exhibit 12.

At the March 28, 2006 organizational meeting for the Non-DIG Arbitration, the party

appointed arbitrators, Mr. Haber and Mr. Dielmann, and the jointly selected Umpire, Mr.

---

[1]    Through the same process used by the parties in connection with this Arbitration, the
identical Panel of three arbitrators had been selected previously to preside over the DIG
Arbitration between the parties under two Quota Share Reinsurance Contracts relating to the
DIG Workers Compensation Program. Jacobson Dec. ¶ 14, n. 2.

Thirkill, disclosed their contacts with the parties, counsel and potential witnesses. Jacobson Dec., Exhibit 13 at 3-4 and Exhibit 14 at 4-17.

After the panel members completed their disclosures during the Non-DIG organizational meeting, the parties formally accepted the Panel on the record for the Non-DIG Arbitration. Jacobson Dec., Exhibit 13 at 4.  The parties also executed a Hold Harmless Agreement, in which they stipulated that the arbitrators had been appointed, that they found the arbitrators to be without conflicts and that they accepted the Panel.  Jacobson Dec. ¶ 15 and Exhibit 15.  Thus, as of March 2006, the Panel in the Non-DIG Arbitration, as well as the DIG Arbitration, consisted of Messrs. Haber, Dielmann, and Thirkill.  After consultation with the parties, the Panel scheduled the Non-DIG Arbitration Hearing for the week of March 4, 2007.[2]  Jacobson Dec. ¶ 15.

Immediately following the organizational meeting for the Non-DIG Arbitration, the Panel heard oral argument on SICH's motion for pre-hearing security in both the DIG and Non-DIG Arbitrations.  The Panel issued a single oral decision resolving both motions by a majority and awarding pre-hearing security in the amount of the claim (less security already held by SICH), without interest, in favor of SICH.  Petition ¶ 76.  The Panel followed up its oral ruling with separate written pre-hearing security awards in each of the DIG and Non-DIG Arbitrations. Jacobson Dec. ¶ 16.

In November 2006, SICH was advised that, due to the illness of Commercial Risk's party appointed arbitrator, the DIG Arbitration Hearing would have to be postponed from the December 2006 date.  The parties and the Panel thereafter agreed to conduct the DIG Arbitration

---

[2]    Several months earlier, at the DIG Arbitration organizational meeting, the DIG Arbitration was scheduled for a Hearing during the week of December 11, 2006.  Jacobson Dec. ¶ 14.

Hearing during the March 2007 week originally scheduled for the Non-DIG Arbitration Hearing and re-schedule the Non-DIG Arbitration Hearing to the week of June 25, 2007. Jacobson Dec. ¶ 17 and Exhibit. 16.

The DIG Arbitration Hearing proceeded as re-scheduled on March 5, 2007. On March 11, 2007, a majority of the Panel issued an Award in the amount of $20,754,990 plus interest in the amount of $1,300,000, in favor of SICH (the "DIG Award"). Jacobson Dec. ¶ 18 and Exhibit 17.

On March 20, 2007, Commercial Risk's party arbitrator, Theodor Dielmann, advised the parties and the other Panel members by email of his withdrawal as arbitrator from the Non-DIG and DIG Arbitrations "[a]fter in-depth deliberation." Jacobson Dec. ¶ 19 and Exhibit 18. Mr. Dielmann's withdrawal email contained no explanation for his withdrawal. Id.

Thereafter, on behalf of the remaining members of the Panel, on March 20, 2007, the Panel's Umpire, Mr. Thirkill, acknowledged Mr. Dielmann's withdrawal as party-appointed arbitrator for Commercial Risk and requested that "Commercial Risk appoint a replacement as soon as possible." Mr. Thirkill also noted, on behalf of the remaining members of the panel, that since the Non-DIG Hearing was not scheduled to start for over three months, there would be no need for a postponement unless the parties agreed otherwise. Jacobson Dec. ¶ 20 and Exhibit 19. In response to Mr. Thirkill's email, SICH's counsel advised that it "[did] not agree to a postponement of the hearing dates." Commercial Risk's counsel responded "Thanks for this, which we have noted." Jacobson Dec. ¶ 21 and Exhibit 20.

In light of Mr. Dielmann's reference to "in depth deliberation," on March 20, 2007, SICH's counsel requested that Commercial Risk's counsel disclose any information or conversations it or its client had with Mr. Dielmann regarding his withdrawal. SICH also

reaffirmed its commitment to the June 25-29 Non-DIG Arbitration Hearing dates.  Jacobson Dec. ¶ 22 and Exhibit 21.  Commercial Risk refused to respond to SICH's request for information about Mr. Dielmann's withdrawal.  Commercial Risk noted SICH's commitment to, but did not confirm that it would proceed on, the scheduled and agreed-upon hearing dates.  Jacobson Dec. ¶ 23 and Exhibit 22.

By letter dated March 27, 2007, SICH's counsel inquired regarding the status of Commercial Risk's appointment of a replacement arbitrator, and advised Commercial Risk that it would seek court appointment of a replacement arbitrator if, within ten days, Commercial Risk did not appoint a replacement arbitrator who satisfied all applicable requirements and was available for a hearing during the week of June 25, 2007.  Jacobson Dec. ¶ 24 and Exhibit 23.  On April 1, 2007, Umpire David Thirkill also inquired regarding the status of Commercial Risk's efforts to appoint a replacement.  Jacobson Dec. ¶ 25 and Exhibit 24.  Mr. Thirkill noted that he and Mr. Haber believed that the replacement should be made as soon as possible.  On behalf of the remaining members of the panel, Mr. Thirkill requested that Commercial Risk advise of the replacement by April 4, 2007.  Id.

By letter dated April 5, 2007, Commercial Risk advised SICH that it had appointed Peter Gentile as arbitrator for the Non-DIG Arbitration.  Jacobson Dec. ¶ 27 and Exhibit 26.  Despite the fact that SICH had selected its party arbitrator, Martin Haber, in its Arbitration Demands and the parties had jointly selected Umpire David Thirkill, and both Messrs. Haber and Thirkill had been accepted by the parties, Commercial Risk requested that SICH confirm its re-appointment of Mr. Haber as arbitrator and advised that, upon such confirmation, Mr. Gentile would contact Mr. Haber to undertake selection of a new Umpire.  Id.

On that same date, Commercial Risk filed a petition in the United States District Court

for the Southern District of New York in connection with the DIG Arbitration, seeking to vacate

the Panel's award. <u>Commercial Risk Reinsurance Co. Ltd. v. Security Ins. Co. of Hartford</u>, No.

07-Civ-2772 (S.D.N.Y. filed April 5, 2007)(Marrero, J.); Jacobson Dec. ¶ 28. Commercial Risk

simultaneously filed an Order to Show Cause for a Preliminary Injunction to prevent SICH from

drawing down on the pre-hearing security posted by Commercial Risk in order to satisfy a

portion of the DIG Award. <u>Id.</u> After considering papers submitted by Commercial Risk and

SICH, and hearing oral argument on Commercial Risk's Motion for a Preliminary Injunction to

restrain SICH from drawing down on pre-hearing security to partially satisfy the DIG Award, on

April 9, 2007, the Court ruled from the bench that Commercial Risk had not satisfied any of the

requirements for injunctive relief and denied Commercial Risk's motion. Jacobson Dec. ¶ 29.

The Court held that:

> In view of what is at stake -- which is essentially a money dispute -- the money
> dispute is literally resolvable by the party that may win on the merits ultimately
> paying back what may have been improperly drawn down, if in fact the plaintiffs
> were to prevail on the merits. I don't see where that irreparable harm comes in.
> Plaintiffs indicate that their view of the irreparable harm enters in the issue of
> what they characterize as the improper or abuse of the process. Again, I'm not
> persuaded that that is the case here. Under the applicable doctrine, the arbitrators
> have a fairly extensive latitude to interpret the scope of arbitration and make
> appropriate rulings concerning on that scope. Those determinations ordinarily are
> entitled to substantial deference by the Court except as has been indicated in the
> cases of clear abuse of legal acts or illegal acts or other forms of impropriety.
>
> I don't believe that there is sufficient evidence that the standard has been met here.
> On those grounds, the issue of whether or not the arbitrators improperly excluded
> evidence, in my view, has not been compellingly demonstrated to the point
> warranting the extraordinary remedy not only of denial of the confirmation of
> [the] arbitration award but also of granting of preliminary injunctive relief.
>
> I also do not believe that the plaintiffs are likely to succeed on the merits given
> the language of the contract that is at issue here, the parties' agreements, and I also
> am not persuaded that there are sufficient issues going to the merits as to make the
> plaintiff's claims later on for litigation and the balance of equities tilting decidedly
> in the plaintiff's favor because the Court believes that in the reading of the
> contract that there is sufficient support in the underlying agreements for the

posting of the letter of credit and for the draw down of the letter of credit absent a
confirmation award.

Jacobson Dec., Exhibit 27 at 25-26.  On April 11, 2007, the Court issued a written Order denying

the Preliminary Injunction Motion.  See Commercial Risk Reinsurance Co. Ltd. v. Security Ins.

Co. of Hartford, No. 07-Civ-2772 (S.D.N.Y. April 11, 2007)(slip op.)(Marrero, J.); Jacobson

Dec., Exhibit 28.

     In order to determine whether Mr. Gentile was qualified to serve as an arbitrator under

the terms of the Treaties, on April 9, 2007, SICH's counsel requested that Mr. Gentile complete

an arbitrator questionnaire in the form that had been used previously by the parties in connection

with Umpire selection. Jacobson Dec. ¶ 30 and Exhibit 29.  Commercial Risk's counsel

responded on behalf of Mr. Gentile and advised that he would not fill out the questionnaire and

provide the requested information until a new panel was constituted.  Jacobson Dec. ¶ 31 and

Exhibit 30.  Commercial Risk's counsel also intimated that it was reneging on its previous

agreement to the June 25-29, 2007 Non-DIG Arbitration Hearing date.  Jacobson Dec., Exhibit

30.  Thereafter, SICH's counsel requested a response directly from Mr. Gentile and, in light of

Commercial Risk's indication that it was unlikely to proceed on the scheduled hearing dates,

queried Mr. Gentile's availability for a hearing on the June 25-29, 2007 dates.  Jacobson Dec. ¶

32 and Exhibit 30.  On April 12, 2007, Mr. Gentile responded to SICH's counsel by email.  He

advised that he would "disclose any potential conflicts at the appropriate time."  He further stated

that Commercial Risk had directed him to contact Mr. Haber to "agree on a process for selecting

the third arbitrator" and that when the third Arbitrator was selected the Panel would meet with

counsel to "select a mutually convenient date for the Arbitration Hearing."  Jacobson Dec. ¶ 33

and Exhibit 31.

     Thereafter, Commercial Risk demanded in writing that SICH appoint an arbitrator within

thirty (30) days, despite the fact that, as Commercial Risk was well aware, SICH had appointed Mr. Haber in its Arbitration Demands.  Jacobson Dec. ¶ 34 and Exhibit 32.

The parties duly selected Messrs. Haber and Thirkill as Arbitrators in accordance with their agreements and duly accepted them as Arbitrators in the Non-DIG Arbitration.  Jacobson Dec. ¶¶ 10-15.  The parties also agreed to proceed with the Non-DIG Arbitration on the June 25-29 dates.  Respondents' attempt to extricate themselves from their agreements by leveraging their appointed arbitrator's unexplained withdrawal into a "do-over" which would delay this arbitration indefinitely, is contrary to the Treaties, the law and the public policy underlying arbitration – which is "to obtain closure in the most efficient, most expeditious, and least costly fashion.  Affidavit of Eugene Wollan, sworn to on April 23, 2007 ("Wollan Aff.") ¶ 14.  It should not be permitted by this Court.

## ARGUMENT

### POINT I

### RESPONDENTS SHOULD BE COMPELLED TO ARBITRATE WITH THE EXISTING UMPIRE ON THE AGREED-UPON HEARING DATES

This Arbitration is governed by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, 9 U.S.C. §§ 201-208 (the "Convention"), because it is not entirely between citizens of the United States.  Section 206 of the Convention provides that "a court . . . may direct that arbitration be held in accordance with . . .[an arbitration] agreement."  The Federal Arbitration Act, 9 U.S.C. §§ 1-16 (the "FAA"), which applies to arbitrations subject to the Convention, absent any conflict with the Convention,[3] has a similar provision:

---

[3]    The FAA and related case law are applicable to the instant Petition through the authority of Chapter 2 of Title 9 of the United States Code, which deems the Convention enforceable.  See 9 U.S.C. §§ 201, 208 (the FAA "applies to actions and proceedings brought under this chapter to the extent that [the FAA] is not in conflict with this chapter or the Convention as ratified by the

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court [with jurisdiction] for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4.  In this case, the parties have a clear agreement in the Treaties to enter into an arbitration process, (see Exhibits 1-5), and within the framework of that process have made additional agreements relating to arbitrators and scheduling.  See Jacobson Dec. ¶¶ 10-13, 17. The parties are thus bound by these agreements, and may be compelled to obey them, if necessary, pursuant to the Convention and the FAA.  See 9 U.S.C. §§ 4, 206.

Because they are clearly dissatisfied with the majority Award rendered in the DIG Arbitration, in which the Umpire likely joined as a matter of logic, Respondents have refused to continue the Non-DIG arbitration with the existing, agreed-upon Umpire – Mr. Thirkill – or pursuant to the agreed-upon schedule.  Pursuant to the Convention and the FAA, Respondents should be compelled to proceed with the Non-DIG Arbitration with Mr. Thirkill as Umpire on June 25-29, 2007, because they agreed to do so.

## A.  The Parties Selected A Panel In Accordance With The Treaties And Are Bound By the Result

Article 32, the arbitration clause of the Treaties (the "Arbitration Clause"), states:

> Upon written request of any party, each party shall choose an arbitrator and the two chosen shall select a third arbitrator.  If either party refuses or neglects to appoint an arbitrator within thirty (30) days after receipt of the written request for arbitration, the requesting party may appoint a second arbitrator.

---

United States"); Yusuf Ahmed Alghanim & Sons v. Toys "R" Us, Inc., 126 F.3d 15, 20 (2d Cir. 1997) (the FAA and the Convention have 'overlapping coverage' to the extent that they do not conflict").  Chapter 2, Title 9 is applicable here because the underlying arbitration agreement arises out of a commercial relationship in which the parties are not all United States citizens.  See 9 U.S.C. § 202.  Both the United States, of which Petitioner and Respondent Commercial Risk Vermont are citizens, and Bermuda, of which Respondent Commercial Risk Bermuda is a citizen, are signatories to the Convention.  See 9 U.S.C. § 201 ("Historical and Statutory Notes").

Exhibits 1-2 at 18-19, Exhibits 3-4 at 16-17, Exhibit 5 at 22-23.  In compliance with this clause, Petitioner appointed Martin Haber as arbitrator in its Arbitration Demands.  Thereafter, Respondents appointed Theodor Dielmann as their arbitrator.  In accordance with the procedure agreed upon by the parties and both Messrs. Haber and Dielmann, and commonly used in reinsurance arbitrations, the parties exchanged lists of acceptable Umpire candidates, narrowed the lists to one mutually acceptable Umpire candidate per party, and through the technological equivalent of a coin toss, selected Mr. David Thirkill as Umpire.  Jacobson Dec. ¶¶ 10-13; Wollan Aff. ¶ 6.

At the organization meeting for the Non-DIG Arbitration on March 28, 2006, the parties formally accepted the Panel consisting of Messrs. Haber, Dielmann and Thirkill, and executed Hold Harmless Agreements confirming that acceptance.  Jacobson Dec. ¶ 15 and Exhibit 15.  Thus, the process for selection of the three-member panel was properly completed and concluded as of March 28, 2006.  There is no reason to undertake that process again.  While the Arbitration Clause does prescribe a mechanism whereby the parties apply to the American Arbitration Association ("AAA") should the two appointed arbitrators fail to agree on a third,[4] that is not the present situation.  Here, the parties, through their party appointed arbitrators, agreed on an Umpire.  That Respondents' appointed arbitrator resigned from service does not rescind the parties' agreement on an Umpire; it merely requires that the vacancy created by the unexplained, voluntary resignation be filled.

---

[4]    "If the two arbitrators fail to agree on the selection of a third arbitrator within thirty (30) days of their appointment, the Company shall petition the American Arbitration Association to appoint the third arbitrator.  If the American Arbitration Association fails to appoint the third arbitrator within thirty (30) days after it has been requested to do so, either party may request a justice of a Court of general jurisdiction of the state in which the arbitration is to be held to appoint the third arbitrator."  See, e.g., Jacobson Dec., Exhibit 2 at 19.

Moreover, even if the parties were to turn to the AAA under the present circumstances (though that is neither called for nor contemplated by the Treaties), the result would be the same. The AAA rules that would be relevant to arbitrator selection in this reinsurance dispute provide that "[v]acancies shall be filled in accordance with the applicable provisions of these rules" which require that "[i]f the agreement of the parties . . . specifies a method of appointing an arbitrator, that . . . method shall be followed." AAA Resolution of Intra-Industry U.S. Reinsurance and Insurance Disputes Supplementary Procedures Rule R-12, R-19. The AAA rules do not provide that the vacancy of a party appointed slot requires removal of a previously selected neutral arbitrator. Thus, application of the AAA rules would simply point to the Treaties' provisions on selection of arbitrators ("each party shall choose an arbitrator"), require that the vacancy be filled accordingly, and direct that the arbitration continue from there. Indeed, the AAA did just this in <u>Arista Marketing Assocs. Inc. v. Peer Group, Inc.</u>, 720 A.2d 659, 669 (N.J. Super. 1998) (where parties in arbitration had agreed to be bound by procedural determinations of AAA, AAA determined that arbitration should proceed after replacement of disqualified arbitrator without disqualifying and re-choosing previously selected third, neutral panel member).

**B.    The Resignation of Commercial Risk's Arbitrator Requires<br>Only His Replacement, Not the Reconstitution of the Entire Panel**

There is simply no basis, in law or contract, for deposing the existing Umpire and reconstituting an entirely new panel as Respondents desire. Absent an express contractual provision to the contrary, where a three-member panel has not deliberated or considered evidence regarding unresolved issues, the withdrawal of one arbitrator does not require a new panel; it merely requires a replacement to fill the gap. <u>See</u> <u>Trade & Transport v. Nat'l Petroleum Charterers</u>, 931 F.2d 191, 196 (2d Cir. 1991). The issue of how to deal with a panel vacancy

when the parties' arbitration agreements do not anticipate one has been litigated numerous times, and this principle of law is clear. See Trade & Transport, supra; Dow Corning Corp. v. Safety Nat'l Cas. Corp., 335 F.3d 742, (8th Cir. 2003); National American Ins. Co. v. Transamerica Occidental Life Ins. Co., 328 F.3d 462, (8th Cir. 2003); Arista Marketing Assocs. Inc. v. Peer Group, Inc., 720 A.2d 659 (N.J. Super. 1998); see also Home Insurance Co. v. Banco de Seguros del Estado (Uruguay), No. 98-Civ-6022, 1999 U.S. Dist. LEXIS 22478 (S.D.N.Y. Feb. 24, 1999). In situations very similar to the instant case, courts have found that reconstituting the entire panel is improper. See, e.g., Trade & Transport, supra, Dow Corning, supra.

In Trade & Transport, a chartering company and a vessel submitted to arbitration over a dispute arising out of their chartering contract. 931 F.2d at 192. Their contract's arbitration clause provided for each side to select an arbitrator, and for those two to pick a third to be chairman of the panel. Id. The chartering company's arbitrator died before the panel could consider evidence or deliberate on the issue of damages. Id. at 194. In response, the chartering company nominated a replacement arbitrator, and then moved before the Southern District of New York to compel its adversary to, likewise, nominate a new arbitrator, claiming that the panel selection process had to start from the beginning. Id. Instead, the court approved the company's replacement arbitrator, refused to compel the selection of a new chairman, and remanded the dispute to the panel as then constituted to continue the arbitration where it had left off. Id. The Second Circuit affirmed. Id. at 196 ("We also agree with the district court's conclusion that NPC's naming a successor to Crocker did not give NPC the right to replace the existing neutral arbitrator agreed upon by NPC's original nominee.").[5]

---

[5]    Moreover, in Trade & Transport, the panel had, before the death of the arbitrator, already decided the issue of liability, and yet the Second Circuit affirmed that a new panel was

Other courts agree with this approach.  In <u>National American</u>, the Eight Circuit, too, held that the withdrawal of a party's arbitrator from a three-member panel does not give that party the right to demand a new neutral arbitrator.  328 F.3d at 464.  In that case, after a dispute arose out of two reinsurance contracts, the parties submitted to arbitration pursuant to clauses very similar to the Arbitration Clause at issue here, and, like here, a three-member panel presided over discovery for a year.  <u>Id.</u> at 463.  When one party's arbitrator resigned for health reasons, that party refused to fill the vacancy and, instead, demanded an entirely new panel.  <u>Id.</u>  On petition of the other party pursuant to Section 5 of the FAA – the provision which permits a court to fill vacancies in arbitration panels absent contractual directives – the district court ordered that "one new arbitrator shall be designated and appointed to serve the remainder of the term of the resigning member of the panel."  <u>Id.</u> at 464.  In affirming, the Court of Appeals noted that the party seeking the new umpire "cannot now use the resignation of its chosen arbitrator to abort the arbitration process."  <u>Id.</u> at 466.

In <u>Arista Marketing</u>, one of two party-appointed arbitrators on a three-member panel was disqualified for bias, pursuant to the AAA rules, which governed the dispute between two companies.  720 A.2d at 663.  After appointing a replacement, one company demanded that the neutral arbitrator, who had been already chosen by the two party-appointed members, be disqualified and a new one selected.  <u>Id.</u>  Although it had no written rule pertinent to the issue of

---

unnecessary because, as the prior decision was final and not reviewable by the panel, any future, unresolved issues (including the issue of damages) could be fairly resolved by the two original arbitrators and the one replacement.  <u>Id.</u> at 195-96.  Here, the only decision the panel made before Mr. Dielmann's resignation related to the Respondents' posting a letter of credit as pre-hearing security.  If a panel that has ruled on <u>liability</u> and then replaced one of its party-appointed members is impartial enough to decide further dispositive issues, certainly a panel that has ruled on an issue of <u>security</u> and then replaced one of its party-appointed members is also impartial enough to decide further dispositive issues.

replacing a disqualified arbitrator, the AAA determined that there was no need to reselect a new neutral, and decided that the arbitration should proceed before the original two arbitrators and the substitute. Id. A New Jersey court confirmed that this was the correct decision, and was affirmed on appeal, when the company sought to restrain the arbitration and disqualify the two arbitrators it did not appoint. Id. The court noted that the disgruntled company had obtained the benefit of participating in the selection of the neutral arbitrator, and found there was "nothing that would support the disqualification of the neutral arbitrator . . . and the consequent re-appointment of an entirely new panel of arbitrators." Id. at 699.

Courts have distinguished, however, between situations where there are no pending applications or ongoing deliberations at the time the arbitrator vacancy arises and where there is ongoing deliberation on an unresolved issue at the time of the vacancy. See Dow Corning, 335 F.3d at 749; Home Insurance, 1999 U.S. Dist. LEXIS 22478 at *4 (distinguishing a circumstance "where one arbitrator dies or becomes incapacitated in medias res," in which case "the parties should begin arbitration anew") (emphasis added). For instance, in Dow Corning, after a three-member panel was assembled, one member resigned due to a conflict and was replaced by the party that nominated him. 335 F.3d at 748. After the panel's ultimate award was challenged in federal court based on the claim that the resignation should have prompted a new panel, not a mere replacement, the court found no basis for vacating the ruling. The court reasoned that "because the substitution occurred before the substantive arbitration hearing, the substitute party-arbitrator participated fully in the hearing, the panel's deliberations, and the preparation of the panel's decision." 335 F.3d at 749; see also Home Insurance, 1999 U.S. Dist. LEXIS 22478 at *21 (where umpire of three-member panel resigned for health reasons before the panel had begun deliberations on phase two of a bifurcated arbitration, district court granted motion to

confirm phase one ruling, denied request for new panel, and then proceeded to consider appointment of replacement umpire for phase two).

Here, all three arbitrators (Mr. Thirkill, Mr. Haber, and Mr. Dielmann's replacement) will be able to fully participate in the upcoming Non-DIG Arbitration hearing, the deliberations, and the decision, because the three original panel members were not mid-deliberation on any issue. Thus, the present case does not warrant appointment of a replacement umpire. See Home Insurance, 1999 U.S. Dist. LEXIS 22478 at * 4; see also Pemex Refinacion v. Tbilisi Shipping Co., No. 04-Civ-02705, 2004 WL 1944450 at * 5 (S.D.N.Y. Aug. 31, 2004) (finding that circumstances "meriting the appointment of a replacement arbitrator [rather than reconstituting a new panel] typically include instances where vacancies have occurred during the very early stages of arbitration or where a panel has rendered a final decision with respect to only some of the issues raised in the arbitration").[6]

As precedent dictates, where, as here, a panel has not deliberated on unresolved issues, a withdrawn arbitrator is simply replaced, allowing the parties to continue the arbitration with the substitute and the two original members presiding.  Trade & Transport, 931 F.2d at 196; Dow Corning, 335 F.3d at 742; National American, 328 F.3d at 465; Arista Marketing, 720 A.2d at

---

[6] Marine Products Export Corp. v. M.T. Globe Galaxy, 977 F.2d 66, 66 (2d Cir. 1992) is easily distinguishable.  There, on a motion to vacate an arbitration award, the Second Circuit affirmed an order requiring an entirely new panel in the situation where a member of a three-person arbitration panel died in the midst of taking evidence and deliberations and before any ruling was issued.  The Second Circuit specifically distinguished the Trade & Transport case: "In this case, unlike Trade & Transport, the original panel had not rendered a final decision on any question prior to the death of a member of the panel."  The distinction drawn by the Second Circuit makes logical sense.  If injected in the middle of deliberations on an issue, a substitute arbitrator would be at risk of forfeiting the benefit of evidence presentation, as well as previous debate and discussion among the other arbitrators, and potentially prejudicing the party who appointed her or him.  Because there is nothing pending in the Non-DIG Arbitration, the logic and holding of Marine Products does not apply here.

659; see also Home Insurance, 1999 U.S. Dist. LEXIS 22478 at *21.

**C.     Policy Considerations Militate Against Permitting
        Commercial Risk To Replace The Umpire They Jointly Selected**

The vacancy at issue here was not caused by death; Mr. Dielmann resigned without

explanation, and Commercial Risk refused to reveal the existence or substance of any

communications with Mr. Dielmann regarding his reason for withdrawing.  While one can

assume that an arbitrator's death cannot be orchestrated by a party, no such assumption can be

made when a party appointed arbitrator, who is retained and remunerated by a party, suddenly

resigns without explanation.

Significantly, the fact that Mr. Dielmann's withdrawal is now being used by Respondents

as an excuse to select a new umpire is highly suspect given that Respondents have expressed

such a level of dissatisfaction with the majority's Award in the DIG Arbitration that they have

moved to vacate it.  Indeed, the timing and secrecy surrounding Mr. Dielmann's withdrawal and

Commercial Risk's unprecedented refusal to proceed with the existing Umpire, compel the

conclusion that Commercial Risk seeks to replace Mr. Thirkill as the Umpire because they

believe that Mr. Thirkill ruled adversely to them in the DIG Arbitration.  See Wollan Aff. ¶¶ 10,

14.

Capitulating to Commercial Risk's apparent machinations would give rise to a host of

potential arbitration abuses.  Requiring replacement of an umpire or constitution of a new panel

every time there is a vacancy would allow a party, if dissatisfied with an interim ruling, to

change the umpire or panel by urging its party appointed arbitrator to withdraw.  Wollan Aff. ¶¶

15-16.  This appears to be exactly what Respondents are attempting to do here, and this Court

should not permit such manipulation.

Other courts have warned of this.  As noted above, the Eighth Circuit affirmed a decision

rejecting one party's argument that the resignation of its arbitrator demanded an entirely new panel, observing that the party "cannot now use the resignation of its chosen arbitrator to abort the arbitration process." National American, 328 F.3d at 465.  In Dow Corning, supra, the court observed that the party advocating a new umpire "well knew, starting over would have deprived [its opponent] of its 'win' in the umpire selection process." 335 F.3d at 749.  The court in Arista Marketing, supra, in distinguishing a case in which the death of an arbitrator led eventually to the selection of a new panel, observed that "[t]he death of an arbitrator, where no one is at fault  is different from circumstances where the actions of one party causes the pre-arbitration disqualification of its designated arbitrator." 720 A.2d at 670.  Those cases make clear that a party dissatisfied with the composition of an arbitration panel cannot exploit the resignation of its own member to secure a second chance at getting a better panel.  Yet Respondents here, now dissatisfied with the choice of Umpire, are seeking to undo the selection process by taking advantage of (and perhaps even directing) the unexplained withdrawal of their own appointed arbitrator.

It is undoubtedly for reasons like this that the ethical rules of the American Bar Association (ABA), the AAA, the A.I.D.A. Reinsurance and Insurance Arbitration Society (ARIAS), JAMS and other arbitration authorities require arbitrators to remain in their positions unless withdrawal is the only fair choice.  See, e.g., Canon 1.H., ABA Code of Ethics for Arbitrators in Commercial Disputes ("Once an arbitrator has accepted an appointment, the arbitrator should not withdraw or abandon the appointment unless compelled to do so by unanticipated circumstances that would render it impossible or impractical to continue."); Canon 1.H., AAA Code of Ethics for Arbitrators in Commercial Disputes (same); Canon IV, ARIAS-U.S. Code of Conduct ("In the event that an arbitrator is requested to withdraw by less than all of

the parties, the arbitrator should withdraw only when one or more of the following circumstances exist. When procedures agreed upon by the parties for resolving challenges to arbitrators have been followed and require withdrawal; If the arbitrator, after carefully considering the matter, determines that the reason for the challenge is substantial and would inhibit the arbitrator's ability to act and decide the case fairly; or If required by the contract or law."); JAMS' Arbitrators Ethics Guidelines, VII.b. ("Except where an Arbitrator is obligated to withdraw or where all Parties request withdrawal, an Arbitrator should continue to serve in the matter.").

As embodied in these ethical rules, public policy concerns dictate that a party should not be allowed to demand a new panel based on the resignation of its own arbitrator, especially when that resignation comes without explanation or good cause. See Wollan Aff. ¶ 15. Respondents have no basis for demanding a change of Umpire in this case, and, pursuant to the Convention and the FAA, should be directed to proceed with Mr. Thirkill, the Umpire jointly selected and accepted by the parties.

**D.    Respondents' Refusal to Arbitrate Is A Delay Tactic That Should Not Be Countenanced; Under The Convention And The FAA, Respondents Should Be Directed to Proceed With The Arbitration On The June 25-29 Dates As They Previously Agreed**

Having already delayed the scheduled hearing once to accommodate their chosen arbitrator, Respondents now hope to delay it again because of his withdrawal. Such manipulation is a factor courts have considered in compelling arbitration where a party is insisting on a new panel. As the Court in National American recognized, "[t]o form an entirely new panel of arbitrators and to start the proceedings anew would cause inappropriate delay and waste resources." National American, 328 F.3d at 464 (affirming existing panel and refusing to allow reselection of neutral).

Having already successfully delayed the scheduled arbitration by over three months, from

its originally agreed March 2007 date to its current June 25, 2007, date, <u>see</u> Jacobson Dec. ¶¶ 17-18, Respondents seek to delay the Non-DIG Arbitration yet again. As reflected in the latest communication from Respondents' newly appointed substitute, Respondents do not intend to abide by their agreement to the June hearing date. <u>See</u> Jacobson Dec ¶ 33 and Exhibit 31.

This Court has the power under the Convention and the FAA to compel Respondents to arbitrate in accordance with their agreements. 9 U.S.C. §§ 4, 206. Because Respondents agreed to proceed with the Non-DIG Arbitration on June 25-29, 2007, this Court should compel them to do so. They should not be rewarded for their dilatory tactics with an adjournment.

**POINT II**

**PETITIONER IS ENTITLED TO AN ORDER APPOINTING A SUBSTITUTE ARBITRATOR WHO IS ELIGIBLE UNDER THE TREATIES AND AVAILABLE <u>ON THE PREVIOUSLY AGREED-UPON HEARING DATES</u>**

Section 206 of the Convention provides that a court with jurisdiction may "appoint arbitrators in accordance with the provisions of [an arbitration] agreement." 9 U.S.C. § 206. Section 5 of the FAA provides in relevant part:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C. § 5 (emphasis added).

Article 32 of the Treaties specifies that "[a]ll arbitrators shall be . . . disinterested in the outcome of the arbitration." Therefore, in the instant case, an implied step in the method for naming or appointing arbitrators is a review of any potential conflicts or interests that a proposed

-22-

arbitrator may have.  SICH is therefore entitled to know whether Peter Gentile, Commercial

Risk's proposed party arbitrator, is, in fact, disinterested in this matter.  Without such assurance,

Mr. Gentile cannot be appointed an arbitrator in accordance with the arbitration agreement.

Both counsel for Commercial Risk and Mr. Gentile individually have indicated an

unwillingness to respond to requests by SICH for Mr. Gentile's potential conflicts.  It is well

established that a proposed arbitrator's professional relationships should be disclosed at the

outset, particularly where the arbitration agreement requires disinterested arbitrators.  Lucent

Technologies Inc. v. Tatung Co., 379 F.3d 24, 29 (2d Cir. 2004).  Refusal to disclose therefore

creates an appearance of bias.  Id.

In accordance with Section 206 of the Convention and Section 5 of the FAA, the Court

should therefore appoint an arbitrator who is willing to participate in the necessary review of

potential conflicts.  See In re Salomon Inc. S'holders' Derivative Litig., 68 F.3d 554, 560 (2d

Cir. 1995) ("[Section 5] applies when an arbitration agreement . . .  specifies a procedure for

selecting an arbitrator, and one of parties refuses to comply, thereby delaying arbitration

indefinitely."); Astra Footwear Industry v. Harwyn Int'l Inc., 442 F. Supp. 907, 910 (S.D.N.Y.

1978) ("[Section 5] was drafted to provide a solution to the problem caused when the arbitrator

selected by the parties cannot or will not perform.").

In substituting a party arbitrator, it is equally important to ensure that a party's proposed

candidate is available to serve on the agreed-upon dates for the hearing.  Despite repeated

requests, SICH has received no response as to whether Mr. Gentile is available to serve on the

specified hearing dates for this matter, which are rapidly approaching.  SICH is therefore left to

assume that Mr. Gentile is not available (and this assumption is borne out by Mr. Gentile's latest

email stating that the hearing will be scheduled for a "mutually convenient date") and requests

that the Court appoint a suitable substitute.

Where parties to an arbitration are unable to select arbitrators pursuant to their contractual methods, as a policy matter, courts will intervene to foster a speedy and fair arbitral proceeding.  See Astra Footwear Industry, 442 F. Supp. at 910; see also Pacific Reinsurance Mgmt. Corp. v. Ohio Reinsurance Corp., 814 F.2d 1324, 1329 (9th Cir. 1987) (where the parties have come to an impasse using the agreed-upon selection method, the court may step in to select an arbitrator).

Thus, pursuant to its authority under section 206 of the Convention and section 5 of the FAA, this Court should direct the appointment of an arbitrator to replace Mr. Dielmann who can demonstrate that s/he is disinterested and unconflicted from fairly adjudicating the dispute, and also is available to preside over the agreed June 25-29, 2007 hearing.  Petitioners are prepared to submit a list of qualified arbitrators, with availability on the scheduled dates, from which the Court can make a selection.

## CONCLUSION

For the foregoing reasons, as well as the reasons set forth in the Petition, the Affidavit of Eugene Wollan and the Declaration of Michele L. Jacobson, Petitioner respectfully requests that this Court issue an Order, pursuant to 9 U.S.C. §§ 4 and 206, granting the Petition, directing Respondents to proceed with the Non-DIG Arbitration Hearing with David Thirkill as the Umpire on June 25-29, 2007 and awarding such other and further relief as this Court deems appropriate. In the event that Respondents' proposed replacement arbitrator is either interested and thus, unqualified to serve pursuant to the Treaties, or unavailable to preside over a hearing on June 25-29, 2007, Petitioner also requests that this Court issue an Order, pursuant to 9 U.S.C. §§ 5 and 206,  appointing a substitute arbitrator on behalf of Respondents from a list to be provided by Petitioner.

Dated: New York, New York
      April 24, 2007

                    STROOCK & STROOCK & LAVAN LLP

                    By: _____
                           Michele L. Jacobson (MJ 4297)
                    *Attorneys for Petitioner*
                    180 Maiden Lane
                    New York, New York 10038
                    (212) 806-5400

Of Counsel:
    Michele L. Jacobson
    Regan A. Shulman
    Andrew Lewner
    Christian Fletcher