# EXHIBIT 13

Page 1

```
---------------------------------x
In the Matter of the Arbitration
          -of-
SECURITY INSURANCE COMPANY OF HARTFORD Itself
and as Successor in Interest to THE FIRE AND
CASUALTY INSURANCE COMPANY OF CONNECTICUT and
THE CONNECTICUT INDEMNITY COMPANY,

            Claimant,

          -against-

COMMERCIAL RISK REINSURANCE COMPANY LIMITED
(BERMUDA) and COMMERCIAL RISK RE-INSURANCE
COMPANY (VERMONT),

      (Non-DIG Arbitration) Respondents.
---------------------------------x
```

            March 28, 2006
            10:05 a.m.
            Stroock & Stroock & Lavan LLP
            180 Maiden Lane
            New York, New York

            ORGANIZATIONAL MEETING
BEFORE:

      DAVID A. THIRKILL, Umpire

      MARTIN D. HABER, ESQ., Arbitrator

      THEODOR DIELMANN, Arbitrator

Reported by:
ANDREW WALKER, RPR (1991)

Page 2

APPEARANCES:

    STROOCK & STROOCK & LAVAN LLP
        Attorneys for Claimant
        180 Maiden Lane
        New York, New York  10038-4982

    BY:  MICHELLE L. JACOBSON, ESQ.
         ANDREW LEWNER, ESQ.

    D'AMATO & LYNCH
        Attorneys for Respondents
        70 Pine Street
        New York, New York  10270

    BY:  JOHN P. HIGGINS, ESQ.

ALSO PRESENT:

    JAMES F. MEEHAN, ESQ.
    Vice President and General Counsel
    Royal & SunAlliance USA

    ANDRE LEFEBVRE
    Financial Risk Officer
    Royal & SunAlliance USA

    JOELLE de LACROIX
    CRP

Page 3

THE UMPIRE: Let's go on the record.

Good morning, ladies and gentlemen. This is the organizational meeting of a dispute between Security of Hartford Insurance Company and Commercial Risk Reinsurance Company Limited, and I think we've all agreed to caption this as, in parentheses, "Non-DIG" to distinguish it from another dispute between the parties which have, in effect, the same cast of characters if different underlying contracts.

I think everybody has got a copy of an agenda that was circulated and, if so, we could move straight to that agenda and item 1, "Disclosures."

The panel, if it's okay with you, would like to use the same disclosures as was disclosed at the previous hearing on the DIG matter. The obvious only update is that whereas before you had not secured an umpire, in this matter

Page 4

Proceedings - 3/28/06
obviously now you have, and it's me. I have no additional disclosures to that.

If none of the other panelists do --

MR. HABER: I have no further disclosures.

MR. DIELMANN: No, none either.

THE UMPIRE: Would that be acceptable to the parties?

MS. JACOBSON: Yes, that's acceptable.

MR. HIGGINS: Yes.

THE UMPIRE: So I thus assume there's no questions of the panel in relation to those disclosures. And would, therefore, ask you to formally accept the panel as it is.

MS. JACOBSON: We accept the panel on behalf of the claimant.

MR. HIGGINS: We do on behalf of respondent.

THE UMPIRE: May I take this opportunity, I understand that there's been some family situation with Mr. --

### Page 5

Proceedings - 3/28/06

1 Bob Lewin, and the panel would like to
2 pass on condolences to him in that
3 regard.
4     MS. JACOBSON: I will pass those
5 along, thank you.
6     THE UMPIRE: I think we had a hold
7 harmless at the last hearing.
8 Presumably somebody's prepared one on a
9 similar basis.
10     MS. JACOBSON: We have.
11     MR. LEWNER: Yes.
12     THE UMPIRE: Go off the record for
13 a second.
14     (Pause in the proceedings)
15     THE UMPIRE: Back on the record.
16     Just for the record, during the
17 break the parties signed — the parties
18 and the panel signed both the hold
19 harmless and a confidentiality
20 agreement.
21     Before we go on to brief
22 statements, what we'd like to do is to
23 go through this organizational meeting
24 and then adjourn that and then stay on

### Page 6

Proceedings - 3/28/06

1 the record for some questions in
2 relation to the security issue, and then
3 we'll go off that record and the panel
4 will meet, and, if necessary, discuss
5 security related to both matters since
6 from a principle viewpoint we believe
7 that the issues are the same.
8     That's what we'd like to do if
9 that's okay with you.
10     MS. JACOBSON: That's fine.
11     MR. HIGGINS: That's fine with us.
12     THE UMPIRE: Thank you.
13     So if we move on, obviously — and
14 thank you, the panel would like to thank
15 the parties for the position statements
16 received, I think they were very clear,
17 as were the exhibits. If you'd like to
18 add anything to it, you should go ahead.
19     MS. JACOBSON: Okay.
20     At the outset — I would like to
21 thank the panel for hearing this matter.
22     At the outset, I want to make
23 clear that although we've been referring
24 to this arbitration as the non-DIG

### Page 7

Proceedings - 3/28/06

1 arbitration, in reality it's really
2 three separate programs, NHE, ORS and
3 HPP, that are all governed by separate
4 reinsurance contracts. Commercial Risk
5 has failed to make payments under three
6 separate reinsurance agreements which
7 covered business written by three
8 program managers with three separate
9 sets of facts. What's notable, really,
10 about Commercial Risk's position
11 statement is what it doesn't say.
12 Although paying lip service to the
13 notion that it's going to satisfy its
14 obligations under the reinsurance
15 agreements, it hasn't done that.
16     Despite the fact that Commercial
17 Risk has been in and audited, it does
18 not share the audit with the panel or
19 with the claimant. What's plain is that
20 Commercial Risk really doesn't have a
21 position, they only intend to use this
22 arbitration proceeding as a means to go
23 fish.
24     We will show that Commercial Risk,

### Page 8

Proceedings - 3/28/06

1 contrary to their position statement,
2 was very involved in these three
3 programs, and that their underwriter
4 participated in joint audits with
5 Security of Hartford. Commercial Risk
6 was in large measure the risk bearer and
7 took that role very seriously. If
8 anyone is an ostrich--and I've taken
9 that from their position
10 statement--that's Commercial Risk now
11 and not Commercial Risk at the time.
12 These reinsurance agreements were all
13 terminated or expired by June 30th of
14 '02 and if, in fact, there were
15 problems, why does it take so long for
16 them to complain?
17     We've asked for prehearing
18 collateral. I don't know if the panel
19 would like me to address that now, but
20 as set forth in our papers we are
21 seeking security in connection with this
22 proceeding.
23     THE UMPIRE: Unless my
24 co-panelists have another decision, if

9

```
 1            Proceedings - 3/28/06
 2     you're talking in a principle sense,
 3     keep going; if you want to get into
 4     details, why don't you leave that to the
 5     post-organizational meeting discussion I
 6     referred to earlier.
 7          MS. JACOBSON: Okay. Well, in
 8     essence, our contention is that under
 9     the reinsurance contracts, each
10     reinsurance contract, there is a
11     provision for security that is
12     unconditional, it's not conditioned on
13     there not being any disputes. So
14     irrespective of whether or not we are in
15     an arbitration proceeding, Commercial
16     Risk is required to post that as a
17     contractual matter. We are seeking that
18     security now, we're calling it
19     prehearing security but, in essence,
20     it's a contractual right which is
21     unconditional, and if the panel would
22     like, I can set aside the numbers
23     discussion for later on.
24          THE UMPIRE: Please.
25          MS. JACOBSON: Thank you.
```

10

```
 1            Proceedings - 3/28/06
 2          THE UMPIRE: Thank you.
 3          MR. HIGGINS: We also would like
 4     to thank the panel for attention.
 5          We agree there are three separate
 6     contracts, three separate contractual
 7     agreements, but we take serious issue
 8     with an implication that we're fishing
 9     here. We did take a limited audit, and
10     that limited audit disclosed several
11     irregularities, to put it mildly, in the
12     underwriting. And those, although there
13     isn't a formal report of this
14     arbitration, we did share the
15     conclusions in broad terms. As a matter
16     of fact, a lot of it has to do with
17     referrals and that sort of thing, and a
18     statement was made by RSA that those
19     referral documents and all the issues
20     relating to the referral question would
21     be delivered to us last year, and we're
22     still waiting for them. So to suggest
23     that we're fishing is, I think, not
24     correct, and shouldn't be given any
25     weight by the panel.
```

11

```
 1            Proceedings - 3/28/06
 2          In terms of the contractual right
 3     to security, I think we can get into the
 4     details of it later. The only statement
 5     we made in support of it at this stage
 6     by Security is--I think there are too
 7     many "securitys" here, but by
 8     Security--is the contractual obligation.
 9     They, in fact, made three arguments; I
10     don't know whether you want me to deal
11     with those at this stage as a matter of
12     principle. I'm happy to if that's the
13     panel's wish.
14          THE UMPIRE: Go ahead.
15          MR. HIGGINS: To begin with,
16     they've cited Section 13 -- was it?
17          MS. JACOBSON: 1213.
18          MR. HIGGINS: -- 1213 of the
19     New York Insurance Law. This has never
20     been used by an arbitration panel. It
21     is clear as to why it's never been used
22     by an arbitration panel because it only
23     applies to court proceedings. All the
24     cases cited are court proceedings,
25     there's no case that's been cited where
```

12

```
 1            Proceedings - 3/28/06
 2     the arbitration panel ordered the
 3     security under 1213 and then the court
 4     approved the arbitrators' act.
 5          They're all cases where there was
 6     a court proceeding, whether it's a
 7     confirmation of an arbitration award or
 8     a motion to compel arbitration, but
 9     there, in every case, is a court
10     proceeding and the judge orders the
11     security to be put up. There's no
12     connection there. And that is a
13     clear -- clearly stated in Section 1213
14     because it refers to the proceeding in
15     which the court or the court where the
16     proceeding is pending, so you don't have
17     an arbitration pending before a court,
18     you may have aspects of it but not the
19     arbitration before the court.
20          Secondly, it's clear that the
21     monies are to be paid into the clerk of
22     the court, and that would only apply to
23     a court proceeding, not to an
24     arbitration proceeding. So it's clear
25     that -- and there's no support for this,
```

Proceedings - 3/28/06

it's clear that that section is utterly irrelevant to this proceeding.

THE UMPIRE: Hold a second.

(Discussion off the record)

THE UMPIRE: I think it would probably be efficient if we ask questions as we go along, if that's okay with the panel.

MR. HIGGINS: That's fine.

MR. HABER: Would you mind looking at Exhibit B of Security's reply brief, please.

MS. JACOBSON: It's also in our --

MR. HIGGINS: The new one?

MR. LEWNER: Yes.

MR. HABER: The case is American Centennial versus Seguros la Republica.

MR. HIGGINS: That's it.

And what's the question?

MR. HABER: Well, I'm looking -- your position, if I understand it correctly, is 1213 does not apply to arbitrations.

MR. HIGGINS: Right.

MR. HABER: Second column of the first page of that says, and I'm reading in the second full paragraph, second to the last sentence, "The contention that the legislature did not intend 1213 to apply to reinsurance must be rejected. In addition, the language of the statute is clear that it applies broadly to any proceeding, including an arbitration proceeding. Accordingly, based on our," and then there's another citation to 1213(c)(1)," "Accordingly, based on our review of this issue, we find no error in the magistrate judge's recommendation and, therefore adopt, that recommendation in full."

Please explain how this case is distinguished and supports your position that 1213 doesn't apply to arbitration.

MR. HIGGINS: Well, it does broadly, as this says, apply to arbitrations in the sense that once it gets to court, just the fact that an underlying procedure is arbitration wouldn't alter the fact, but the judge here ordered the security. It hadn't been, it hadn't been -- the order hadn't been issued by an arbitration panel so we don't have a situation where the arbitration panel ordered it under 1213, so that -- well, number one, that issue would be dicta, but number two --

MR. HABER: Yeah?

MR. HIGGINS: -- number two, this is an underlying procedure, proceeding, this arbitration. And as I said, there are cases where you had a confirmation proceeding in court and before the court would allow a response to the confirmation proceeding, the court ordered that this security be put up under 1213, and there have been cases where there's a motion to compel arbitration, there's very few cases, but motion to compel arbitration where the court ordered the security to be put up before it would allow the respondent to put in a response or an answer, pleading, which is what this refers to, in the court.

MR. HABER: Okay. Could you now go to Exhibit C, which is the next case, which is Northwestern National v. Kansa and I'm looking at the third page, first column under "Request for Bond," and this is the bond that Kansa is supposed to post to security and the last two sentences say, "Accordingly, the parties are instructed to meet and attempt to resolve the amount of the bond to be posted by Kansa. If the parties are unable to reach agreement within two weeks from the date of this order, the arbitration panel will then resolve the issue."

How does that support your position?

MR. HIGGINS: Well, not the issue of whether there'd be security, just the amount. So the court is ordering the security under Section 1213, it isn't assigning that job to the panel, which

**Page 17**

Proceedings - 3/28/06
is what is being suggested by the claimant.
MR. HABER: Are you --
MR. HIGGINS: All that the court is assigning to the parties for agreement or in default to the panel, is the amount of the security.
MR. HABER: I'm trying to understand, so your argument is that it is only a judge who may order the posting of security, not this panel?
MR. HIGGINS: Yes.
MR. HABER: And your authority for that position -- do you have affirmative authority or are you just saying you disagree with any reading of the cases other than your interpretation?
MR. HIGGINS: Well, I don't think there is a disagreement with my interpretation in terms of who ordered the security. Now, there are --
MR. HABER: I'm going to go out -- your opposing counsel I think is.
MR. HIGGINS: That there's

**Page 18**

Proceedings - 3/28/06
security, that there's authority for an arbitration panel ordering security?
MR. HABER: You don't think they've taken that position?
MR. HIGGINS: They have taken that position, there's no authority for it. And I don't think you can read these cases as a matter of fact to interpret them that the panel issued the 1213 order and not a court. In every case, the court ordered the 1213.
MR. HABER: Okay.
MR. HIGGINS: And there is no authority going the other way, simply because the statute is clear.
MR. HABER: Okay.
THE UMPIRE: Let me see if I can clarify that for my own mind.
It's your position that an arbitration panel, per 1213, does not have authority?
MR. HIGGINS: Exactly.
THE UMPIRE: Not an arbitration panel doesn't have authority per se?

**Page 19**

Proceedings - 3/28/06
MR. HIGGINS: We don't contest that.
THE UMPIRE: Thank you.
MR. HIGGINS: There are three grounds here, that's one of them.
The second ground is the ground that there's a contractual obligation, and that was dealt with briefly by Ms. Jacobson. There's a number of arguments against that. The primary argument is that that's final relief, and until we have -- until we have a hearing here, the panel shouldn't be in the business of enforcing one provision of the contract and refusing to enforce the other provisions of the contract. We say it's equally clear that these contracts only cover business which is written in accordance with the underwriting guidelines.
Now, we have to prove that and we'd like an opportunity to prove that, but to say that one provision is clear and, you know, object to the other

**Page 20**

Proceedings - 3/28/06
provision is splitting the contract, and that's final relief. If we are ordered to put up security at the end of the case because the panel has determined that it's part of the relief that security should be granted, then that's what we'll deal with at the time and that's when we'll put up -- we're happy to put up the security at that time. We don't think that at this stage we should be looking at one aspect of the contract and not at the other aspect.
Secondly, the clause only applies to situations where credit for reinsurance is a problem. And there are a number of reasons why we shouldn't be thinking about prehearing security, which presumably would be under the control of the panel, as solving that problem. There's no contractual requirement that we put up security that is in the possession -- or under the control of the panel, for the simple reason that it wouldn't solve the credit

## Page 21

Proceedings - 3/28/06

for reinsurance problem because if it's not unconditional, then the state won't accept it, it's got to be utterly unconditional. So if the panel decides that security is there and it can only be paid over if the judgment provides for that, which is the standard forms for security under the ARIAS forms, then that does Security no good.

Secondly, on that point, we don't believe that there is an obligation under the contract to provide security for the amount that's being sought. Number one, we question the number, because we question our obligation in light of the defenses that we have raised.

Secondly, we question the number based on the security that -- based on the amount of letters of credit that Security is showing on its Schedule F. There is no penalty for this contract, so if there's no penalty, then there's no right to claim a right under the

## Page 22

Proceedings - 3/28/06

contract for a letter of credit which would cure the penalty. The fact that a parent put up letters of credit we would suggest is not a proper way to secure under Schedule F. So the fact that they have chosen to do this, and it cures their problem, is not something that we brought along. The problem is cured? So be it.

The last item -- well, and also, sorry, just to go back to that item, if you look at the amounts claimed on the schedule, number one, they keep changing, and, number two, the schedule is not understandable in terms of what the security should be. It deals with various items, premium items, claim items, and, you know, there are negative items on the funds held, there are positive items on the amount of the losses, Schedule F only deals with losses, so we shouldn't -- you know, we shouldn't be obligated to secure things like return premium or, as they put it,

## Page 23

Proceedings - 3/28/06

overpayment of premium, it's just not covered by the treaty. And I think if you push it all out and give us a credit for the $4 million letter of credit, I'm not sure that we owe them anything, even under their interpretation.

The last argument that's made, and we think it's libelous, is that Commercial Risk doesn't have the wherewithal to satisfy a $6 million letter of credit. We think it's just outrageous for a company like RSA to make against Commercial Risk and ultimately SCOR, to question the ability of SCOR to satisfy a judgment. We trust that that's an argument that's -- an advocate, a lawyer would put forward and not RSA, but it's kind of a sad commentary when that sort of bloody-minded attitude is put forth in an arbitration. We have this much security in these two big companies going at each other for a paltry $6 million, it's just, we think,

## Page 24

Proceedings - 3/28/06

outrageous.

Question was made as to whether a an award would be enforceable in France. That's unsupported by the claimant under French law. I'm not an expert on French law but I do know that France is a signatory of the U.N. Convention for the Enforcement of Foreign Arbitration Awards, so, number one, there wouldn't be any problem going to France and getting it upheld and getting an order confirming the award. As it wouldn't be in this country if we had an arbitration award in France. There's an assumption that civilized countries should recognize their judgments and also should recognize their arbitration awards. So we think that that is also a fairly outrageous statement to make on that issue.

And I think I had another point.

Also, a point was made that there's a case that's been filed in, I think Supreme Court New York, for an

Proceedings - 3/28/06

additional 55 million.

MR. LEWNER: 49.

MS. JACOBSON: 48.

MR. HIGGINS: 48, sorry.

That's -- you know, I think that's utterly improper for anyone to suggest that that has any relevance here. Number one, it's not SCOR France, the parent company, it's SCOR U.S.

Secondly, I think what's being asked is for the panel to not only judge this case but to judge that case as to whether there's any merit to that claim either. We don't know what it's about. I mean they claim they stopped paying losses but, you know, who knows what that dispute is about. It's in court, it's not an arbitration, and the panel here really has no ability to analyze it, to figure out whether it has any application here or whether it affects the ability of the parent company or could affect the ability of the parent company to satisfy this judgment which

---

Page 26

Proceedings - 3/28/06

in this case is going to be, if they get everything they want, $6 million, maybe plus some interest. So that's the arguments we have on the security issue.

THE UMPIRE: Thanks.

Any more questions of John before -- Michelle?

MS. JACOBSON: I believe that Mr. Higgins has actually combined the two security motions because a lot of the references were actually to DIG and I believe that we were here to discuss the non-DIG programs, NHE, ORS and HPP. However --

MR. HIGGINS: I was mistaken, I thought we were discussing -- we were still in the organizational meeting when we were discussing security.

THE UMPIRE: Yes, we're still in the organizational meeting.

MS. JACOBSON: Right.

THE UMPIRE: I understand that there are perhaps some grayish and blurry lines here when we're talking

---

Page 27

Proceedings - 3/28/06

about security because we are going to talk about security relative to both contracts.

MS. JACOBSON: Okay, well, Mr. --

THE UMPIRE: I don't think that's too much of a problem at the moment but please go ahead.

MS. JACOBSON: Okay.

First of all, with respect to Mr. Higgins' attempt to parse the cases with respect to Section 1213, that it was ordered by the court and not the arbitration panel, I thoroughly disagree with that, we've only cited two cases, there are more cases.

If you turn to the actual statute that we've appended to our reply brief with respect to the DIG motion, you will see that, we turn to Exhibit A, page 16 of 19, see under "Bond or Deposit" in general there is a series of cases which deal with Section 1213, the first of which is dealing with an arbitration panel's interim order for prejudgment

---

Page 28

Proceedings - 3/28/06

security.

THE UMPIRE: Hold on, just a second.

MS. JACOBSON: That's the thin one.

THE UMPIRE: It's actually page 15 but at the top --

MS. JACOBSON: Page 15 but it does say page 16 of 19 at the top.

THE UMPIRE: Okay.

MS. JACOBSON: If you look to the very first entry, there it is dealing with an arbitration panel's interim order, it was obviously being reviewed by the court on prejudgment security.

So I think it is clear that 1213 does, in fact, apply to proceedings, it's not limited to litigations, but in any event, if I heard Mr. Higgins correctly, he does not debate that the panel has the inherent authority to issue such awards, even if one were to credit his argument under Section 1213.

Mr. Higgins' statement -- I'd like

Proceedings - 3/28/06

to respond to Mr. Higgins' statements with respect to the contractual provision. He's indicated that, in essence, we're seeking final relief. I mean that's not the case at all. In both of our arbitration proceedings, we're -- certainly we were entitled under these provisions to completely draw down on whatever we had, and we haven't done so. We believe, however, that these amounts should be set aside in escrow, it's not akin to final relief, and we would -- we assert that the contract is clear that it does not limit itself to matters not in dispute; therefore, to the extent that we have reserved and we have paid losses, and that there is IBNR that we have set aside, then they should post those sums in an escrow amount per the terms of the contract.

Mr. Higgins has discussed the Schedule F. I think, frankly, that it's shocking that Commercial Risk did not

Proceedings - 3/28/06

inform the panel that, indeed, it had not posted the $29 million which appears under LOCs. They know they haven't posted that amount. In fact, there is 10.3 million that was as a result of Royal's parent's LOC and to the extent that Commercial Risk has contended that in some regard that's improper, the Delaware Insurance Department, which is Royal Indemnity's domicile, has blessed this very use of the parental LOC. It's contained in the notes of the annual statement of Royal Indemnity. So there is nothing wrong with it.

However, they should not be entitled to take credit for the parental LOC that's out there. Their statement that we solved the problem so that, therefore, they don't have to abide under their contractual obligations is frankly -- I find it absurd.

Now, they express shock and dismay over the fact that we said that they may not have the wherewithal to satisfy any

Proceedings - 3/28/06

award here, and they said that they feel it libelous. Well, to the extent that we know that Commercial Risk has frankly ceased paying on many millions of dollars worth of obligations, we have a problem with that. We don't think it's libelous to assert that maybe that they won't pay; their financial statements show otherwise. They are relying wholeheartedly on this guarantee that has been posted by SCOR? Well, you know, if you take a look at that guarantee, it's addressed to whom it may concern; that's not a contract that anyone can rely on, to whom it may concern.

And I would also indicate that if you look at that SCOR guarantee, one of them is dated July of '99. That's the date of the first DIG contract that we have. That parental guarantee is not slapped on to the back of the reinsurance contract, it is not our -- our reinsurance contract is with

Proceedings - 3/28/06

Commercial Risk, it's signed by Commercial Risk and it's Commercial Risk that we should look to to enforce any obligations under the reinsurance contract.

We, with all due respect, should not have to go off to France to litigate against the parent on a guarantee which is certainly -- I'm not even sure if it's a legal obligation under U.S. law or French law.

And, certainly, I don't think that Security Insurance Company of Hartford should have to engage in ancillary litigation in France to enforce something here and that certainly collateral should be posted.

MR. DIELMANN: I have a question. Mr. Higgins said -- stated that there are -- France is a signatory of the U.N. agreement for enforcing arbitration awards. Is this, indeed, correct, that you have to go to France if the panel, you know, gives you relief or can that

**Page 33**

Proceedings - 3/28/06

award be enforced in this country?

MS. JACOBSON: Well, SCOR, the parent, is not a party to this arbitration. So if this panel -- this panel would have to somehow suck SCOR, the parent, into this arbitration on an alter ego theory.

MR. DIELMANN: But is that not then a formality to have it confirmed in France? I mean what you are implying it seems to me that you basically have to struggle to get it enforced in France but if SCOR is a signatory, then surely the subsidiary -- you would have to just to get it confirmed or do I understand this incorrectly?

MS. JACOBSON: No, I believe, with all due respect, I think you have it incorrectly. I mean here SCOR is not a party to this arbitration; they would not -- there would not be an award entered against SCOR in this arbitration unless they're brought in as a party. Therefore, there would be no award to

**Page 34**

Proceedings - 3/28/06

enforce here or overseas against SCOR. We would have to have an award against Commercial Risk. If Commercial Risk wouldn't pay, then we would be stuck with that parental guarantee and have to chase SCOR somewhere, either by commencing arbitration against SCOR somewhere or by litigating against SCOR somewhere. That's the fear.

MR. HABER: Theo, isn't there a simple solution. If SCOR voluntarily wishes to submit to the jurisdiction of this arbitration panel and be bound by U.S. law and be subject to any judgment, wouldn't that solve the problem?

MR. HIGGINS: That's something that may well happen but I don't have the authority, sitting here, to respond to that, but I'm certainly willing to respond to it in the next day or so.

THE UMPIRE: Let me make sure I understand this, maybe I can --

MR. HIGGINS: I can assure you that we didn't put that guarantee out as

**Page 35**

Proceedings - 3/28/06

something which is illusory.

MR. HABER: Well, not --

MR. HIGGINS: To whom it may concern is the world. It was sent to RSA, it was sent to all the cedents.

MS. JACOBSON: With all due respect, no one in our organization recalls having been brought -- provided with that.

THE UMPIRE: I tell you what, let's move on, I'm happy with understanding where I think we are.

MR. DIELMANN: I haven't really understood what your suggestion, Marty, was.

MR. HABER: Well, my suggestion is this, under American laws with regard to personal jurisdiction, because SCOR, the parent, is not a party here, they are not bound by anything legal.

MR. DIELMANN: Okay.

MR. HABER: They have signed a judgment, they have signed an arbitration treaty, if you will, that

**Page 36**

Proceedings - 3/28/06

says in the event they lose an arbitration in the United States and a judgment is against the parent --

MR. DIELMANN: Right.

MR. HABER: -- that judgment may be enforced in France, not a judgment against their subsidiary.

MR. DIELMANN: Right.

MR. HABER: So your question, in order to respond to your question completely, they would have to be subject to the jurisdiction of this panel and they are not.

MR. DIELMANN: Okay.

MR. HABER: I mean no one here is claiming that SCOR, the parent, is part of this case.

MR. HIGGINS: No, we're not, but it's certainly not clear that anyone would have to go to France. SCOR's doing business everywhere including here.

THE UMPIRE: Let me say something here for a second. As far as I

**Page 37**

Proceedings - 3/28/06
understand it from following Mr. Dielmann's question--I'll leave Mr. Haber's question out of it for the moment--in the event that this panel found in favor of Security of Hartford, that would be against Commercial Risk's both Bermuda and Vermont --

MS. JACOBSON: That's right.

THE UMPIRE: -- where relevant.

If those companies -- and if there were no security, with a small "S," posted, Security of Hartford would look to Commercial Risk for satisfaction of that award. In the event that Commercial Risk failed to satisfy the award, for whatever reason, it's possible that Security could look to the guarantee from SCOR as relief. In order to satisfy that, it would need to write to SCOR and say kindly pay us X amount of dollars. If SCOR said, yes, end of problem; if SCOR said no, however, then I would imagine that Security of Hartford would need to file litigation

**Page 38**

Proceedings - 3/28/06
against SCOR, presumably in France, under the terms of that guarantee. Whether in France or the U.S., it would need to file litigation, I'm just assuming, but what I'm saying, it in France; I would need to fight that litigation in order to secure the award.

Is that a clear understanding of that issue?

MS. JACOBSON: That is correct.

THE UMPIRE: As far as Mr. Haber's question --

MR. HIGGINS: Well, could I just --

THE UMPIRE: Go ahead.

MR. HIGGINS: One caveat to what you just said. In the first instance, it would be up to Security -- or, I'm sorry, Commercial Risk to determine whether they even satisfied the judgment. I mean this is something that only applies if there isn't enough assets, and there's been no proof that there isn't enough assets or that there

**Page 39**

Proceedings - 3/28/06
won't be enough assets. You have to get into the reserving of the company.

THE UMPIRE: In the event that Commercial Risk paid the award that the panel had given, it will be end of story.

MR. HIGGINS: Yes.

THE UMPIRE: In the event that it did not pay, for whatever reason, whether it could, didn't want to or couldn't because it was bust, makes no difference.

MR. HIGGINS: I'm sorry, it does make a difference on the first thing that you said, because you can enforce it against the company if they have the funds. It's entitled to be entered in a court and then enforced, entered as a judgment and then enforced if they don't want to pay. Now, if they're belly up, then that would trigger what you're --

THE UMPIRE: Well, couldn't Security pursue both angles --

MR. HIGGINS: Sure.

**Page 40**

Proceedings - 3/28/06
THE UMPIRE: -- at the point in time, i.e., pursue Commercial Risk, let's assume that it's not in litigation or even if it is, it's against the receiver, and under the parental guarantee, the guarantee I don't think mentions the liquidation scenario, it's just a blanket guarantee, what it's worth is something else, I don't want to get into that issue, but as a matter of law, I think Security could pursue both if they so choose?

MR. HIGGINS: If they believe that it's clear that Commercial Risk can't satisfy it, then they would be -- they would be free to, you know, to litigate under the guarantee and then pursue rights against Security presumably at the same time by filing a liquidation proceeding or however. But the guarantee is a standby, so, first, they'd have to pursue Security, which is normal, and if Security has sufficient funds --

```
                                               41
 1          Proceedings - 3/28/06
 2      THE UMPIRE:  You mean Commercial
 3  Risk?
 4      MR. HIGGINS:  I'm sorry, they have
 5  to pursue Commercial Risk, and if
 6  Commercial Risk has sufficient funds,
 7  then they'd be obligated to pay them.
 8      THE UMPIRE:  Thank you.
 9      As far as Mr. Haber's question is
10  concerned, I would prefer that we didn't
11  raise the issue of bringing in any
12  parties yet until we've gone down
13  through stage one.  I think that's a
14  little premature and I'd like to have
15  panel discussion on that first which we
16  could -- I think that's --
17      MR. HABER:  That's perfectly fine
18  but I think when we deal with the
19  guarantee, and we're assuming facts not
20  in evidence, because it's not clear
21  under American law that this is a valid
22  guarantee, it might be under French law,
23  but we do not have an opinion of French
24  counsel that this is any sort of
25  enforceable guarantee because the first
```

```
                                               42
 1          Proceedings - 3/28/06
 2  sentence says that "SCOR guarantees that
 3  Commercial Risk Reinsurance Company,"
 4  without determining which company,
 5  "shall perform its claims obligations
 6  when due."  If I understand this case,
 7  there are two Commercial Risk
 8  reinsurance companies, correct?
 9      MR. HIGGINS:  Yes.
10      MR. HABER:  Which one does this
11  guarantee apply to?
12      MR. HIGGINS:  Both of them.
13      MR. HABER:  It doesn't say that,
14  they're two separate legal entities, you
15  have not specifically identified -- I
16  don't mean you personally, John, I don't
17  mean it that way, but SCOR has not
18  specifically identified the party whose
19  obligations it is guaranteeing.  In
20  America, under the rules of strictissimi
21  juris that voids this to begin with
22  because you don't have a party whose
23  actual performance is guaranteed without
24  having the party completely identified
25  and here the party isn't.  I think the
```

```
                                               43
 1          Proceedings - 3/28/06
 2  guarantee is questionable.  It may be
 3  perfectly valid under French law, I'm
 4  not suggesting it's not, but there's
 5  clearly no proof before the panel that
 6  it is.
 7      MR. HIGGINS:  Well, that's just
 8  one of them.  The other one names both
 9  companies.
10      MR. DIELMANN:  May I just, you
11  know, just taking on what Mr. Haber
12  said, I mean, well, where is the
13  problem -- to clarify this, even to take
14  out the remotest possibility that SCOR
15  doesn't stand behind their subsidiary,
16  is that, you know, that there is a, a
17  specific guarantee, referring to the two
18  treaties and, if need be, to this
19  particular or the two arbitrations that
20  are currently pending, I mean I do not
21  know whether that is too specific but
22  surely I would say it would take away
23  even the doubts that obviously in the
24  claimant's mind that there may be a risk
25  that SCOR or Commercial Risk will
```

```
                                               44
 1          Proceedings - 3/28/06
 2  talk -- walk away from any award being
 3  given by the panel?
 4      MR. HIGGINS:  That is one thing I
 5  indicated earlier we'd discuss -- what
 6  you're suggesting is make it specific to
 7  these contracts --
 8      MR. DIELMANN:  Yeah.
 9      MR. HIGGINS:  -- and have SCOR,
10  the parent --
11      MR. DIELMANN:  Right.
12      MR. HIGGINS:  -- state that the
13  guarantee covers that specifically.
14      MR. DIELMANN:  Exactly.
15      MR. HABER:  But there's something
16  else, the language in the guarantee says
17  that there's a guarantee that they shall
18  perform its payment obligations when
19  due.  This is a judgment in an
20  arbitration we're looking to be
21  guaranteed, not the performance of a
22  claims obligation when due, because in
23  theory, and only in theory, if this
24  panel ruled in favor of Security of
25  Hartford, we would be ruling that a
```

**45**

Proceedings - 3/28/06

1. claims obligation -- a claims demand
2. made X months ago or X years ago,
3. whenever it was made, was due when made
4. and wasn't paid.
5. This guarantee is unclear in a literal sense as to all of Commercial Risk's obligations. It's only talking about claims obligations when due. It could mean there's judgment--I'm not suggesting it doesn't--but it's -- at this point in time the language is so unclear as to require a court's interpretation. Not the kind of thing you want to bank on to enforce.
6. MR. HIGGINS: Well, I mean the suggestion is that we clarify that to --
7. MR. HABER: A brand --
8. MR. HIGGINS: -- to alleviate those concerns.
9. But, secondly, when you're dealing with guarantees, before you can pursue the parent, you have to enforce the obligation, to the extent you can, against the guaranteeing party.

**46**

Proceedings - 3/28/06

MR. HABER: It depends on the terms of the guarantee. Some are guarantees of payment, some are guarantees of performance. It depends on the guarantee you enter into and what the consideration is for the guarantee. It's a little difficult on the July 1 '99 guarantee to understand how that was consideration for the DIG contract since it was the same date.

The March 9, 2001 guarantee, at least I don't think the panel has seen any evidence as to what the genesis was for that document and what the consideration is.

I'm just saying there are a lot of open questions and as we all well know, if you give a lawyer a chance, they can make a thousand questions out of a one-question issue. And there are really a lot of questions here that are unanswered and I don't think the guarantee says precise -- and clearly, you could clarify it by SCOR issuing a

**47**

Proceedings - 3/28/06

document that says, "Without offset defense or counterclaim, we guarantee the full payment and performance of all debts owed under the two contracts." I'm not saying you agree to that language, I'm not suggesting that; all I'm saying is you could draft a document that was a lot tighter.

MR. HIGGINS: Yes, and that's what I'm going to discuss with the client.

MS. JACOBSON: And I have a comment to that.

We entered into these contracts with Commercial Risk. That is our contracting party. We are entitled to look to Commercial Risk, we're not -- we don't have to look to anyone else, because that's not -- no one else signed that contract; Commercial Risk signed that contract, Commercial Risk Vermont and Commercial Risk Bermuda, those are the folks that we are pursuing in this arbitration. Frankly, these are the only folks that we have a right to

**48**

Proceedings - 3/28/06

pursue in this arbitration and we are entitled to security from them. I don't want other guarantees or that we may pay, you know, the parent stands behind us, I don't think that that does the trick. That's not who we contracted with.

THE UMPIRE: I think it's probably -- now is probably a good time to cut off this particular line of discussion --

MS. JACOBSON: Yeah.

THE UMPIRE: -- (a) because I think we'll start going round again, and (b) I think from a procedural viewpoint what we discussed earlier on is the panel will discuss the issue. It may or may not become relevant.

MS. JACOBSON: Okay.

THE UMPIRE: If it does become relevant, we can revisit it and either make an order or ask the parties to comment some more but I think we've probably added sufficiently enough from

## Page 49

Proceedings - 3/28/06
the principle viewpoint other than my
co-panelist who obviously doesn't agree
with me.
    MR. DIELMANN: No, I do agree with
you.
    THE UMPIRE: Good, let's move on.
    MR. DIELMANN: No, again, I just
have a very specific question. Is that
correct or incorrect that, you know,
Commercial Risk Vermont can -- does have
under Article -- under the security
clause you can take credit or not, and
my question is, you know, does the
contractual obligation in respect of the
security requirement, does that also
refer to Commercial Risk Vermont or not?
    Because I think they only have
to -- have to -- they only, you know,
have to oblige if you can -- if, you
know, Security of Hartford can take
credit, my question is I'm not clear on
this point whether that's correct or
not.
    MS. JACOBSON: I believe that

## Page 50

Proceedings - 3/28/06
Commercial Risk Vermont is an admitted
company.
    MR. DIELMANN: Okay.
    MS. JACOBSON: Authorized,
authorized, I'm sorry.
    MR. DIELMANN: So as far as if
there's a security obligation under the
Article 14, as far as DIG is concerned
and other articles of a similar nature
is concerned, they wouldn't have to post
letters of credit; is that correct?
    MS. JACOBSON: That would be
correct under the security provisions in
the contracts, apart from common law and
statute -- that's correct.
    MR. DIELMANN: And I have another
question that refers to the net funds
held.
    Net funds held --
    THE UMPIRE: Theo, can we leave
that, I was going to ask you your first
question, you've asked it, but I want to
get into those details when we get into
the security discussion.

## Page 51

Proceedings - 3/28/06
    MR. DIELMANN: Okay, fine.
    THE UMPIRE: Maybe if we get back
to the organizational meeting here for a
moment at least.
    I was incorrect at the beginning
here, I moved too quickly, I should have
asked everybody in the room to identify
themselves, so as a break now it might
be a good idea to do that.
    I'll start here and then we'll
move round to the left.
    Obviously, David Thirkill, umpire.
    MR. HABER: Martin Haber,
party-appointed arbitrator for Security
of Hartford.
    MR. MEEHAN: James Meehan, I'm
general counsel for Royal & SunAlliance
USA and its affiliated insurance
companies.
    MR. LEFEBVRE: Andre Lefebvre,
financial risk officer for Royal &
SunAlliance USA.
    MR. LEWNER: Andrew Lewner, from
Stroock & Stroock & Lavan, for claimant.

## Page 52

Proceedings - 3/28/06
    MS. JACOBSON: I'm Michelle
Jacobson, from Stroock & Stroock &
Lavan, for the claimant.
    MR. HIGGINS: John Higgins,
D'Amato & Lynch, for the respondent.
    MS. de LACROIX: Joelle
de Lacroix, CRP.
    MR. DIELMANN: Theo Dielmann,
party-appointed arbitrator for
Commercial Risk Vermont and Bermuda.
    THE UMPIRE: Thank you.
    As far as prehearing motions are
concerned, obviously we have the motion
for security. Are there any other
prehearing motions that anybody wants to
raise at this juncture?
    MR. HIGGINS: Which one are we on?
    THE UMPIRE: We're on the
organizational meeting?
    MR. HIGGINS: Non-DIG.
    THE UMPIRE: Non-DIG.
    MR. HIGGINS: I think we should
discuss the consolidation issue. Should
I deal with that?

**Page 53**

Proceedings - 3/28/06
THE UMPIRE: Please.
MR. HIGGINS: We believe that consolidation -- not consolidation in a literal sense because we don't have or the panel doesn't have the authority under New York or Connecticut law to order parties to consolidate different contracts, so we're not asking for consolidation in a literal sense. What we're asking is for the panel to order that the discovery or disclosure in the hearings be held at the same time. I've seen that in many cases but -- and that's what we're suggesting.

Now, the objection to that, as far as we know, from Security is that we're on a very tight schedule in the DIG arbitration and it will interfere with the ability to complete the schedule and it will cause problems timewise for us to do that. And I think that if that's the case, if that's -- if there's merit to that argument, then we would be willing to yield on that point so long

**Page 54**

Proceedings - 3/28/06
as we don't end up doing the same thing, which is pushing this arbitration, the non-DIG arbitration, along at the same time as the other and, you know, creating the same problem that's being objected to.

So what we would suggest, if the panel wants to entertain it, is that we have -- that we put this one off and have it done after the DIG arbitration. And that's perfectly acceptable to us.

MS. JACOBSON: Okay. Well, we, despite what Mr. Higgins is saying that he's not seeking consolidation, I think, in fact, it would be a de facto consolidation, which is not required either contractually, you know, in any of the agreements, and we don't agree to it and I think that's been made clear.

We agree to consolidate NHE, ORS and HPP--those were actually three separate arbitrations--we agreed to consolidate them into one, having -- leaving us with two arbitrations.

**Page 55**

Proceedings - 3/28/06
There are such disparate facts with respect to each of those programs. In one we have a set of three disparate facts and DIG has its own set of facts. We don't believe that there is that much of a substantial overlap. I believe the contention is violation of underwriting guidelines. The guidelines are different in all of the arbitrations.

If what Mr. Higgins is suggesting is to have the DIG arbitration in December, as scheduled, and then have a later date for the non-DIG, keeping them separate, that's fine with us, and we would propose an end-of-January hearing date if that's acceptable to the panel, just splitting them up, keeping them separate.

THE UMPIRE: Okay, let me make a couple of points. The panel has already chatted datewise at least, and while I don't have the specific dates -- are you okay?

MS. JACOBSON: Yeah.

**Page 56**

Proceedings - 3/28/06
THE UMPIRE: -- while I don't have the specific dates, and we can come to those in a second, the first date we could offer you would be March anyway, and, in effect, since we had already reserved the whole -- the whole week in December, I don't remember the exact dates, but we reserved the whole week and I think the impression that we gained when we discussed this is we'd need all of that time for the DIG arbitration.

MS. JACOBSON: That's right.
THE UMPIRE: I mean just as a matter of fact we want to be able to go --
MR. HABER: December 11th.
THE UMPIRE: December 11th, thank you, Marty.

We wouldn't be able to go until March anyway.

Talking a little more generally, and again I welcome any input from my co-panelists here, since the panel has

**57**

Proceedings - 3/28/06

not heard from either of you relative to discovery issues in relation to the DIG contract, we assume one of two things, either you're getting along famously or you haven't chatted at all but in either case, obviously there's no issues yet before us on that. It would seem to me, as a matter of logic, that if there's auditors going in, just from an efficiency viewpoint, one would imagine that it would make sense for them to sort of look at the two or three if that was feasible but, again, if it is a problem to either of you, please go ahead and organize it as you think best and come to us with any issues as they arise.

As far as dates are concerned -- what was that date again, Marty?

MR. HABER: March 26th is my earlier --

THE UMPIRE: Okay, that's good. I'm free -- are you free?

MR. DIELMANN: Yes.

**58**

Proceedings - 3/28/06

THE UMPIRE: Again, do you think with the three that a week is sufficient?

MS. JACOBSON: I believe so.

THE UMPIRE: So we could reserve off -- if that was okay with you, Mr. Higgins, also, the week of 26th of March '07?

MR. HIGGINS: Should be okay.

THE UMPIRE: Is there anything strange about that --

MR. HABER: 26th is a Monday.

THE UMPIRE: -- apart from it being, the 29th being Mr. Haber's next wedding anniversary after tomorrow?

MS. JACOBSON: We were attempting to figure out which week it was Good Friday and I can't -- according to my list it's wrong. It must be the 23rd.

THE UMPIRE: The 23rd is Good Friday?

MS. JACOBSON: I was just trying to figure it out but apparently the schedule that I have of holidays has to

**59**

Proceedings - 3/28/06

be wrong because I have Easter Sunday being on March 27th in 2007, which it certainly isn't the case.

MR. HABER: That's a Monday.

THE UMPIRE: Let's put it this way, let's reserve that week.

MS. JACOBSON: Yes.

THE UMPIRE: If it so transpires there's a holiday at the end of it and we need to go over to the following week and come back, we'll do that but I think that's important that we at least get it on the calendar.

MS. JACOBSON: I agree with you.

MR. HABER: Unless you want to pick the week of April 2nd and then be sure?

MR. HIGGINS: That's probably better anyway because I get concerned about the suggestion of January but once this one, the DIG one is over, we're going to, you know, we're going to have to shift gears and have some time to prepare papers on the other.

**60**

Proceedings - 3/28/06

THE UMPIRE: I actually have no problem if Mr. Dielmann doesn't with either of those.

MR. DIELMANN: No.

THE UMPIRE: And I don't think it's going to make that much difference.

MS. JACOBSON: If my notes are correct, Passover may be the following week, which is April 2nd, so we would want to do it the 26th.

THE UMPIRE: Okay. Did you hear that, Mr. Higgins?

MS. de LACROIX: I'm trying to look at his journal and it seems that he's going to a seminar in April, but I can't see anything -- I'm sorry.

THE UMPIRE: That's okay. Let's put in the week of the 26th now and if it transpires that it's a big issue either for Easter or Passover, we'll revisit it.

MR. HABER: So we're at the 26th?

THE UMPIRE: 26th.

MR. HABER: Okay, done.

61

1  Proceedings - 3/28/06
2  MR. DIELMANN: Yeah.
3  MR. HIGGINS: So the week of the
4  2nd, April?
5  THE UMPIRE: No, the 26th, there's
6  a question probably of Passover in that
7  week.
8  MR. LEWNER: Passover is the first
9  two days, April 2nd and April 3rd of
10 that year.
11 MS. JACOBSON: We're better off in
12 the March dates it appears.
13 THE UMPIRE: Okay, back to the
14 agenda, I think we're down -- could we
15 take it that the parties would like
16 similar procedural issues to that we
17 discussed and agreed on in the other
18 matter?
19 MR. HIGGINS: Yes.
20 MS. JACOBSON: Yes.
21 THE UMPIRE: And ex parte
22 communication in the same way, I think
23 we said at the filing of the initial
24 prehearing briefs?
25 MS. JACOBSON: Yes.

62

1  Proceedings - 3/28/06
2  MR. HIGGINS: Yes.
3  THE UMPIRE: Dates and locations
4  we've done.
5  MS. JACOBSON: Well, we'll offer
6  to hold -- I don't think we discussed
7  location but we'll offer our --
8  MR. HIGGINS: We can discuss that
9  much later. I prefer to avoid hotel
10 expenses and all the rest of that.
11 MS. JACOBSON: That's why we're
12 offering.
13 THE UMPIRE: The panel will not
14 insist on being in a hotel if the
15 parties can agree on a location.
16 MS. JACOBSON: Okay.
17 THE UMPIRE: And, again, I think
18 we're all agreed in New York --
19 MR. HIGGINS: Yes.
20 THE UMPIRE: -- as before.
21 Please correct my memory if it's
22 incorrect, but I don't think we actually
23 discussed the form of award, whether you
24 want a reasoned award or not in the
25 other matter, and I raise it now, it

63

1  Proceedings - 3/28/06
2  wasn't on the agenda here. If
3  necessary, we could revisit that one
4  officially but if unofficially if we
5  come to the same conclusion here, I
6  think it will be much more efficient.
7  MS. JACOBSON: We would request a
8  reasoned award.
9  MR. HIGGINS: What was that, I'm
10 sorry?
11 MS. JACOBSON: We request a
12 reasoned award.
13 MR. HIGGINS: We agree.
14 THE UMPIRE: Okay. I don't think
15 this particular panel is afraid of
16 writing written awards.
17 So if there's no other matters
18 before this particular organizational
19 meeting panel, we'd like to adjourn it.
20 Do you have any other matters?
21 MS. JACOBSON: I don't believe so.
22 MR. HIGGINS: We don't.
23 THE UMPIRE: So we're going --
24 we'll adjourn the organizational meeting
25 and take a 10-, 15-minute break?

64

1  Proceedings - 3/28/06
2  MR. HABER: 10 is fine.
3  THE UMPIRE: 10 is fine.
4  (Time noted: 11:12 a.m.)

```
                                                          65
1
2           C E R T I F I C A T E
3
4         I, ANDREW WALKER, a Registered
5    Professional Reporter and Notary Public,
6    do hereby certify:
7         I reported the proceedings in the
8    within-entitled matter, and that the
9    within transcript is a true record of
10   such proceedings.
11        I further certify that I am not
12   related, by blood or marriage, to any of
13   the parties in this matter and that I am
14   in no way interested in the outcome of
15   this matter.
16        IN WITNESS WHEREOF, I have
17   hereunto set my hand this_____day
18   of_____, 2006.
19
20        _____
          ANDREW WALKER, RPR
21
22
23
24
25
```