# EXHIBIT 14

## Page 1

```
------------------------x
In the Matter of the Arbitration
            -of-
SECURITY INSURANCE COMPANY OF HARTFORD Itself
and as Successor in Interest to THE FIRE AND
CASUALTY INSURANCE COMPANY OF CONNECTICUT and
THE CONNECTICUT INDEMNITY COMPANY,

                   Claimant,

            -against-

COMMERCIAL RISK REINSURANCE COMPANY LIMITED
(BERMUDA) and COMMERCIAL RISK RE-INSURANCE
COMPANY (VERMONT),

                   Respondents.
------------------------x
```

         February 22, 2006
         10:05 a.m.
         Stroock & Stroock & Lavan LLP
         180 Maiden Lane
         New York, New York

         ORGANIZATIONAL MEETING
BEFORE:

    DAVID A. THIRKILL, Umpire

    MARTIN D. HABER, ESQ., Arbitrator

    THEODOR DIELMANN, Arbitrator

Reported by:
ANDREW WALKER, RPR (1991)

## Page 2

A P P E A R A N C E S:

    STROOCK & STROOCK & LAVAN LLP
        Attorneys for Claimant
        180 Maiden Lane
        New York, New York  10038-4982
    BY: ROBERT LEWIN, ESQ.
        MICHELLE L. JACOBSON, ESQ.

    D'AMATO & LYNCH
        Attorneys for Respondents
        70 Pine Street
        New York, New York  10270
    BY: JOHN P. HIGGINS, ESQ.

ALSO PRESENT:

    BRIAN THIBODEAU, ESQ.
    Senior Counsel
    Royal & SunAlliance

    DENNIS T. HAVER, ESQ.
    Assistant General Counsel
    Royal & SunAlliance

    ANDRE LEFEBVRE
    Financial Risk Officer
    Royal & SunAlliance

    JOELLE de LACROIX
    CRP

## Page 3

Proceedings - February 22, 2006
        THE UMPIRE: Let's all go on the record.
        Good morning, we are at the organizational meeting in the matter of an arbitration between Security Insurance Company of Hartford and others, petitioners, and Commercial Risk Reinsurance Company Limited (Bermuda) and Commercial Risk Re-Insurance Company (Vermont), respondents.
        Let's do an identification of everybody in the room, going this way round. I'll start.
        I'm David Thirkill, umpire in this matter.
        MR. HABER: Martin D. Haber, I'm the party-appointed arbitrator for Security of Hartford.
        MR. THIBODEAU: Brian Thibodeau, senior counsel of Royal & SunAlliance.
        MR. LEFEBVRE: Andre Lefebvre, financial risk officer of Royal & SunAlliance.
        MS. JACOBSON: Michelle Jacobson,

## Page 4

Proceedings - February 22, 2006
Stroock & Stroock & Lavan, for the claimants.
        MR. HAVER: Dennis Haver, assistant general counsel with Security, part of the Royal & SunAlliance group of companies.
        MR. LEWIN: Robert Lewin, from Stroock & Stroock & Lavan, for the claimants.
        MR. HIGGINS: John Higgins, D'Amato & Lynch, for the respondents.
        MS. LACROIX: Joelle de Lacroix, Commercial Risk.
        THE UMPIRE: Thank you.
        MR. DIELMANN: I'm Theodor Dielmann, and I'm the party-appointed arbitrator for Commercial Risk.
        THE UMPIRE: I had circulated an agenda. Does everybody have that or would anybody like a copy?
        We're all good to go. Let's start off with disclosures by the panel. I'll go first.
        As far as my fellow panelists are

5

Proceedings - February 22, 2006
concerned, starting with Mr. Dielmann, whom I've known for 20 years, our first meeting was conducting business between our then respective employers. I've seen him many times particularly in the last five years or so, mainly in social contexts, such as ARIAS meetings and so on. I know there were a number of business dealings between my immediately preceding employer, RiverStone Group, and companies that Mr. Dielmann represented but I was not directly involved in any of those. Mr. Dielmann and I have come close to working together on panels but this is the first time we have ever done so.

As far as Mr. Haber is concerned, I met him first several years ago when he was part of the faculty at an ARIAS intensive training workshop and I was a mere student. I have met him many times, again, in social and ARIAS type contexts and at industry conferences or seminars since. Like Mr. Dielmann, I

6

Proceedings - February 22, 2006
know Mr. Haber and I have come close to working together on panels but this is the first time we have done so. Mr. Haber was a party-appointed arbitrator a number of times, I don't know how many, for companies that were managed or associated with my former employer, RiverStone, but I was never involved in any of those.

As far as counsel is concerned, I've met Mr. Lewin on many occasions, in the last few years particularly. I believe, again, he also has represented some RiverStone or Fairfax associated companies but not anything that I've directly worked on.

Mr. Haver and I have not met prior to this morning although we've known of each other's existence for some years, which I'll come back to in a moment.

I don't believe I've met any of the other representatives heretofore of Security although I did find out that Mr. Lefebvre lives not 20 miles from

7

Proceedings - February 22, 2006
where I live in New Hampshire. I did not know that until this morning.

Mr. Higgins and I, I don't believe we've had the pleasure of meeting, we might have seen each other at ARIAS type contexts, but I don't believe so.

Ms. Lacroix, I believe I've met you somewhere in our careers in reinsurance, I just don't recall where but I know we have met sometime, forgive me if your memory is better than mine.

As far as the parties are concerned, when I was a litigation manager at RiverStone I was involved in what turned out to be quite a complex dispute that did involve Security of Hartford that I believe Mr. Haver was directly involved in managing and, as I say, I was involved in the litigation side of that. We never did meet during it although I think we probably read each other's correspondence quite extensively. It was a matter that did settle eventually, I believe last year.

8

Proceedings - February 22, 2006
I was also involved at RiverStone in trying to resolve some business issues such as commutations and so on with a company, my memory tells me it's Connecticut Indemnity, an affiliate of Security of Hartford, for yet another affiliate of the Fairfax group.

As far as Commercial Risk is concerned, either of the companies, I have had no business relationship with them.

Now, my memory may be slightly incorrect here when I was putting together these disclosures but I think that when Commercial Risk first opened its doors in Bermuda, it was in the same building, ironically enough the Continental Insurance building, that I worked in for a former employer of mine called Forum Re. And I did know well, I can't recall whether he was then president or at least a senior officer in the company, a man called Graham Pewter. Which leads me to add that I

## Page 9

Proceedings - February 22, 2006

1. don't know that this amounts to a
2. disclosure yet but as I read the briefs,
3. it did occur to me that if either or
4. both sides call witnesses that have a
5. Bermudian connection, such as
6. individuals from Commercial Risk, from
7. Legion Insurance Company, or from
8. H&H Park, the brokers involved here, I
9. may well know them personally because I
10. lived in Bermuda twice so I'm just
11. giving predisclosure of that were it to
12. come up.
13. I would add that during my over
14. 35 years' career in the reinsurance
15. business, which included over 25 years
16. as a reinsurance underwriter, I know
17. that I was involved in business
18. relationships, I could not specify them
19. at all here, that would involve
20. virtually all of the companies here on a
21. reinsurance or ceded or assumed basis
22. other than Commercial Risk, I don't
23. think anything there.
24. Those are my disclosures.

## Page 10

Proceedings - February 22, 2006

1. Obviously I welcome any questions.
2. MR. LEWIN: We have no questions.
3. MR. HIGGINS: We have no questions.
4. THE UMPIRE: Thank you.
5. MR. HABER: Thank you.
6. Again, I'm Martin Haber, party-appointed arbitrator for Security of Hartford in this matter.
7. First as to my colleagues, I will reiterate exactly what Mr. Thirkill has said about our relationship. I have nothing really further to add to that.
8. Mr. Dielmann and I met, I guess this is the second time of our face-to-face meeting on his last trip when this -- to America when this case was first starting, he and I did met for lunch and we had a very pleasant discussion about how we would be working together on this matter.
9. The only other disclosure I have is, with regard to Mr. Dielmann, is there is another case pending involving

## Page 11

Proceedings - February 22, 2006

the same two parties but different transactions where he and I are both party-appointed arbitrators, and the counsel is the same, the only difference is we don't have an umpire.

And that's my disclosures as to the panel.

As to Security of Hartford and the Royal & SunAlliance Group, let me preface my disclosures by saying in my former life I was general counsel to the Continental Corporation, that means every person in this room has either sued me, been sued by me, engaged in reinsurance transactions with us, both as cedent and assuming company. I have no recollection of any of that but if someone wishes to remind me, I will search my memory and disclose as much as I can recollect.

I believe disclosure is an ongoing obligation and I will endeavor to disclose everything necessary to the point of boredom for all of you up

## Page 12

Proceedings - February 22, 2006

through the final judgment or settlement of this case.

With regard to Security of Hartford, as I said, there are two other cases -- there was one other case pending, and in 1998, prior to the purchase of Security of Hartford by the Royal & Sun group, I think they had a premium finance dispute in the State of South Carolina and I was hired by the Orion Capital Group, which was the prior owner, as an expert witness regarding premium financing. That case settled in 1998.

With regard to SCOR, there were three matters, one of which is pending but I am told is inches away from settlement and there is a settlement negotiation going on now between SCOR and the other party. No counsel in this room is involved and substantively there are no issues that I know that are similar.

The Royal cases were the other

13

```
1       Proceedings - February 22, 2006
2    things, as I said, that I've disclosed.
3       With regard to D'Amato & Lynch,
4    there were a total of three cases in
5    which I was involved, other than this
6    one. One is the other Royal case as
7    mentioned previously. We had a case
8    where I was appointed for a client
9    opposite to D'Amato & Lynch's client
10   that settled in February of 2001, and
11   another case that went to judgment in
12   February of 2004.
13      As to the Stroock law firm, there
14   were nine matters in total where I was
15   involved. Of the nine matters, with the
16   exception of one where I was appointed
17   by a client opposed to Stroock's client,
18   I have been appointed by Stroock in, as
19   I said, eight other matters.
20      Of the eight matters, two matters
21   are pending and -- not counting the
22   Royal cases. And I am told one of those
23   two matters might be settling but,
24   again, no one has told me anything more
25   specific, and in the two matters that
```

14

```
1       Proceedings - February 22, 2006
2    are pending, we've not even appointed an
3    umpire yet so I have no idea how that's
4    going to go.
5       Four of the matters went to
6    judgment and two others were settled.
7       And those are the sum total of my
8    Stroock disclosures.
9       I am pleased to answer -- oh, yes,
10   one other thing, Mr. Haver and I know
11   each other probably north of 25 years.
12   When he was employed solely by the Royal
13   and when the Royal was here in New York,
14   we were involved in various lobbying
15   efforts, for want of a better term,
16   involving the American Insurance
17   Association.
18      And I believe those are the sum
19   total of my disclosures and I'm pleased
20   to answer any questions.
21      Mr. Lewin?
22      MR. LEWIN: No questions.
23      MR. HAVER: Just for the sake of
24   this, my recollection is you served as
25   an umpire involving The Fire and
```

15

```
1       Proceedings - February 22, 2006
2    Casualty Insurance Company in an
3    arbitration and The Fire and Casualty
4    Company is a --
5       MR. HABER: I'm sorry, you're
6    absolutely right, let me amend.
7       There was another arbitration that
8    did, in fact, go to judgment. My
9    problem is because so many companies
10   have so many subsidiaries it's very
11   difficult to remember, but I thank
12   Mr. Haver for reminding me. I was the
13   umpire in a case that went to judgment
14   three years ago, I'm going to say,
15   involving a different affiliate and
16   another company involving transactions
17   in California that have nothing to do
18   with this.
19      MR. HIGGINS: No questions.
20      MR. LEWIN: We have no questions.
21      THE UMPIRE: Let me supplement
22   mine with two things that you jogged my
23   memory on there.
24      One is the panel that you're
25   talking about earlier on with
```

16

```
1       Proceedings - February 22, 2006
2    Mr. Dielmann, I believe that I filled up
3    a questionnaire form or the same
4    questionnaire form as was filled up for
5    this one. I'm delighted to hear that an
6    umpire hasn't been selected. Which also
7    leads me -- as far that umpire
8    questionnaire form, and I'm sorry I
9    forgot to mention it earlier, but I
10   believe and my hope is that I put on the
11   original questionnaire form is that I am
12   currently an umpire in a matter where
13   Stroock & Stroock & Lavan's West
14   Coast -- a West Coast office, so Jim
15   Fitzgerald, I don't remember which
16   particular office, is the counsel. I do
17   not know who nominated me for that but I
18   believe I put it on the questionnaire
19   form, I just forgot it this morning.
20   Sorry.
21      MR. DIELMANN: Compared to my
22   esteemed co-panelists, I am just a blank
23   sheet, so I can cut this short.
24      As far as the panel is concerned,
25   you've heard what they said, there is
```

17

1   Proceedings - February 22, 2006
2   nothing to add other than to say who
3   doesn't know Marty has never been to an
4   ARIAS meeting.
5       As far as the parties are
6   concerned, I have no relationship
7   whatsoever other than, you know, this
8   particular arbitration.
9       As far as the legal counsel are
10  concerned, you know, it both comes back
11  to when I did my round I think four or
12  five years ago, I visited both
13  Mr. Higgins and some gentleman from
14  Stroock & Stroock. Somehow, I do not
15  know how they -- Mr. Higgins dug up my
16  name again, but there is a present that
17  I still have in my cupboard, a T-shirt
18  with Stroock & Stroock on it, but the
19  color doesn't suit me so well so I
20  haven't put it on yet.
21      So this is all I have to say.
22      MR. HIGGINS: We have baseball
23  hats.
24      MR. LEWIN: What color?
25      MR. DIELMANN: It was black.

18

1   Proceedings - February 22, 2006
2       THE UMPIRE: The umpire refuses to
3   wear a black hat.
4       MR. LEWIN: We have no questions.
5       THE UMPIRE: Any questions of
6   Mr. Dielmann?
7       MR. HIGGINS: No questions.
8       THE UMPIRE: So can I take it that
9   the parties accept the panel as
10  constituted?
11      MR. LEWIN: Yes.
12      THE UMPIRE: And has -- thank you.
13      Has either of you prepared hold
14  harmless forms, the customary ARIAS
15  type?
16      MR. LEWIN: Yes. Would you like
17  to sign them?
18      THE UMPIRE: We'd be very
19  grateful.
20      MR. LEWIN: Do you want us to take
21  a moment to sign this and the
22  confidentiality, should we do this at
23  the same time or is that acceptable?
24      THE UMPIRE: If that's okay with
25  you?

19

1   Proceedings - February 22, 2006
2       MR. HIGGINS: I just have a couple
3   questions on the confidentiality.
4       THE UMPIRE: Okay, why don't you
5   do the hold harmless and then we'll do
6   the confidentiality.
7       MR. LEWIN: Fair enough.
8       THE UMPIRE: Did you want to go
9   ahead with comments on the
10  confidentiality?
11      MR. HIGGINS: We did discuss, I
12  did discuss with an associate from
13  Stroock, who is not here today, the
14  one -- the change that they indicated
15  they wanted which was disclosure
16  essentially only on a judgment -- I'm
17  sorry, on a court order which would
18  require it, disclosure. And some other
19  provisions in the original agreement.
20  We don't have a problem with that.
21      We'd like to make sure that to the
22  necessary extent reinsurers can be made
23  aware of this arbitration if we need to
24  give reinsurers information, you know,
25  in the ordinary course of business that

20

1   Proceedings - February 22, 2006
2   provides for auditors.
3       Does anyone have a problem with
4   that?
5       MS. JACOBSON: Actually, it's the
6   typical ARIAS form which provides that
7   you may disclose to retrocessionaires.
8       MR. HIGGINS: Where is that?
9       MS. JACOBSON: Let me give you a
10  copy, John.
11      MR. HABER: Michelle, out loud for
12  the record.
13      MS. JACOBSON: 3(a) says,
14  "Disclosure of arbitration information
15  may be made: (a) to the extent necessary
16  to obtain compliance with any interim
17  decisions or the final award herein, or
18  to secure payment from
19  retrocessionaires." So the form would
20  provide for that.
21      MR. HIGGINS: Okay.
22      The other question I had, the form
23  talks about disclosures pursuant to
24  subparagraphs (a) and (c), it seems to
25  me to be a bit onerous or complicated